[This opinion has been published in *Ohio Official Reports* at 86 Ohio St.3d 451.]

THE STATE EX REL. OHIO ACADEMY OF TRIAL LAWYERS ET AL. *v.* SHEWARD, JUDGE, ET AL.

[Cite as *State ex rel. Ohio Academy of Trial Lawyers v. Sheward*, 1999-Ohio-123.]

*Tort reform—Am.Sub.H.B. No. 350 unconstitutional in toto—Standing—Where object of an action in mandamus and/or prohibition is to procure the enforcement or protection of a public right, the relator need not show any legal or special individual interest in the result.*

1. Where the object of an action in mandamus and/or prohibition is to procure the enforcement or protection of a public right, the relator need not show any legal or special individual interest in the result, it being sufficient that the relator is an Ohio citizen and, as such, interested in the execution of the laws of this state.

2. Am.Sub.H.B. No. 350 usurps judicial power in violation of the Ohio constitutional doctrine of separation of powers and, therefore, is unconstitutional.

3. Am.Sub.H.B. No. 350 violates the one-subject provision of Section 15(D), Article II of the Ohio Constitution, and is unconstitutional *in toto*.

(No. 97-2419—Submitted September 29, 1998—Decided August 16, 1999.)

IN PROHIBITION AND MANDAMUS.

————————————

{¶ 1} On November 20, 1997, relators, Ohio Academy of Trial Lawyers ("OATL"), Ohio AFL-CIO, Richard Mason, and William A. Burga, filed an original action in prohibition and mandamus in this court against six Ohio common pleas court judges "in their official capacities and representing those similarly

situated."[1]  Relators assert eight claims, one primary and seven ancillary, challenging the constitutionality of Am.Sub.H.B. No. 350 of the 121st Ohio General Assembly.[2]

{¶ 2} Relators' primary claim is that Am.Sub.H.B. No. 350 constitutes an improper legislative usurpation of judicial power, and an intrusion upon the exclusive authority of the judiciary, in violation of Section 32, Article II, and Sections 1, 5(A)(1) and (B), Article IV of the Ohio Constitution.  Relators allege that many provisions of Am.Sub.H.B. No. 350 conflict with various rules of evidence, rules of civil procedure, and decisions by this court declaring that such provisions are invalid, and thus "[t]he General Assembly, in passing Am.Sub.H.B. 350, * * * violated the constitutional separation of powers."

{¶ 3} In their ancillary claims, relators maintain that Am.Sub.H.B. No. 350

---

1. According to the complaint, OATL is a voluntary association of over two thousand lawyers who primarily represent plaintiffs in civil actions throughout Ohio.  According to its Code of Regulations, OATL's objectives are "to uphold and defend the Constitution of the United States; to advance the science of jurisprudence; to educate the bar and the general public in all fields and phases of advocacy; to promote the administration of justice for the public good; to uphold the honor and dignity of the profession of the law; to encourage fellowship among the members of the bar; to uphold and approve the adversary system and trial by jury; and to advance the cause of those who are damaged in person or property and who must seek redress therefor."

Ohio AFL-CIO states that it is composed of one thousand five hundred local labor unions, forty-three central bodies, and eight hundred fifty thousand members, and that its "primary purpose is to represent the rights and interests of working people on a wide variety of public policy issues and before various units and branches of the government of the State of Ohio."

Mason and Burga, each of whom identifies himself as "a citizen and taxpayer in the State of Ohio," are, respectively, the Executive Director of OATL and the President of the Ohio AFL-CIO.

The named respondents are Richard S. Sheward and Dale A. Crawford, both judges of the Franklin County Court of Common Pleas; John W. Kessler and Jeffrey E. Froelich, both judges of the Montgomery County Court of Common Pleas; Richard J. McMongle, presiding judge of the Cuyahoga County Court of Common Pleas; and Norman A. Fuerst, retired judge of the Cuyahoga County Court of Common Pleas, who was succeeded in office and replaced as a party by Nancy Fuerst.  81 Ohio St.3d 1463-1464, 690 N.E.2d 1284-1285.

2. Am.Sub.H.B. No. 350, 146 Ohio Laws, Part II, 3867, was passed by the Ohio Senate on September 11, 1996, and by the Ohio House of Representatives on September 26, 1996.  The bill was signed into law by former Governor George Voinovich on October 28, 1996, and took effect on January 27, 1997.

was passed in violation of Section 15(D), Article II of the Ohio Constitution, providing that "[n]o bill shall contain more than one subject," and that various aspects of the legislation violate the following provisions of the Ohio Constitution: right of trial by jury (Section 5, Article I), damages for wrongful death (Section 19a, Article I), right to remedy (Section 16, Article I), equal protection and prohibition of special privileges (Section 2, Article I), and prohibition of retroactive laws (Section 28, Article II).

{¶ 4} Relators seek (1) a writ of prohibition preventing respondents from implementing those provisions in Am.Sub.H.B. No. 350 that intrude on judicial authority, (2) a writ of mandamus ordering respondents to follow "the rules of civil procedure, the rules of evidence, the relevant constitutional decisions and common-law [causes of action] * * *, notwithstanding contrary provisions in Am.Sub.H.B. 350," and (3) pursuant to their ancillary claims, an order declaring that Am.Sub.H.B. No. 350 violates the Ohio Constitution and enjoining its implementation.

{¶ 5} Along with their complaint, relators filed a memorandum in support of the issuance of a peremptory writ in prohibition and mandamus and certification of a respondent class consisting of sitting Ohio trial judges. On November 26, 1997, Attorney General Betty D. Montgomery filed a motion for leave to intervene. On December 1, 1997, Judges Sheward and Crawford filed a memorandum opposing relators' petition for a peremptory writ pending the filing of a motion to dismiss. On December 15, 1997, Judge Sheward and Attorney General Montgomery filed separate motions to dismiss on the basis that relators lack standing, that this court is without jurisdiction to grant declaratory or injunctive relief, and that relators have failed to satisfy the requirements for the issuance of a writ of prohibition or mandamus.

{¶ 6} On February 25, 1998, we granted an alternative writ, 81 Ohio St.3d 1226, 689 N.E.2d 971, and set forth a schedule for the presentation of evidence and

briefing. On March 9, 1998, we denied class certification and granted Attorney General Montgomery leave to intervene. 81 Ohio St.3d 1463, 690 N.E.2d 1284.

{¶ 7} On March 10, 1998, relators moved to quash subpoenas issued by Attorney General Montgomery on March 5, 1998, for the purposes of discovery. On March 12, 1998, Attorney General Montgomery filed a motion to compel and a memorandum in opposition to relators' motion to quash. On March 19, 1998, we granted relators' motion to quash and denied the Attorney General's motion to compel. 81 Ohio St.3d 1255, 691 N.E.2d 1050.

―――――――――――

*Don C. Iler Co., L.P.A.,* and *Don C. Iler; Robert S. Peck; E.S. Gallon & Associates* and *James D. Dennis,* for relators Ohio Academy of Trial Lawyers and Richard Mason.

*Stewart R. Jaffy & Assoc. Co., L.P.A., Stewart R. Jaffy* and *Marc Jaffy,* for relators Ohio AFL-CIO and William A. Burga.

*Ron O'Brien,* Franklin County Prosecuting Attorney, and *Jeffrey L. Glasgow*, Assistant Prosecuting Attorney, for respondents Judge Richard S. Sheward and Judge Dale A. Crawford.

*Mathias H. Heck, Jr.,* Montgomery County Prosecuting Attorney, *Chris R. Van Schaik* and *Walter F. Ruf*, Assistant Prosecuting Attorneys, for respondents Judge John W. Kessler and Judge Jeffrey E. Froelich.

*William D. Mason,* Cuyahoga County Prosecuting Attorney, *Carol Shockley* and *Robert E. Matyjasik*, Assistant Prosecuting Attorneys, for respondents Judge Richard J. McMonagle and Judge Nancy A. Fuerst.

*Betty D. Montgomery*, Attorney General, *Arthur J. Marziale, Jr., Judith L. French* and *Stephen P. Carney*, Assistant Attorneys General, for intervening respondent Ohio Attorney General Betty D. Montgomery.

*Spater, Gittes, Schulte & Kolman* and *Frederick M. Gittes,* urging the granting of writs of prohibition and mandamus for *amici curiae* Ohio Employment

Lawyers Association, the Columbus Chapter of the National Conference of Black Lawyers, Ohio Civil Rights Coalition, Ohio NOW Education and Legal Fund, Committee Against Sexual Harassment, and Ohio Environmental Council.

*Murray & Murray Co., L.P.A.,* and *James T. Murray,* urging the granting of writs of prohibition and mandamus for *amicus curiae* Ohio Citizen Action.

*Manley, Burke, Lipton & Cook, Andrew S. Lipton* and *Johnathan M. Holifield,* urging the granting of writs of prohibition and mandamus for *amici curiae* Ohio Conference of Branches for the National Association for the Advancement of Colored People, and the Cincinnati, Columbus, and Dayton Branches of the National Association for the Advancement of Colored People, and the Armco Employees Independent Federation, Inc.

*Hermanies, Major, Castelli & Goodman* and *Ronald D. Major,* urging the granting of writs of prohibition and mandamus for *amicus curiae* Ohio State UAW-CAP Council, John F. Burke, Jr., and Vernon L. Traster.

*Blaugrund, Herbert & Martin Incorporated, Steven A. Martin, Teri G. Rasmussen, Christopher T. Cline* and *Stephen P. Postalakis,* urging denial of writs of prohibition and mandamus for *amicus curiae* Ohio Society of Certified Public Accountants.

*Vorys, Sater, Seymour & Pease, L.L.P., John C. Elam* and *Duke W. Thomas,* urging denial of writs of prohibition and mandamus for *amicus curiae* Owens Corning.

*Crowell & Moring, L.L.P., Victor E. Schwartz, Mark A. Behrens* and *Jeffrey A. Spector,* urging denial of writs of prohibition and mandamus for *amici curiae* Product Liability Advisory Council, Inc., National Association of Manufacturers, and American Tort Reform Association.

*Gibson, Dunn & Crutcher, L.L.P.,* and *Theodore J. Boutrous, Jr.,* urging denial of writs of prohibition and mandamus for *amicus curiae* American Council of Life Insurance.

*Arter & Hadden, L.L.P.,* and *Irene C. Keyse-Walker*, urging denial of writs of prohibition and mandamus for *amici curiae* Ohio Association of Civil Trial Attorneys and Defense Research Institute.

*Isaac, Brant, Ledman & Teetor, Mark Landes* and *Paul A. MacKenzie,* urging denial of writs of prohibition and mandamus for *amici curiae* County Commissioners' Association of Ohio, Ohio Municipal League, Ohio Township Association, and Public Children Services Association.

*Schottenstein, Zox & Dunn* and *Roger L. Sabo*, urging denial of writs of prohibition and mandamus for *amici curiae* American Institute of Architects (Ohio), Associated General Contractors of Ohio, National Electric Contractors Association (Ohio Chapter), Ohio Association of Consulting Engineers, Ohio Contractors Association, Ohio Home Builders Association, Ohio Mechanical Contracting Industry, and Ohio Roofing Contractors Association.

*Larry R. Gearhardt,* urging denial of writs of prohibition and mandamus for *amici curiae* Ohio Farm Bureau, National Federation of Independent Businesses, and Ohio Small Business Council.

*Squire, Sanders & Dempsey, L.L.P., Robin G. Weaver* and *Thomas G. Kovach*, urging denial of writs of prohibition and mandamus for *amici curiae* Chemical Manufacturers Association and Ohio Chemical Council.

*Bricker & Eckler, L.L.P., Randolph C. Wiseman* and *Kurtis A. Tunnell*, urging denial of writs of prohibition and mandamus for *amici curiae* Fowler Products, Inc. et al.

*Fredric J. Entin* and *James A. Henderson; Bricker & Eckler, L.L.P., James J. Hughes, Jr.,* and *Catherine M. Ballard; Hahn, Loeser & Parks, L.L.P., Terri-Lynne B. Smiles* and *Richard W. Cline,* urging denial of writs of prohibition and mandamus for *amici curiae* American Hospital Association et al.

*Thomas L. Froehle,* urging denial of writs of prohibition and mandamus for *amicus curiae* Ohio Manufacturers' Association.

*Spengler Nathanson, P.L.L.,* and *Truman A. Greenwood,* urging denial of writs of prohibition and mandamus for *amicus curiae* American Legislative Exchange Council.

_____

**ALICE ROBIE RESNICK, J.**

**I**

**Am.Sub.H.B. No. 350 Converts the Drive for Civil Justice Reform into an**

**Attack on the Judiciary as a Coordinate Branch of Government**

**{¶ 8}** For more than a decade, Ohio has been home to an ongoing conflict over the necessity and propriety of transforming the civil justice system. In its most elementary form, this conflict reflects a power struggle between those who seek to limit their liability and financial exposure for civil wrongs and those who seek compensation for their injuries. Research indicates that there is a vast amount of scholarly analysis available on either side of virtually every conceivable aspect of this debate.[3] All arguments going to the soundness of legislative policy choices,

_____

3. See, *e.g.,* Development in the Law: Jury Determination of Punitive Damages (1997), 110 Harv.L.Rev. 1513; Eisenberg, Goerdt, Ostrom, Rottman & Wells, The Predictability of Punitive Damages (1997), 26 J. Legal Stud. 623; Werber, Ohio Tort Reform Versus the Ohio Constitution (1996), 69 Temple L.Rev. 1155; Wade, Should Joint and Several Liability of Multiple Tortfeasors Be Abolished? (1986), 10 Am.J. Trial Adv. 193; Learner, Restrictive Medical Malpractice Compensation Schemes: A Constitutional "Quid Pro Quo" Analysis to Safeguard Individual Liberties (1981), 18 Harv.J. on Legis. 143; Bovbjerg, Sloan, Dor & Hsieh, Juries and Justice: Are Malpractice and Other Personal Injuries Created Equal? (1991), 54 L. & Contemp. Probs. 5; Croley & Hanson, What Liability Crisis? An Alternative Explanation for Recent Events in Products Liability (1991), 8 Yale J. of Reg. 1; Hans & Lofquist, Jurors' Judgments of Business Liability in Tort Cases: Implications for the Litigation Explosion Debate (1992), 26 L. & Soc. Rev. 85; Kinney, Gronfein & Gannon, Indiana's Medical Malpractice Act: Results of a Three-Year Study (1991), 24 Ind.L.Rev. 1275; Koenig & Rustad, His and Her Tort Reform: Gender Injustice in Disguise (1995), 70 Wash.L.Rev. 1; Saine, Preserving the Collateral Source Rule: Modern Theories of Tort Law and a Proposal for Practical Application (1997), 47 Case W.Res.L.Rev. 1075; Lefkin, Comment, Shattering Some Myths on the Insurance Liability Crisis: A Comment on the Article by Clarke, Warren-Boulton, Smith, and Simon (1988), 5 Yale J. of Reg. 417; Daniels & Martin, Myth and Reality in Punitive Damages (1990), 75 Minn.L.Rev. 1; Mooney, The Liability Crisis — A Perspective (1987), 32 Villanova L.Rev. 1235; Nader, The Corporate Drive to Restrict Their Victims' Rights (1986/1987), 22 Gonzaga L.Rev. 15; O'Connell & Tolnitch, Note, Ohio's Attempts to Halt the Medical Malpractice Crisis: Effective or Meaningless? (1984), 9 U. Dayton L.Rev. 361;

however, are directed to their proper place, which is outside the door to this courthouse. This court "has nothing to do with the policy or wisdom of a statute. That is the exclusive concern of the legislative branch of the government." *State ex rel. Bishop v. Mt. Orab Village School Dist. Bd. of Edn.* (1942), 139 Ohio St. 427, 438, 22 O.O. 494, 498, 40 N.E.2d 913, 919. "The only judicial inquiry into the constitutionality of a statute involves the question of legislative power, not legislative wisdom." *State ex rel. Bowman v. Allen Cty. Bd. of Commrs.* (1931), 124 Ohio St. 174, 196, 177 N.E. 271, 278.

{¶ 9} This struggle, waged by powerful and capable interests on both sides of the issue, has created turbulence among our coordinate branches of government.[4]

---

Scheiner, Judicial Assessment of Punitive Damages, The Seventh Amendment, and the Politics of Jury Power (1991), 91 Colum.L.Rev. 142; Wade, An Evaluation of the "Insurance Crisis" and Existing Tort Law (1987), 24 Houston L.Rev. 81; Zwier & Piermattei, Who Knows Best About Damages: A Case for Courts' Rights (1989), 93 Dick.L.Rev. 689; Saks, Do We Really Know Anything About the Behavior of the Tort Litigation System—and Why Not? (1992), 140 U.Pa.L.Rev. 1147; Galanter, News from Nowhere: The Debased Debate on Civil Justice (1993), 71 Denv.U.L.Rev. 77; Rustad, In Defense of Punitive Damages in Products Liability: Testing Tort Anecdotes with Empirical Data (1992), 78 Iowa L.Rev. 1; Komesar, Injuries and Institutions: Tort Reform, Tort Theory, and Beyond (1990), 65 N.Y.U.L.Rev. 23; Kahn, Regulation and Simple Arithmetic: Shifting the Perspective on Tort Reform (1994), 72 N.C.L.Rev. 1129; Rustad, Nationalizing Tort Law: The Republican Attack on Women, Blue Collar Workers and Consumers (1996), 48 Rutgers L.Rev. 673; Annotation, Validity and Construction of Statute Terminating Right of Action for Product-Caused Injury at Fixed Period After Manufacture, Sale, or Delivery of Product (1995), 30 A.L.R.5th 1; Mutter, Moving to Comparative Negligence in an Era of Tort Reform: Decisions for Tennessee (1990), 57 Tenn.L.Rev. 199; O'Connor & Sreenan, Apportionment of Damages: Evolution of a Fault-Based System of Liability for Negligence (1996), 61 J.Air.L. & Com. 365; Schwartz & Behrens, Punitive Damages Reform—State Legislatures Can and Should Meet the Challenge Issued by the Supreme Court of the United States in *Haslip* (1993), 42 Am.U.L.Rev. 1365; Manzer, 1986 Tort Reform Legislation: A Systematic Evaluation of Caps on Damages and Limitations on Joint and Several Liability (1988), 73 Cornell L.Rev. 628; Meros, Toward a More Just and Predictable Civil Justice System (1998), 25 Fla.St.U.L.Rev. 141; Note, "Common Sense" Legislation: The Birth of Neoclassical Tort Reform (1996), 109 Harv.L.Rev. 1765; Eaton & Talarico, Testing Two Assumptions About Federalism and Tort Reform (1996), 14 Yale J. on Reg. 371; Schwartz & Behrens, The Road to Federal Product Liability Reform (1996), 55 Md.L.Rev. 1363: Schwartz, Behrens & Taylor, Illinois Law: A Rich History of Cooperation and Respect Between the Courts and the Legislature (1997), 28 Loy.U.Chi.L.J. 745.

4. Indeed, one legal scholar, upon reviewing Ohio's recent history in the area of tort reform, was compelled to comment that "[a]lthough civil and mannerly in its tone, with all heeding the principle of separation of power, there is no doubt that the Ohio Constitution forms the battleground for an ongoing war between the tort policies and power of the judicial branch and those of the legislative

While the General Assembly and former Governor Voinovich have clearly expressed their commitment to revamp the civil justice system, this court has struck down significant components of these legislative measures as having gone too far, to the point of violating the constitutional rights of our citizens.[5] Nevertheless, each

---

and executive branches of state government." Werber, Ohio Tort Reform Versus the Ohio Constitution (Fall 1996), 69 Temple L.Rev. 1155, 1156.

5. See *Adamsky v. Buckeye Local School Dist.* (1995), 73 Ohio St.3d 360, 653 N.E.2d 212 (two-year statute of limitations contained in R.C. 2744.04[A], enacted in 1985 as part of the Political Subdivision Tort Liability Act, 141 Ohio Laws, Part I, 1699, held unconstitutional as applied to minors in violation of Section 2, Article I of the Ohio Constitution); *Zoppo v. Homestead Ins. Co.* (1994), 71 Ohio St.3d 552, 644 N.E.2d 397, paragraph two of the syllabus (R.C. 2315.21[C][2], 142 Ohio Laws, Part I, 1661, 1691, enacted in 1987, providing that the amount of punitive or exemplary damages shall be determined by the court, held to violate the right to trial by jury under Section 5, Article I of the Ohio Constitution); *Galayda v. Lake Hosp. Sys., Inc.* (1994), 71 Ohio St.3d 421, 644 N.E.2d 298, paragraph one of the syllabus (R.C. 2323.57, mandating that upon motion future damages awards in medical malpractice claims exceeding $200,000 be paid periodically rather than in a lump sum, held violative of Sections 5 and 16, Article I of the Ohio Constitution); *Cyrus v. Henes* (1994), 70 Ohio St.3d 640, 640 N.E.2d 810, and *Brennaman v. R.M.I. Co.* (1994), 70 Ohio St.3d 460, 639 N.E.2d 425, paragraph two of the syllabus (overruling *Sedar v. Knowlton Constr. Co.* [1990], 49 Ohio St.3d 193, 551 N.E.2d 938, and holding that former R.C. 2305.131, a statute of repose barring tort actions against designers and engineers of improvements to real property, that are brought more than ten years after completion of construction services, violates the right to a remedy guaranteed by Section 16, Article I of the Ohio Constitution); *Depew v. Ogella* (1994), 69 Ohio St.3d 610, 635 N.E.2d 310, *May v. Tandy Corp.* (1994), 69 Ohio St.3d 415, 633 N.E.2d 504, and *Sorrell v. Thevenir* (1994), 69 Ohio St.3d 415, 633 N.E.2d 504 (R.C. 2317.45, part of the Tort Reform Act of 1987, enacted by Am.Sub.H.B. No. 1, 142 Ohio Laws, Part I, 1661, 1694, effective January 5, 1988, relating to the deductibility of collateral source benefits, held violative of Sections 2, 5, and 16, Article I of the Ohio Constitution and unconstitutional *in toto*); *Hiatt v. S. Health Facilities, Inc.* (1994), 68 Ohio St.3d 236, 626 N.E.2d 71 (holding that R.C. 2307.42, requiring that a complaint in a medical action be accompanied by an affidavit asserting that claimant's attorney requested medical records from each defendant, is in conflict with Civ.R. 11, promulgated by the Supreme Court pursuant to Section 5[B], Article IV of the Ohio Constitution, and thus invalid and of no force and effect); *Rockey v. 84 Lumber Co.* (1993), 66 Ohio St.3d 221, 611 N.E.2d 789 (R.C. 2309.01, which prohibited a plaintiff in a tort action from specifying in the complaint an amount of damages in excess of $25,000 and requiring the plaintiff to later amend for such purpose, held to be in conflict with Civ.R. 8[A]); *Burgess v. Eli Lilly & Co.* (1993), 66 Ohio St.3d 59, 609 N.E.2d 140, paragraph one of the syllabus (holding that the provision of R.C. 2305.10 regarding the accrual date of a cause of action for diethylstilbestrol-related injuries is unconstitutional under the right-to-remedy clause of Section 16, Article I, Ohio Constitution); *Morris v. Savoy* (1991), 61 Ohio St.3d 684, 576 N.E.2d 765 (holding that R.C. 2307.43, part of the Ohio Medical Malpractice Act enacted by Am.Sub.H.B. No. 682, 136 Ohio Laws, Part II, 2809, 2813, setting a $200,000 cap on general damages that may be awarded for medical malpractice, is unconstitutional); *Brady v. Safety-Kleen Corp.* (1991), 61 Ohio St.3d 624, 576 N.E.2d 722, paragraph two of the syllabus (R.C. 4121.80, governing intentional torts that occur within the employment relationship, held to exceed and

has endeavored to comport with the principle of separation of powers and respect the integrity and independence of the other, that is, until now.

{¶ **10**} Am.Sub.H.B. No. 350 is the latest effort at civil justice reform and, to be sure, the most comprehensive and multifarious legislative measure thus far.[6]

conflict with the legislative authority granted to the General Assembly pursuant to Sections 34 and 35, Article II of the Ohio Constitution). See, also, *Gaines v. Preterm-Cleveland, Inc.* (1987), 33 Ohio St.3d 54, 514 N.E.2d 709; *Hardy v. VerMeulen* (1987), 32 Ohio St.3d 45, 512 N.E.2d 626; and *Mominee v. Scherbarth* (1986), 28 Ohio St.3d 270, 28 OBR 346, 503 N.E.2d 717, relative to the constitutionality of R.C. 2305.11(B), the four-year statute of repose for medical malpractice actions.

6. Am.Sub.H.B. No. 350 amends, enacts, or repeals over one hundred sections of the Ohio Revised Code "relative to changes in the laws pertaining to tort and other civil actions." 146 Ohio Laws, Part II, 3867, 3867. The changes addressed include interest on judgments (R.C. 163.17, 1343.03, 1701.95, 2743.18, 2743.19, 2744.06, 3113.219, 3722.08, 4113.52, 4909.42), immunity and liability of political subdivisions (R.C. 723.01, 2744.01 through 2744.06), liability for the condition of premises open to the public for accessing growing agricultural produce (R.C. 901.52), sales of securities and class action requirements therefor (R.C. 1707.01, 1707.432 through 1707.438), joint and several liability, contributory and comparative fault, assumption of risk and apportionment of damages (R.C. 1775.14, 2307.31 through 2307.331, 2315.19, 2345.20, 4171.10, 4507.07), alternative dispute resolution (R.C. 1901.262, 1907.262, 2101.163, 2151.542, 2303.202), certificates of merit (R.C. 2305.011), wrongful death (R.C. 2125.01, 2125.02, 2125.04), statutes of repose (R.C. 2117.06[G], 2125.02, 2125.04, 2305.10, 2305.11, 2305.131), discrimination claims (R.C. 4112.02, 4112.14, 4112.99), accrual dates (R.C. 2305.10, 2305.131), collateral benefits (R.C. 2317.45), seat belts (R.C. 4513.263), alcohol and drug consumption (R.C. 2323.59), liability of liquor permit holder (R.C. 4399.18), caps on recoverable damages (R.C. 2305.01, 2315.21, 2323.54), frivolous conduct (R.C. 2323.51), liability of athletic coaches and officials (R.C. 2305.381), contingency fees for expert witnesses (R.C. 2317.46), hazardous- or toxic-substance litigation (R.C. 2307.792), actions by a roller skater (R.C. 4171.10), domestic relations (R.C. 3113.219), poison prevention and treatment centers (R.C. 3701.19), appellate court jurisdiction (R.C. 2501.02), personal services contracts (R.C. 109.36), appropriation cases (R.C. 163.17), liability of directors to corporations (R.C. 1701.95), adult care facilities (R.C. 3722.08), whistleblowers (R.C. 4113.52), port authority boards (R.C. 4582.27), public utilities (R.C. 4909.42), and a variety of other changes relative to products liability, wrongful death, medical malpractice, jury instructions, burdens of proof, statutes of limitation, and procedural and evidentiary matters too numerous to set forth here.

The Legislative Service Commission, in its Final Analysis of Am.Sub.H.B. No. 350, breaks down the bill into five different general sections ("The cause of action"; "Trial, liability, damages, and judgment"; "Product liability actions"; "Medical claims and claims against other professionals"; and "Miscellaneous"), headed by roman numerals, for purposes of analysis of the content and operation of the bill. These general sections are correspondingly broken down into subsections. For example, the first general section, "The cause of action," is divided into thirteen different subsections, such as "Civil actions regarding picking agricultural produce," "Unavailability of wrongful death action," "Recovery of damages by a criminal plaintiff," "Accrual of certain causes of action," "Statutes of repose," etc. Some of the subsections are further broken down into

More important, it changes the complexion of the reform debate into a challenge to the judiciary as a coordinate branch of government. It marks the first time in modern history that the General Assembly has openly challenged this court's authority to prescribe rules governing the courts of Ohio and to render definitive interpretations of the Ohio Constitution binding upon the other branches.[7]

---

subsubsections: "Product liability actions"; "Specified malpractice claims; medical, dental, optometric, and chiropractic claims"; and "Improvements to real property." For each section (or subsubsection when there is one), the Legislative Service Commission's Analysis indicates which Revised Code section is affected. Under this analysis, there are at least forty-eight separate topics in the bill.

The enormousness of Am.Sub.H.B. No. 350's scope is highlighted by the diversity of interested parties who have joined this action, which include approximately two hundred associations, corporations, organizations, and individuals participating in the submission of twenty-four separate *amicus curiae* briefs.

7. On September 18, 1995, the Legislative Service Commission ("LSC") issued a research memorandum, No. R-121-1458, on the "Potential Constitutional Infirmities in H.B. 350 of the 121st General Assembly." According to the memo, a member of the General Assembly had requested that the LSC expand upon the following "Comment" to the "As Introduced" analysis of H.B. No. 350:

"Several provisions of the bill arguably include potential conflicts with the due process and equal protection provisions of Sections 2 and 16 of Article I of the Ohio Constitution and the Fourteenth Amendment to the United States Constitution, the 'open courts' provision of Section 16 of Article I of the Ohio Constitution, the prohibition against limiting damages in wrongful death actions of Section 19a of Article I of the Ohio Constitution, and the duty of the Supreme Court to adopt procedural rules (*e.g.*, the Rules of Civil Procedure and the Rules of Evidence) under Section 5 of Article IV of the Ohio Constitution."

The LSC responded in chart form by grouping various provisions of the introduced version of H.B. No. 350 according to topic, and found potential constitutional infirmities with regard to fourteen topics. The LSC reminded the General Assembly that "only the Ohio Supreme Court * * * would have the constitutional authority to 'definitively' declare (1) whether those provisions pass constitutional muster or are constitutionally infirm and (2) which provisions of the Ohio Constitution * * * are infringed by the constitutionally infirm provisions."

Most of the provisions that the LSC identified as potential constitutional infirmities were retained in Am.Sub.H.B. No. 350 as passed at the regular session of the 121st General Assembly. However, the bill includes a number of uncodified sections that contain various findings and statements of intent with regard to the constitutionality of Am.Sub.H.B. No. 350 and some of its more controversial provisions. Later in this opinion, we will examine the substance of these declarations, as well as the extent to which they reveal an attempt to absorb the authority of the judicial branch of government. Suffice it to say here that the General Assembly, particularly in Section 5, has sought to rework the rules of procedure and evidence, issue judicial mandates, and judge the constitutionality of its own acts even to the point of reenacting legislation which this court has struck down as constitutionally infirm, while proclaiming to respectfully disagree with our holdings and to recognize the legal rationale of a dissenting opinion and the judgment of a court of

appeals that we reversed. The following are but a few instances of just such legislative overreaching:

"(E) In enacting new section 2305.131 of the Revised Code in this act, it is the intent of the General Assembly to do all of the following:

"(1) To recognize the holdings of the Ohio Supreme Court in *Sedar v. Knowlton Constr. Co.* (1990), 49 Ohio St.3d 193 [551 N.E.2d 938], and in *Ross v. Sam W. Emerson Co.* (1990), 49 Ohio St.3d 206 [551 N.E.2d 950], the holding of the Court of Appeals for Lorain County in *Cyrus v. Henes* (1993), 89 Ohio App.3d 172 [623 N.E.2d 1256], the holding of the Court of Appeals for Highland County in *Cincinnati Ins. Co. v. Wylie* (1988), 48 Ohio App.3d 289 [549 N.E.2d 1198], and the holding of the Court of Appeals for Hamilton County in *Elizabeth Gamble Deaconess Home Assn. v. Turner Constr. Co.* (1984), 14 Ohio App.3d 281 [14 OBR 337, 470 N.E.2d 950] [all of which were overruled, reversed, or rendered ineffectual by *Brennaman, Ross v. Tom Reith, Inc.,* and *Cyrus*, *infra*], that a statute of repose, as contained in former section 2305.131 of the Revised Code, does not violate the remedy by due course of law and open courts provisions of Section 16 of Article I of the Ohio Constitution, the equal protection guarantee of Section 2 of Article I of the Ohio Constitution, or the equal protection or due process clauses of the Fourteenth Amendment to the United States Constitution when applied to bar a third person's assertion of a cause of action against a person performing services for an improvement to real property or furnishing the design, planning, supervision of construction, or construction of an improvement to real property;

"(2) To repeal former section 2305.131 of the Revised Code in light of the holdings of the Ohio Supreme Court in *Ross v. Tom Reith, Inc.* (1995), 71 Ohio St.3d 563 [645 N.E.2d 729], *Brennaman v. R.M.I. Co.* (1994), 70 Ohio St.3d 460 [639 N.E.2d 425], and *Cyrus v. Henes* (1994), 70 Ohio St.3d 640 [640 N.E.2d 810] but to respectfully disagree with those holdings and to recognize the legal rationale set forth in the concurring-dissenting opinion in *Brennaman v. R.M.I. Co., supra*.

" * * *

"(5) To recognize that new section 2305.131 of the Revised Code, as enacted by this act, does not deny a remedy to a claimant who has a vested cause of action but instead bars a cause of action before it ever arises as stated by the Ohio Supreme Court in *Sedar v. Knowlton Constr. Co.* (1990), 49 Ohio St.3d 193 [551 N.E.2d 938] [overruled by *Brennaman, supra*];

" * * *

"(G) In amending section 2305.11 of the Revised Code in this act, it is the intent of the General Assembly to do all of the following:

"(1) To recognize the holdings of the Ohio Supreme Court in *Sedar v. Knowlton Construction Company* (1990), 49 Ohio St.3d 193 [551 N.E.2d 938] [overruled in *Brennaman*] and in *Ross v. Sam W. Emerson Co.* (1990), 49 Ohio St.3d 206 [551 N.E.2d 950], that the concept of a statute of repose does not violate the remedy by due course of law and open courts provisions of Section 16 of Article I of the Ohio Constitution, the equal protection guarantee of Section 2 of Article I of the Ohio Constitution, or the equal protection or due process clauses of the Fourteenth Amendment to the United States Constitution;

" * * *

"(4) To recognize [contrary to *Brennaman, Cyrus,* and *Ross v. Tom Reith, Inc.*] that the failure to adopt orderly and predictable rules governing the resolution of disputes, such as the six-year statutes of repose set forth in section 2305.11 of the Revised Code, as amended by this act, would violate the rights of certain defendants to due course of law under Section 16 of Article I of the Ohio Constitution and due process of law under the due process clause of the Fourteenth Amendment to the United States Constitution;

" * * *

"(H) In enacting section 2305.011 of the Revised Code in this act, it is the intent of the

General Assembly to do all of the following:

"(1) To respond to the issues raised by the holding of the Supreme Court in *Hiatt v. S. Health Facilities, Inc.* (1994), 68 Ohio St.3d 236 [626 N.E.2d 71] [holding former R.C. 2307.42's certificate-of-merit requirement to be invalid and in conflict with Civ.R. 11], by clarifying the jurisdictional nature of certificate of merit requirements and creating a substantive requirement for medical, dental, optometric, chiropractic, and malpractice claims defined or described in section 2305.11 of the Revised Code;

"(2) To exercise the General Assembly's constitutional power to establish certain jurisdiction for Ohio courts by establishing that trial courts lose subject matter jurisdiction to hear medical, dental, optometric, chiropractic, and malpractice claims defined or described in section 2305.11 of the Revised Code unless they are supported by certificates of merit;

" * * *

"(L) In enacting new division (D)(2) in section 2125.02 and new division (C) in section 2305.10 of the Revised Code in this act, it is the intent of the General Assembly to do all of the following:

"(1) To recognize the holdings of the Ohio Supreme Court in *Sedar v. Knowlton Constr. Co.* (1990), 49 Ohio St.3d 193 [551 N.E.2d 938] [overruled in *Brennaman*], and in *Ross v. Sam W. Emerson Co.* (1990), 49 Ohio St.3d 206 [551 N.E.2d 950], that a statute of repose does not violate the remedy by due course of law and open courts provision of Section 16 of Article I of the Ohio Constitution, the equal protection guarantee of Section 2 of Article I of the Ohio Constitution or the equal protection or due process clauses of the Fourteenth Amendment to the United States Constitution, and to respectfully disagree with the Ohio Supreme Court's holdings in *Ross v. Tom Reith, Inc.* (1995), 71 Ohio St.3d 563 [645 N.E.2d 729], *Brennaman v. R.M.I. Co.* (1994), 70 Ohio St.3d 460 [639 N.E.2d 425], and *Cyrus v. Henes* (1994), 70 Ohio St.3d 640 [640 N.E.2d 810] that a statute of repose violates Section 16 of Article I of the Ohio Constitution.

"2. To recognize the legal rationale set forth by Chief Justice Moyer in *Brennaman* * * * [dissenting in part] and by the Ohio Supreme Court in *Sedar* * * *, and in light of that rationale, to recognize that new division (D)(2) of section 2125.02 and new division (C) of section 2305.10 of the Revised Code do not deny a remedy to a claimant who has a vested cause of action, but instead bar the commencement of an action before any right accrues.

" * * *

"(O) The intent of the General Assembly in enacting section 2307.792 of the Revised Code is to establish the judicial standard for the granting of summary judgment in hazardous or toxic exposure cases, consistent with the decision of *Lohrmann v. Pittsburgh Corning Corp.* 782 F.2d 1156 (4th Cir.1986), and contrary to Syllabus 2, *Horton v. Harwick Chemical Corp.* (1995), 73 Ohio St.3d 679 [653 N.E.2d 1196]. The General Assembly recognizes that the courts of Ohio prior to the *Horton* decision generally followed the rationale of the *Lohrmann* decision in determining when summary judgment was appropriate in hazardous or toxic exposure cases, a similar standard of which has been adopted by the majority of states. The *Lohrmann* standard provides litigants and the courts of Ohio with an objective, easily applied standard for determining when summary judgment is appropriate.

"(P) In enacting the amendments to section 2305.01 and new section 2323.54 of the Revised Code [establishing noneconomic damage caps], the General Assembly finds * * * all of the following:

" * * *

"(6) The Ohio Constitution, Article I, Section 19A provides that 'The amount of damages recoverable by civil action in the courts for death caused by the wrongful act, neglect, or default of another, shall not be limited by law.'; that provision refers only to economic or pecuniary losses and

## II

## It Is the Constitutional Duty of the Supreme Court of Ohio to Preserve the Integrity and Independence of the Judiciary and Ensure that the Judicial Power of the State Remains Vested in the Courts

{¶ 11} As detailed in footnote 7 and below, Am.Sub.H.B. No. 350 intrudes upon judicial power by declaring itself constitutional, by reenacting legislation struck down as unconstitutional, and by interfering with this court's power to regulate court procedure. To appreciate the importance of separation of powers we need look no further than Ohio's own history.

{¶ 12} "[T]he people possessing all governmental power, adopted constitutions, completely distributing it to appropriate departments." *Hale v. State* (1896), 55 Ohio St. 210, 214, 45 N.E. 199, 200. They vested the legislative power

---

not to noneconomic or nonpecuniary losses, which by implication distinguishes among potential damages and supports the authority of the General Assembly to limit damages otherwise.
" * * *

"(8) The courts of common pleas were established by the Ohio Constitution as courts of general jurisdiction in Ohio, but the Constitution itself limits their jurisdiction to that which is expressly conferred by the General Assembly, including jurisdiction to limit consideration of noneconomic damages. The Ohio Constitution, Article IV, Section 4(B) provides: 'The courts of common pleas and divisions thereof shall have such original jurisdiction over all justiciable matters and such powers of review of proceedings of administrative officers and agencies as may be provided by law.' In addition, Section 18 of Article IV provides: 'The several judges of the supreme court, of the common pleas, and of such other courts as may be created, shall, respectively, have and exercise such power and jurisdiction, at chambers, or otherwise, as may be directed by law.' The Supreme Court of Ohio has uniformly held that the provisions of Article IV are not self-executing. Rather, the jurisdiction of the common pleas courts is limited to whatever the legislature may choose to bestow. *Central Ohio Transit Auth. v. Transport Workers Union of America* (1988), 37 Ohio St.3d 56 [524 N.E.2d 151]; *Seventh Urban, Inc. v. University Circle* (1981), 67 Ohio St.2d 19 [21 O.O.3d 12, 423 N.E.2d 1070]; *State ex rel. Miller v. Keefe* (1958), 168 Ohio St. 234 [6 O.O.2d 18, 152 N.E.2d 113]." 146 Ohio Laws, Part II, 4021-4028. (The last nine quoted words of Section 5[E][2] do not appear in 146 Ohio Laws, due to a printing error. They are in the official enrolled Act, as correctly quoted in notes to R.C. 2305.131 in both published versions of the Revised Code.)

See, also, Werber, *supra*, 69 Temple L.Rev. at 1170:

"The legislative branch, at least in theory, knows the extent to which it has the power to act, and that the judiciary alone has the authority to determine constitutional issues. Where the tort reform legislation [H.B. No. 350] seeks to impose the General Assembly's view of the constitution upon the court—as it does in several key places—the effort is not only misguided, it is futile. In these areas, battle is truly joined." (Footnote omitted.)

of the state in the General Assembly (Section 1, Article II, Ohio Constitution), the executive power in the Governor (Section 5, Article III, Ohio Constitution), and the judicial power in the courts (Section 1, Article IV, Ohio Constitution). They also specified that "[t]he general assembly shall [not] * * * exercise any judicial power, not herein expressly conferred." Section 32, Article II, Ohio Constitution.

{¶ 13} The power and duty of the judiciary to determine the constitutionality and, therefore, the validity of the acts of the other branches of government have been firmly established as an essential feature of the Ohio system of separation of powers. See, *e.g.*, *Beagle v. Walden* (1997), 78 Ohio St.3d 59, 62, 676 N.E.2d 506, 508 ("[i]nterpretation of the state and federal Constitutions is a role exclusive to the judicial branch"). However, this was not always so, and a major part of our history involves a continuing effort to establish and secure this power as intrinsic to the judiciary and, indeed, to establish the judiciary as a viable and coequal branch of our government.

{¶ 14} On April 30, 1802, Congress approved an "Act to enable the people of the Eastern division of the territory northwest of the river Ohio to form a constitution and state government, and for the admission of such state into the Union, on an equal footing with the original States, and for other purposes." 2 Stat. 173 (1802). On November 1, 1802, over the objections of Governor Arthur St. Clair, Ohio's first constitutional convention assembled at Chillicothe and proceeded to form a constitution which led to statehood in 1803.[8]

{¶ 15} The 1802 Constitution evinces a strong reaction to the executive

---

8. This portion of the opinion dealing with Ohio's history as it relates to judicial power is based in part on the following sources: Gold, Public Aid to Private Enterprise Under the Ohio Constitution: Sections 4, 6, and 13 of Article VIII In Historical Perspective (1985), 16 U.Tol.L.Rev. 405; Woodbridge, A History of Separation of Powers in Ohio: A Study in Administrative Law (1939), 13 U.Cin.L.Rev. 191; Pollack, Ohio Unreported Judicial Decisions Prior To 1823 (1952); 1, 2 Marshall, History of the Courts and Lawyers of Ohio (1934); Gilkey, The Ohio Hundred Year Book (1901); 1 Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of Ohio, 1850-1851; 1 Chase, Statutes of Ohio and of the Northwestern Territory (1833).

autocracy that prevailed under the Ordinance of 1787, and touched off an era of legislative dominance. The General Assembly had the power of judicial appointment under Section 8, Article III of the Constitution of 1802, and considered the judiciary a subordinate governmental department. Four years after Ohio achieved statehood and the United States Supreme Court handed down its decision in *Marbury v. Madison* (1803), 5 U.S. (1 Cranch) 137, 2 L.Ed. 60, Chief Justice Samuel Huntington and Judge George Tod of the Ohio Supreme Court held Section 5 of the Act of February 12, 1805, 3 Ohio Laws 14, 21, to be repugnant to Section 8, Article 8, Constitution of Ohio, 1802, and therefore void and of no binding effect. *Rutherford v. M'Faddon* (1807), Pollack, Ohio Unreported Judicial Decisions Prior To 1823 (1952) 71.

{¶ 16} In asserting the court's authority to determine the constitutionality of a legislative Act, Chief Justice Huntington wrote that "our constitution * * * is the supreme law of the land, and paramount to any legislative act," that "the judiciary [is] a co-ordinate branch of the government deriving its authority from the constitution," and that "[t]he people can never be secure under any form of government, where there is no check among the several departments." *Id.* at 73, 74, 75. He went on to explain that if it is true that "the legislature *can* pass unconstitutional acts—that they are the sole judges of their constitutionality—and if unconstitutional, that there is no remedy; then indeed is our constitution a blank paper: there is no guarantee for a single right to citizens; * * * but slavery may be introduced; a religious test may be established; the press may be fettered or restrained; the trial by jury may be abolished; *ex post facto* laws may be made; standing armies may be raised, and the whole train of evils against which our constitution meant to provide, may be gradually let in upon us." (Emphasis *sic*.) *Id.* at 76.

{¶ 17} Judge Tod, concurring, added:

"The people in this, their fundamental law, have entered into a solemn

covenant with every individual citizen, that [their] inherent rights shall be protected, even against the encroachments of legislative authority. If a law was to be passed, inflicting death on a person convicted of larceny — or that a particular class of citizens should have the exclusive privilege of acquiring and possessing property, and that all others should be proscribed and doomed to exile; could not the devoted victims of such legislative tyranny, claim, with a confidence inspired by the constitution, the interfering power of the judicial courts? Could they not entrench themselves within the ramparts raised by the constitution, and then in safety bid defiance to such attempts?" *Id.* at 85-86.

{¶ 18} Judge Tod explained that "[i]f legislative acts are to all intents obligatory on the court — the constitution is a subordinate instrument — liable to be annulled, altered and amended by legislative supremacy. Their acts would not only be equal, but superior to that charter, which has the sanction of 'We the people do ordain and establish.' " *Id.* at 87.

{¶ 19} On January 9, 1809, Judge Tod stood on trial before the Ohio Senate, charged as follows:

"That he did in his judicial capacity, adjudicate and determine, that the said * * * act of the general assembly * * * was unconstitutional, null and void, * * * to the evil example of all good citizens of the State of Ohio * * * contrary to its constitution and laws, disgraceful to his own character as a judge, and degrading to the honor and dignity of the State of Ohio." House Journal of the 7th Ohio General Assembly, 47, 79; Journal of the Senate of Ohio in Cases of Impeachment (1808-1809) 53.

{¶ 20} Although Judge Tod was acquitted by a margin of one vote, the majority of the General Assembly quickly retaliated. The provision held to be unconstitutional in *Rutherford* was reenacted in an even stronger form. House Journal, *supra,* at 164; 7 Ohio Laws 43, 49. On January 16, 1810, the General Assembly passed the "sweeping resolution," which declared that all judicial offices

carrying a seven-year appointment would become vacant on the state's seventh anniversary regardless of interim appointments that had been made to fill vacancies. 8 Ohio Laws 349. By virtue of this resolution, the General Assembly was able to sweep out of office those judges whose views on judicial review differed from the legislative majority, including Judge Tod, and appoint in their place those whose views were more in harmony with their own. See Pollack, *supra*, at 102-105; 3 Marshall, A History of the Courts and Lawyers of Ohio (1934) 722-727; Gilkey, The Ohio Hundred Year Book (1901) 468.

{¶ 21} The legislature also became heavily involved in the subsidization of private companies and the granting of special privileges in corporate charters. The General Assembly passed a number of Acts, most notably the Loan Law of 1837, 35 Ohio Laws 76, which became known as the "Plunder Law," designed to loan credit or give financial aid to private canal, bridge, turnpike, and railroad companies. Between 1825 and 1830, the total state debt increased nearly elevenfold and more than doubled again by 1840. The public began to bemoan the taxes imposed on them for the benefit of private companies and the losses incurred by the state when subsidized corporations failed. See Gold, Public Aid to Private Enterprise Under the Ohio Constitution: Sections 4, 6, and 13 of Article VIII In Historical Perspective (1985), 16 U.Tol.L.Rev. 405, 407-423.

{¶ 22} This era of legislative dominance, which proved as undesirable as the executive supremacy which preceded it, led to the Constitutional Convention of 1851 and the adoption of our second Constitution. Just as the Constitution of 1802 had reflected an aversion to an all-powerful executive, so the Constitution of 1851 was inspired by an antipathy toward an all-powerful legislature and a desire for more independence of each branch of our tripartite system of government. One delegate to the convention expressed this belief:

"To the Legislative department * * * is expressly delegated an almost boundless discretion, and an almost unlimited authority * * *. It is, then, in the

Legislative department of the Government that the rights of the people will be usurped and sacrificed, in my opinion, if at all.  And it is this body, possessing by far the most vast and dangerous discretion of any body under the constitution, that we should especially watch and restrain.

"Mr. President, I am not one of those who believe that  * * * any essential or any lasting encroachment will be made upon the essential liberties of the mass of the people.  But, sir, so far as any encroachments upon the popular rights may be made, they will be made by the Legislative body.  They will not proceed from a military dictator; they will not proceed from the Judicial Power.  They will not proceed from an over-riding executive, but from an irrational, excited, triumphant party majority in the Halls of the Legislature.

" * * *

"I am, therefore, especially anxious to guard well the limits of the exercise of the Legislative Power.

" * * * I shall vote to take away from the Legislature all power to pass local, partial, private and *exposte facto* [*sic*] laws.  I shall vote for an executive veto.  I shall vote to take away from the Legislature all power to appoint officers, or to intervene with the Judiciary; and in fine, I shall vote to define and limit as closely as possible, the exact line in which the Legislative Department shall move."  1 Debates of the Constitutional Convention, 1851-52, at 123.

{¶ 23} Another delegate summarized the overall sentiment as follows:

"What kind of a General Assembly shall we have under the new Constitution?  In view of all the opinions which we have gathered from each other with reference to what our constitution will be, we must expect to have a General Assembly stripped of certain important powers which it before possessed; stripped of the power to enact special laws or creating special corporations; stripped of the appointing power; stripped of the apportionment power, and of the power of special legislation.  We shall have a General Assembly reduced materially in power and

the scope of duties, in all its arrangements; and we shall thus take away from them as much as possible all temptation to the abuse of their powers.  * * *

"* * *

"* * * Under the old Constitution, the legislature swallowed up all the rest of the government.  They constituted not only the Legislature, but the Executive and Judiciary to some extent.  Now it seems to me, that by confining the Legislature, to their appropriate law making functions, we shall have accomplished everything the people have asked for; that is we shall have established a just equilibrium in the government.  We shall have an active Legislature—if they meet annually; an active Governor; and a more active Judiciary, thus restoring the harmony that has been so long disturbed under the old Constitution, in all the different departments of governments." *Id.* at 174-175.

{¶ 24} Our second Constitution was adopted on March 10, 1851, and the following year the court, in *Cincinnati, Wilmington & Zanesville RR. Co. v. Clinton Cty. Commrs.* (1852), 1 Ohio St. 77, held:

"It is the right and duty of the judicial tribunals to determine, whether a legislative act drawn in question in a suit pending before them, is opposed to the constitution of the United States, or of this State, and if so found, to treat it as a nullity." *Id.*, paragraph one of the syllabus.

{¶ 25} In so holding, the court expounded as follows:

"How any doubt could ever have been entertained upon this subject, is matter of no little astonishment; and yet the history of our own State shows, that the power was, at one time, not only doubted, but positively denied; and judges, for a fearless discharge of this duty, were subjected to impeachment by the house of representatives.  * * *

"* * *

"To adjudicate upon, and protect [individual] rights and interests, constitute the whole business of the judicial department.  Each judge before he is permitted to

enter upon so important a duty, is required to bind his conscience by a solemn oath to support these constitutions. After all this, when he is clearly convinced, their provisions have been violated, and the rights of the individual secured by them, have been invaded by a legislative enactment, he has but one of two courses to pursue—either to regard his oath, vindicate the fundamental law, and protect the rights of the individual citizen, or to give effect to an act of usurped authority. In such case, it cannot be doubtful where the path of duty leads. The latter alternative can only be followed, when we are to nullify all constitutional guaranties, and proclaim the legislative body, like the British Parliament, omnipotent." *Id.* at 81-82.

**{¶ 26}** Thereafter, the power of constitutional adjudication was secured exclusively in the judiciary, essential to its integrity and independence, serving, fundamentally and intrinsically, as a check upon the other branches. Once doubted, it became axiomatic that the judicial branch is the final arbiter in interpreting the Constitution and that the General Assembly may not enter upon the judicial business of settling the constitutionality of its own laws, disregard a Supreme Court decision on the subject, reenact legislation previously declared violative of the Constitution, or in any other way exercise, direct, control, or encroach upon the judicial power. Temporally connected to the formative history of our second Constitution, our early decisions reflect the proven dangers of a subservient judiciary. We learn therefrom to jealously guard the judicial power against encroachment from the other two branches of government and to conscientiously perform our constitutional duties and continue our most precious legacy. See, *e.g., Ex parte Bevan* (1933), 126 Ohio St. 126, 184 N.E. 393; *Bowman v. Allen Cty. Bd. of Commrs.* (1931), 124 Ohio St. 174, 177 N.E. 271; *State ex rel. Bryant v. Akron Metro. Park Dist. for Summit Cty.* (1929), 120 Ohio St. 464, 473-475, 166 N.E. 407, 410; *State ex rel. Davis v. Hildebrant* (1916), 94 Ohio St. 154, 169, 114 N.E. 55, 59; *State ex rel. Weinberger v. Miller* (1912), 87 Ohio St. 12, 99 N.E. 1078;

*Fairview v. Giffee* (1905), 73 Ohio St. 183, 76 N.E. 865; *Bartlett v. State* (1905), 73 Ohio St. 54, 75 N.E. 939; *State ex rel. Trauger v. Nash* (1902), 66 Ohio St. 612, 64 N.E. 558; *Zanesville v. Zanesville Tel. & Tel. Co.* (1900), 63 Ohio St. 442, 451, 59 N.E. 109, 110; *Hale v. State* (1896), 55 Ohio St. 210, 45 N.E. 199; *Hixson v. Burson* (1896), 54 Ohio St. 470, 43 N.E. 1000; *State ex rel. Atty. Gen. v. Harmon* (1877), 31 Ohio St. 250; S*tate ex rel. Atty. Gen. v. Kennon* (1857), 7 Ohio St. 546, 553-554; *Cass v. Dillon* (1853), 2 Ohio St. 607.

## III

**This Court Will Entertain a Public Action in the Rare and Extraordinary Case Where Relators Challenge the Constitutionality of a Legislative Enactment on Grounds that It Operates, Directly and Broadly, to Divest the Courts of Judicial Power**

{¶ 27} Perhaps the most amorphous and contentious aspect of this litigation involves the question whether relators' claims should even be heard at this juncture. In their motions to dismiss, and again in their merit briefs, respondents contend that this action is an inappropriate vehicle for determining the constitutionality of Am.Sub.H.B. No. 350, as it involves the wrong parties seeking the wrong relief in the wrong court. Respondents argue that relators are not the proper parties to raise constitutional questions because they have failed to show the necessary personal injury to establish standing to sue in a court in Ohio. Respondents assert that relators have demonstrated no more than an insufficient generalized public interest in the enforcement of Am.Sub.H.B. No. 350, and that relators' claims of potential financial loss hardly rise to the level of concrete injury required for standing. According to respondents, relators have no standing to bring an action as taxpayers because they are not enforcing a public right, and because they have failed to demonstrate pecuniary harm different from the harm suffered by the general taxpaying public.

{¶ 28} Respondents also maintain that the present form of action is an

improper means by which to secure judicial review. Since the unconstitutionality of a statute does not deprive a trial court of the jurisdiction to proceed to its terms, it is inappropriate to grant an extraordinary writ to compel or prohibit trial judges in the exercise of their essential function to adjudicate constitutional questions. Further, adequate procedural mechanisms are available in the ordinary course of law to any tort victim who wishes to challenge the constitutionality of Am.Sub.H.B. No. 350. In addition, the argument continues, relators' requests for prohibitive and mandatory writs are actually disguised requests for declaratory and injunctive relief, which this court has no original jurisdiction to grant. Respondents urge that we allow the normal judicial process to run its course, whereby the constitutionality of the various components of Am.Sub.H.B. No. 350 would be determined by trial courts as they arise in individual tort and other civil actions, and then proceed piecemeal through the appellate process toward a final determination by this court.[9]

---

9. Cases brought by private litigants, many of which remain pending, include *Wolgamott v. E.R. Trucking, Inc.* (Nov. 12, 1995), Stark C.P. No. 1996 CV 02033; *Wells v. Thomson Newspaper Holdings, Inc.* (1998), 183 F.R.D. 225; *Crowe v. Owens Corning Fiberglas* (Oct. 29, 1998), Cuyahoga App. No. 73206, unreported, 1998 WL 767622, discretionary appeal allowed (1998), 85 Ohio St.3d 1426, 707 N.E.2d 516; *Kempthorn, Inc. v. Wallace* (Sept. 14, 1998), Stark App. No. 98CA00087, unreported, 1998 WL 667655; *Leisure v. State Farm Auto. Ins. Co.* (Aug. 31, 1998), Stark App. Nos. 1997CA00417 and 1998CA00001, unreported, 1998 WL 667437; *Mead v. Lakewood School Dist. Bd. of Edn.* (Aug. 5, 1998), Licking App. No. 97 CA 113, unreported, 1998 WL 516290; *McCray v. Springboro* (July 13, 1998), Warren App. No. CA98-01-006, unreported, 1998 WL 391404; *Harris v. Trader Bud's Westside Dodge, Inc.*, Medina C.P. No. 97CIV-0212; *Schriner v. Valve-Trol Co.*, Summit C.P. No. 97-01-0827; *Triplett v. Triplett* (Aug. 14, 1997), Franklin App. No. 97APE02-147, unreported, 1997 WL 467322; *Emerick v. Reddy* (Mar. 25, 1997), Montgomery C.P. No. 95-2316; *Shaker Auto Lease, Inc. v. Cleveland Hts.* (June 19, 1997), Cuyahoga App. No. 72022, unreported, 1997 WL 337632; *Sheets v. Carmel Farms* (June 5, 1997), Franklin App. Nos. 96APE09-1224 and 96APE09-1225, unreported, 1997 WL 303760; *Burt v. Gregory Galvanized & Metal Processing* (May 9, 1997), Stark C.P. No. 1994 CV 01786; *Grasse v. Eden* (June 24, 1997), Lorain C.P. No. 97 CV 118008; *Marcum v. Bynorty* (Nov. 24, 1997), Licking C.P. No. 96-CV-625; *Katynski v. Kotaka*, Franklin C.P. No. 97CV03-4056; *Cugliari v. Colts' Mgf. Co.*, Stark C.P. No. 1997 CV02668; *Burger v. Cleveland Hts.* (July 21, 1997), Cuyahoga App. No. 72675, dismissed without opinion for lack of a final appealable order, discretionary appeal allowed (1997), 80 Ohio St.3d 1482, 687 N.E.2d 476; *Stickovich v. Cleveland*, Cuyahoga App. No. 72874, discretionary appeal not allowed (1997), 80 Ohio St.3d 1470, 687 N.E.2d 298; *Foreman v. TS Tech*, Franklin C.P. No. 97CV10-9455; *Kagy v. Toledo-Lucas Cty. Port Auth.* (1997), 121 Ohio App.3d 239, 699 N.E.2d 566. See, also, *Natl. Lawyers Guild of Cleveland v. Voinovich* (Nov. 7, 1997), Franklin C.P. No. 97CVH06-6194 (case dismissed for lack of standing).

**{¶ 29}** It is well established that before an Ohio court can consider the merits of a legal claim, the person seeking relief must establish standing to sue. *Ohio Contractors Assn. v. Bicking* (1994), 71 Ohio St.3d 318, 320, 643 N.E.2d 1088, 1089. The concept of standing embodies general concerns about how courts should function in a democratic system of government. As the court explained in *Fortner v. Thomas* (1970), 22 Ohio St.2d 13, 14, 51 O.O.2d 35, 35, 257 N.E.2d 371, 372:

"It has been long and well established that it is the duty of every judicial tribunal to decide actual controversies between parties legitimately affected by specific facts and to render judgments which can be carried into effect. It has become settled judicial responsibility for courts to refrain from giving opinions on abstract propositions and to avoid the imposition by judgment of premature declarations or advice upon potential controversies. The extension of this principle includes enactments of the General Assembly."

**{¶ 30}** These concerns become more acute where there may be an intrusion into areas committed to another and coequal branch of government. The judicial "power to declare legislative enactments unconstitutional is not a superior power, neither one of veto nor of greater wisdom. It is rather a power burdened with a duty—a duty to determine in particular cases whether the Legislature has reached and passed the extreme boundary of its legislative power." *Ostrander v. Preece* (1935), 129 Ohio St. 625, 629, 3 O.O. 24, 26, 196 N.E. 670, 672. Thus, the judicial function does not begin until after the legislative process is completed and "the void law is about to be enforced against a citizen to his prejudice." Otherwise, if "no private rights of person or property are in jeopardy, * * * [w]e are simply asked to regulate the affairs of another branch of government." *Pfeifer v. Graves* (1913), 88 Ohio St. 473, 488, 104 N.E. 529, 533.

**{¶ 31}** Accordingly, in the vast majority of cases brought by a private litigant, " 'the question of standing depends upon whether the party has alleged

24

such a personal stake in the outcome of the controversy, as to ensure that the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution.' " (Citations and internal quotations omitted.) *State ex rel. Dallman v. Franklin Cty. Court of Common Pleas* (1973), 35 Ohio St.2d 176, 178-179, 64 O.O.2d 103, 105, 298 N.E.2d 515, 516, quoting *Sierra Club v. Morton* (1972), 405 U.S. 727, 732, 92 S.Ct. 1361, 1364, 31 L.Ed.2d 636, 641. In order to have standing to attack the constitutionality of a legislative enactment, the private litigant must generally show that he or she has suffered or is threatened with direct and concrete injury in a manner or degree different from that suffered by the public in general, that the law in question has caused the injury, and that the relief requested will redress the injury. See *Bicking, supra*; *Willoughby Hills v. C.C. Bar's Sahara, Inc.* (1992), 64 Ohio St.3d 24, 27, 591 N.E.2d 1203, 1205; *Palazzi v. Estate of Gardner* (1987), 32 Ohio St.3d 169, 512 N.E.2d 971, at the syllabus; *Anderson v. Brown* (1968), 13 Ohio St.2d 53, 42 O.O.2d 100, 233 N.E.2d 584, paragraph one of the syllabus; *State ex rel. Lynch v. Rhodes* (1964), 176 Ohio St. 251, 254, 27 O.O.2d 155, 156, 199 N.E.2d 393, 396; *State ex rel. Skilton v. Miller* (1955), 164 Ohio St. 163, 169, 57 O.O. 145, 149, 128 N.E.2d 47, 51; *Zangerle v. Evatt* (1942), 139 Ohio St. 563, 574, 23 O.O. 52, 57, 41 N.E.2d 369, 374. See, generally, 16 Ohio Jurisprudence 3d (1979) 266, 270, Constitutional Law, Sections 134 and 135.

{¶ 32} In the federal judicial system, where the requirement for injury is grounded in the constitutional requirements of Section 2, Article III of the United States Constitution, the necessity of showing injury in fact prevails irrespective of whether the complaining party seeks to enforce a private or public right. See *Whitmore v. Arkansas* (1990), 495 U.S. 149, 155, 110 S.Ct. 1717, 1722-1723, 109 L.Ed.2d 135, 145; *Secy. of State of Maryland v. Joseph H. Munson Co., Inc.* (1984), 467 U.S. 947, 954, 104 S.Ct. 2839, 2845, 81 L.Ed.2d 786, 794; *Singleton v. Wulff* (1976), 428 U.S. 106, 112, 96 S.Ct. 2868, 2873, 49 L.Ed.2d 826, 832; *Sierra Club*

*v. Morton* (1972), 405 U.S. 727, 736-740, 92 S.Ct. 1361, 1367-1368, 31 L.Ed.2d 636, 643-646. However, the federal decisions in this area are not binding upon this court, and we are free to dispense with the requirement for injury where the public interest so demands. "Unlike the federal courts, state courts are not bound by constitutional strictures on standing; with state courts standing is a self-imposed rule of restraint. State courts need not become enmeshed in the federal complexities and technicalities involving standing and are free to reject procedural frustrations in favor of just and expeditious determination on the ultimate merits."[10] (Footnote omitted.) 59 American Jurisprudence 2d (1987) 415, Parties, Section 30.

{¶ 33} This court has long taken the position that when the issues sought to be litigated are of great importance and interest to the public, they may be resolved in a form of action that involves no rights or obligations peculiar to named parties. Thus, in *In re Assignment of Judges to Hold Dist. Courts* (1878), 34 Ohio St. 431, it was held that two legislative enactments, 75 Ohio Laws 139 and 537, which undertook to reconstruct the common pleas districts of the state, would work "the

10. The federal courts have described the problem of standing as being among " 'the most amorphous [concepts] in the entire domain of public law.' " *Flast v. Cohen* (1968), 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947, 961, quoting Hearings on S. 2097, before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary, 89th Cong., 2d Session (1966) 498 (statement of Professor Paul A. Freund). Justice William O. Douglas warned that "[g]eneralizations about standing to sue are largely worthless as such." *Assn. of Data Processing Serv. Org., Inc. v. Camp* (1970), 397 U.S. 150, 151, 90 S.Ct. 827, 829, 25 L.Ed.2d 184, 187. Similarly, in what has been described as "a nearly unprecedented degree of inarticulateness," Jaffe, Standing to Secure Judicial Review: Public Actions (1961), 74 Harv.L.Rev. 1265, 1268, Justice Frankfurter wrote: "It would not further clarification of this complicated specialty of federal jurisdiction, the solution of whose problems is in any event more or less determined by the specific circumstances of individual situations, to set out the divergent grounds in support of standing in these cases." *United States ex rel. Chapman v. Fed. Power Comm.* (1953), 345 U.S. 153, 156, 73 S.Ct. 609, 612, 97 L.Ed. 918, 925. It has also been stated that "[c]onfusion twice-confounded reigns in the area of federal jurisdiction described as 'standing to sue,' " Berger, Standing to Sue in Public Actions: Is it a Constitutional Requirement? (1969), 78 Yale L.J. 816, and the high court has been constrained to acknowledge that " 'the concept of "Art. III standing" has not been defined with complete consistency in all of the various cases decided by this Court which have discussed it.' " *Whitmore, supra*, 495 U.S. at 155, 110 S.Ct. at 1723, 109 L.Ed.2d at 145, quoting *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.* (1982), 454 U.S. 464, 475, 102 S.Ct. 752, 760, 70 L.Ed.2d 700, 710.

substantial destruction of," *id.* at 436, constituted "an attempt to overthrow," *id.* at 438, and were "subversive of the judicial system established by the constitution," *id.* at 439. The court, viewing the issues presented as "of the highest importance," *id.* at 432, determined the constitutionality of the acts solely upon the submission of briefs of *amici curiae*.

**{¶ 34}** In *State v. Brown* (1882), 38 Ohio St. 344, at paragraph one of the syllabus, the court held that "[a] proceeding in mandamus to compel the sheriff to give notice and make proclamation to the qualified voters of a county to elect a judge of the court of common pleas therein is properly instituted upon the relation of an elector of such county." In so holding, the court explained as follows:

"It is said that this proceeding could only be properly instituted upon the relation of the attorney-general, and that the relator is not a party 'beneficially interested' in the sense in which that term is used in the [mandamus] statute. * * * This objection, we think, is not well taken. The relator, as a citizen of Clermont county, is interested in having the proper number of courts and judges to administer justice therein; as an elector, he would be entitled to vote at the election, if an election were proper, and would be himself eligible to the office." *Id.* at 346-347.

**{¶ 35}** In *State ex rel. Meyer v. Henderson* (1883), 38 Ohio St. 644, the court held that the Clerk of the city of Cincinnati was required, under an ordinance, to advertise for sealed proposals for the construction of a street railway. In discussing whether the clerk could be compelled by mandamus to perform this duty, upon the relation of a citizen and owner of property along the line of the proposed railroad, the court explained:

"As regards the degree of interest on the part of the relator, requisite to make him a proper party on whose information the proceedings may be instituted, a distinction is taken between cases where the extraordinary aid of a mandamus is invoked, merely for the purpose of enforcing or protecting a private right,

unconnected with the public interest, and those cases where the purpose of the application is the enforcement of a purely public right, where the people at large are the real party in interest, and, while the authorities are somewhat conflicting, yet the decided weight of authority supports the proposition that, where the relief is sought merely for the protection of private rights, the relator must show some personal or special interest in the subject matter, since he is regarded as the real party in interest and his rights must clearly appear. On the other hand, where the question is one of public right and the object of the mandamus is to procure the enforcement of a public duty, the people are regarded as the real party, and the relator need not show that he has any legal or special interest in the result, it being sufficient to show that he is a citizen, and, as such, interested in the execution of the laws." *Id.* at 648-649.

{¶ 36} In *State ex rel. Trauger v. Nash, supra,* relator, as an elector, citizen, and taxpayer, filed an action in mandamus to compel Governor George K. Nash to fill a vacancy in the office of Lieutenant Governor created by the resignation of Carl L. Nippert. The court held that "[t]he attorney general not having become such, a private citizen may be the relator in a mandamus proceeding to enforce the performance of a public duty affecting himself as a citizen and the citizens of the state at large." *Id.* at paragraph one of the syllabus. In so holding, the court explained:

"[I]t may be conceded that a majority of the courts which have pronounced opinions on the subject, have held that a private relator applying for a mandamus must show a special interest in himself; but even in some of those jurisdictions it has been said that 'the rule which rejects the intervention of private complainants against public grievances is one of discretion and not of law.' *Ayres v. Board of State Auditors* [1880], 42 Mich. 422, 429 [4 N.W. 274, 278-279]. And in the same case, pages 429-430 [4 N.W. 274, 279], the court made the following observations which are very pertinent here: ' * * * There are serious objections against allowing

mere interlopers to meddle with the affairs of the state, and it is not usually allowed *unless under circumstances when the public injury by its refusal will be serious.*' " (Emphasis added.) *Id.,* 66 Ohio St. at 615-616, 64 N.E. at 558-559.

{¶ 37} In *State ex rel. Newell v. Brown* (1954), 162 Ohio St. 147, 54 O.O. 392, 122 N.E.2d 105, relator, as citizen, taxpayer, and elector of Cleveland Heights, filed an original action in prohibition in this court seeking to prevent the Secretary of State and the members of the Board of Elections of Cuyahoga County from placing on a ballot the names of certain candidates for the office of several judgeships. In allowing the action and ultimately finding R.C. 3513.256 unconstitutional, the court held, at paragraph one of the syllabus:

"Ordinarily a person is not authorized to attack the constitutionality of a statute, where his private rights have suffered no interference or impairment, but as a matter of public policy a citizen does have such an interest in his government as to give him capacity to maintain a proper action to enforce the performance of a public duty affecting himself and citizens generally."

{¶ 38} The court explained that "[w]here a public right, as distinguished from a purely private right, is involved, a citizen need not show any special interest therein, but he may maintain a proper action predicated on his citizenship relation to such public right. This doctrine has been steadily adhered to by this court over the years." *Id.* at 150-151, 54 O.O. at 393, 122 N.E.2d at 107.

{¶ 39} More recently, in *State ex rel. Cater v. N. Olmsted* (1994), 69 Ohio St.3d 315, 322-323, 631 N.E.2d 1048, 1054-1055, we held that a taxpayer has standing as such to enforce the public's right to proper execution of city charter removal provisions, regardless of any private or personal benefit. While the mandamus action in *Cater* was brought pursuant to R.C. 733.59, which specifically provides for judicial review, we have made clear that R.C. 733.56 through 733.61 merely codify the public-right doctrine as to municipal corporations, and that the doctrine exists independent of any statute authorizing invocation of the judicial

process. *State ex rel. Nimon v. Springdale* (1966), 6 Ohio St.2d 1, 4-5, 35 O.O.2d 1, 3, 215 N.E.2d 592, 595. In particular, the court in *Nimon* listed a long line of cases in support of the citizen/taxpayer-mandamus action, and explained that "no case cited in the footnote involves (1) a municipal corporation; (2) Section 733.59, Revised Code, or any statute similar thereto; or (3) an extrastatutory demand upon, and refusal of, a county prosecutor, the Attorney General or other public legal officer to institute the suit." *Id.*, 6 Ohio St.2d at 4, 35 O.O.2d at 3, 215 N.E.2d at 595. See, also, 67 Ohio Jurisprudence 3d (1986) 388-390, Mandamus, Section 124.

{¶ 40} Thus, the public action is fully conceived in Ohio as a means to vindicate the general public interest. The only question that remains is whether the present action should be allowed to proceed as a private action, a public action, neither, or both.

{¶ 41} In support of their claim for a personal or private right to secure judicial review, relators have submitted uncontroverted affidavits to the effect that Am.Sub.H.B. No. 350 has caused OATL to lose dues-paying members, and its members to lose fees and clients. While we do not question the accuracy or veracity of relators' affidavits, we must reject the doctrine of lawyer standing. Virtually every legislative action is bound to affect at least some attorneys who practice in an area of law related to the subject of the legislation. Since any injury, however small, is sufficient for purposes of private-action standing, there would be no objective basis upon which to disallow suits by attorneys or their organizations to challenge any number of statutory enactments. Quite frankly, we are not willing to allow every lawyer who suffers a diminution in income traceable to legislation to mount a constitutional challenge in his or her own right. Accordingly, we find that the present action should not be allowed as a private action.

{¶ 42} However, there can be no doubt that the issues sought to be litigated in this case are of such a high order of public concern as to justify allowing this action as a public action. The people of this state have delegated their judicial

power to the courts, and have expressly prohibited the General Assembly from exercising it. Section 1, Article IV, and Section 32, Article II, Ohio Constitution. "A people does not lose majesty by achieving liberty." *Hale, supra*, 55 Ohio St. at 214, 45 N.E. at 200. The argument surely defeats itself that proclaims that the people's interest in keeping the judicial power of the state in those in whom they vested it does not rise to the level of a public right. Indeed, it is difficult to imagine a right more public in nature than one whose usurpation has been described as the very definition of tyranny. See *State ex rel. Bryant, supra*, 120 Ohio St. at 473, 166 N.E. at 410; *Zanesville, supra*, 63 Ohio St. at 451, 59 N.E. at 110. If the General Assembly could, even inadvertently, reenact legislation declared unconstitutional by this court and "require the courts to treat [these laws] as valid * * * the whole power of the government would at once become absorbed and taken into itself by the legislature." *Bartlett, supra*, 73 Ohio St. at 58, 75 N.E. at 941.

{¶ 43} We are well aware, as respondents point out, that the unconstitutionality of a statute does not deprive a court of the initial jurisdiction to proceed to its terms; and, therefore, a writ of prohibition will not lie to prevent a court of common pleas from determining its own jurisdiction or rendering an anticipated erroneous judgment. See *State ex rel. Crebs v. Wayne Cty. Court of Common Pleas* (1974), 38 Ohio St.2d 51, 52, 67 O.O.2d 61, 309 N.E.2d 926, 927; *State ex rel. Heimann v. George* (1976), 45 Ohio St.2d 231, 232, 74 O.O.2d 376, 377, 344 N.E.2d 130, 131. See, also, *State ex rel. Tubbs Jones v. Suster* (1998), 84 Ohio St.3d 70, 74, 701 N.E.2d 1002, 1006. However, this case has little to do with the jurisdiction of common pleas courts to initially determine constitutional questions or with preventing anticipated erroneous judgments. Here, the General Assembly has, in several places, reenacted legislation which this court has already determined to be unconstitutional and/or in conflict with the rules we have prescribed pursuant to Section 5(B), Article IV of the Ohio Constitution governing practice and procedure for Ohio courts. As will be seen in the following section,

the General Assembly has clearly indicated in Section 5, Am.Sub.H.B. No. 350, that these provisions were not reenacted inadvertently, but that it intends for the courts to treat these laws as valid notwithstanding our previous pronouncements. Respondents have cited no authority, and we reject any such notion, that purports to give any inferior tribunal the power to reject the mandates of this court on constitutional questions or rules of court in favor of conflicting judicial mandates issued by the General Assembly. To say the least, this is not how our system of government operates.

{¶ 44} We hold, therefore, that where the object of an action in mandamus and/or prohibition is to procure the enforcement or protection of a public right, the relator need not show any legal or special individual interest in the result, it being sufficient that relator is an Ohio citizen and, as such, interested in the execution of the laws of this state.

{¶ 45} Accordingly, we now proceed to determine the merits of relators' claims.[11]

## IV

### Am.Sub.H.B. No. 350 Usurps Judicial Power in Violation of the Doctrine of Separation of Powers

{¶ 46} A statute that violates the doctrine of separation of powers is unconstitutional. In *State v. Hochhausler* (1996), 76 Ohio St.3d 455, 463, 668 N.E.2d 457, 465-466, Chief Justice Moyer explained as follows:

"The principle of separation of powers is embedded in the constitutional framework of our state government. The Ohio Constitution applies the principle in defining the nature and scope of powers designated to the three branches of the government. *State v. Warner* (1990), 55 Ohio St.3d 31, 43-44, 564 N.E.2d 18, 31.

---

11. As to respondents' arguments going to the true nature of the relief sought and the availability of alternative remedies and forms of actions, we reject these arguments for the reasons stated in *State ex rel. Zupancic v. Limbach* (1991), 58 Ohio St.3d 130, 131-134, 568 N.E.2d 1206, 1207-1209.

See *State v. Harmon* (1877), 31 Ohio St. 250, 258. It is inherent in our theory of government ' "that each of the three grand divisions of the government, must be protected from the encroachments of the others, so far that its integrity and independence may be preserved. * * * " ' *S. Euclid v. Jemison* (1986), 28 Ohio St.3d 157, 159, 28 OBR 250, 252, 503 N.E.2d 136, 138, quoting *Fairview v. Giffee* (1905), 73 Ohio St. 183, 187, 76 N.E. 865, 866."

**{¶ 47}** In light of the foregoing history, and with this principle of separation of powers in mind, we will proceed to examine several aspects of Am.Sub.H.B. No. 350.

## A

## Statutes of Repose

{¶ 48} Former R.C. 2305.131, 134 Ohio Laws, Part I, 530, barred tort actions against designers and engineers of improvements to real property that were brought more than ten years after the completion of the construction services. In *Brennaman v. R.M.I Co.* (1994), 70 Ohio St.3d 460, 639 N.E.2d 425, paragraph two of the syllabus, we held:

"R.C. 2305.131, a statute of repose, violates the right to a remedy guaranteed by Section 16, Article I of the Ohio Constitution, and is, thus, unconstitutional. (*Sedar v. Knowlton Constr. Co.* [1990], 49 Ohio St.3d 193, 551 N.E.2d 938, overruled.)"

{¶ 49} Pursuant to *Brennaman*, "the General Assembly is constitutionally precluded from depriving a claimant of a right to a remedy 'before a claimant knew or should have known of her injury.' " *Id.,* 70 Ohio St.3d at 466, 639 N.E.2d at 430, quoting *Burgess v. Eli Lilly & Co.* (1993), 66 Ohio St.3d 59, 61, 609 N.E.2d 140, 141. On the authority of *Brennaman*, we reversed contrary appellate court judgments in *Cyrus v. Henes* (1994), 70 Ohio St.3d 640, 640 N.E.2d 810; *Ross v. Tom Reith, Inc.* (1995), 71 Ohio St.3d 563, 645 N.E.2d 729; and *Cleveland City School Dist. Bd. of Edn. v. URS Co.* (1995), 72 Ohio St.3d 188, 648 N.E.2d 811.

{¶ 50} Prior to the passage of Am.Sub.H.B. No. 350, the Legislative Service Commission ("LSC") advised the General Assembly that under these decisions, "[a]n issue may be raised that a statute of repose infringes the 'open courts, right-to-remedy, and due course of law' provisions of Section 16 of Article I of the Ohio Constitution." See Research Memorandum, No. R-121-1458, *supra*, fn. 7, at 3, 5. The LSC informed the General Assembly that "only the Ohio Supreme Court * * * would have the constitutional authority to 'definitively' declare * * * whether those [statutory] provisions passed constitutional muster." *Id.* at 1.

{¶ 51} Nevertheless, Am.Sub.H.B. No. 350 reenacts R.C. 2305.131 as a

fifteen-year statute of repose with certain exceptions, and provides for a fifteen-year statute of repose for wrongful death actions involving a product liability claim (R.C. 2125.02[D][2]), a fifteen-year statute of repose for product liability claims (R.C. 2305.10[C]), a six-year statute of repose for professional malpractice claims other than medical (R.C. 2305.11[A][2]), and a six-year statute of repose for medical malpractice claims (R.C. 2305.11[B][3]).

{¶ 52} In enacting and/or amending these sections, the General Assembly chose to usurp this court's constitutional authority by refusing to recognize our holdings in *Brennaman, Cyrus,* and *Ross*.[12] The General Assembly's stated intent is "to respectfully disagree with those holdings and to recognize the legal rationale set forth in the concurring-dissenting opinion in *Brennaman*," Section 5(E)(2), Am.Sub.H.B. No. 350, 146 Ohio Laws, Part II, 4021, as well as the holdings in *Sedar* (which was overruled) and several courts of appeals, including that of the Court of Appeals for Lorain County, which we reversed in *Cyrus*. Section 5(E)(1). See, also, Sections 5(E)(5), (G)(1), (L)(1) and (2), 146 Ohio Laws, Part II, 4022, 4023, 4025. The General Assembly not only directs, contrary to our declarations, that "the concept of a statute of repose does not violate the remedy by due course of law and open courts provisions of Section 16 of Article I of the Ohio

---

12. Professor Werber argues that the fifteen-year statute of repose for wrongful death actions set forth in R.C. 2125.02(D)(2) "is unlike any other in the legislation as it relates to a statutory cause of action." Werber, Ohio Tort Reform Versus the Ohio Constitution, *supra*, 69 Temple L.Rev. at 1177. Relying on *Shover v. Cordis Corp.* (1991), 61 Ohio St.3d 213, 574 N.E.2d 457, Professor Werber argues that the result in *Shover*, based on "the principle that the legislature has the power to condition the right it created as it deems appropriate, applies with equal force to the repose provision." Werber at 1177. However, *Shover* has been overruled. *Collins v. Sotka* (1998), 81 Ohio St.3d 506, 692 N.E.2d 581. Moreover, the right-to-remedy analysis of the majority in *Shover* did not proceed from this premise. Instead, the majority in *Shover* explained that "[t]he effect of R.C. 2125.02(D) [now R.C. 2125.02(D)(1)] is to prevent what might otherwise be a cause of action from ever arising." *Id.*, 61 Ohio St.3d at 219, 574 N.E.2d at 462. This was the very same reasoning employed in *Sedar, supra*, 49 Ohio St.3d at 201, 551 N.E.2d at 946, to uphold the constitutionality of former R.C. 2305.131, and which was rejected in *Brennaman* and its progeny. Thus, *Shover* provides no more basis than *Sedar* on which to distinguish R.C. 2125.02(D)(2) from the other statutes of repose contained in Am.Sub.H.B. No. 350.

Constitution," Section 5(G)(1), it also finds that the failure to recognize the validity of rules "such as the six-year statutes of repose set forth in section 2305.11 of the Revised Code, as amended by this act, would violate the rights of certain defendants to due course of law under Section 16 of Article I of the Ohio constitution and due process of law under the due process clause of the Fourteenth Amendment to the United States Constitution." Section 5(G)(4).

**{¶ 53}** The following language from *Bartlett, supra*, 73 Ohio St. at 58, 75 N.E. at 941, has particular force here:

"It is sufficient to say that we adhere to [our prior] ruling [declaring acts to be in violation of the constitution]; and that the sections of the statutes now under consideration do not stop short of being a mandate to all of the courts [to accept as legal that which we have declared unconstitutional]. This we regard as wholly beyond the power conferred upon the general assembly by the constitution. The power conferred upon the general assembly is legislative power, and that body is expressly prohibited from exercising any judicial power which is not expressly conferred by the constitution. Article 2, section 32.

"At this time, the limits of the power invested in the respective co-ordinate branches of the government [are] so well defined and so generally understood, that we are constrained to believe that, whatever may have been the thought of the persons who drafted them, the enactment of these sections was an inadvertence on the part of the general assembly; for it is well settled that the legislature cannot annul, reverse or modify a judgment of a court already rendered, nor require the courts to treat as valid laws those which are unconstitutional. If this could be permitted the whole power of the government would at once become absorbed and taken into itself by the legislature."

**{¶ 54}** Am.Sub.H.B. No. 350, however, does not allow for any pretense of inadvertence. While some members of this court, now and in the past, may disagree with the holding in *Brennaman*, no member of this court can, consistent with his or

her oath of office, find that the General Assembly has operated within the boundaries of its constitutional authority by brushing aside a mandate of this court on constitutional issues as if it were of no consequence. Indeed, the very notion of it threatens the judiciary as an independent branch of government and tears at the fabric of our Constitution.

## B

## Certificate of Merit

{¶ 55} Section 5(B), Article IV of the Ohio Constitution provides: "The supreme court shall prescribe rules governing practice and procedure in all courts of the state, which rules shall not abridge, enlarge, or modify any substantive right. * * * All laws in conflict with such rules shall be of no further force or effect after such rules have taken effect."

{¶ 56} In *Rockey v. 84 Lumber Co.* (1993), 66 Ohio St.3d 221, 611 N.E.2d 789, paragraph two of the syllabus, we held:

"The Ohio Rules of Civil Procedure, which were promulgated by the Supreme Court pursuant to Section 5(B), Article IV of the Ohio Constitution, must control over subsequently enacted inconsistent statutes purporting to govern procedural matters."

{¶ 57} Civ.R. 11 provides in part:

"Except when otherwise specifically provided by these rules, pleadings need not be verified or accompanied by affidavit. The signature of an attorney or *pro se* party constitutes a certificate by the attorney or party that the attorney or party has read the document; that to the best of the attorney's or party's knowledge, information, and belief there is good ground to support it; and that it is not interposed for delay."

{¶ 58} Former R.C. 2307.42 provided that in an action upon a medical, dental, optometric, or chiropractic claim, the complaint must be accompanied by affidavit of merit. 142 Ohio Laws, Part III, 4696. In *Hiatt v. S. Health Facilities,*

*Inc.* (1994), 68 Ohio St.3d 236, 626 N.E.2d 71, syllabus, we held that "R.C. 2307.42 is in conflict with Civ.R. 11 and is invalid and of no force and effect." See, also, *State ex rel. Bohlman v. O'Donnell* (1994), 68 Ohio St.3d 496, 628 N.E.2d 1367.

{¶ 59} Am.Sub.H.B. No. 350 repeals R.C. 2307.42, but enacts a certificate-of-merit requirement under R.C. 2305.011(A) and (B) for actions upon a medical, dental, optometric, chiropractic, or malpractice claim. Under R.C. 2305.011, the certificate of merit must be filed within ninety days after the later of the filing of a responsive pleading or compliance with discovery requests for the production of the appropriate medical or professional records.

{¶ 60} Respondent Montgomery argues that *Hiatt* is not determinative of R.C. 2305.011's validity because the General Assembly now "sets forth its view that the certificate of merit is substantive and it sets forth its rationale for that conclusion." In Section 5(H)(1), the General Assembly states that its intent in enacting R.C. 2305.011 is to respond to the holding in *Hiatt* "by clarifying the jurisdictional nature of certificate of merit requirements and creating a substantive requirement for medical, dental, optometric, chiropractic, and malpractice claims." 146 Ohio Laws, Part II, 4024.

{¶ 61} The notion that the General Assembly can direct our trial courts to apply a legislative rule that this court has already declared to be in conflict with the Civil Rules simply by denominating it "jurisdictional" or "substantive" is so fundamentally contrary to the principle of separation of powers that it deserves no further comment. Moreover, the General Assembly has clarified nothing by expressing its view that certificate-of-merit requirements are jurisdictional in nature. Former R.C. 2307.42(B) specifically provided that trial courts "shall have *jurisdiction* to hear and determine an action upon a medical, dental, optometric, or chiropractic claim *only if* the complaint or other pleading that sets forth the claim is supported by" an affidavit of merit. (Emphasis added.) The fact that the General Assembly views certificate-of-merit requirements as something other than

38

procedural is nothing new, and it certainly adds nothing to its claim of clarification that the term "jurisdiction" was used in former R.C. 2307.42, but appears nowhere in R.C. 2305.011(B).[13]

## C

### Collateral Benefits

**{¶ 62}** In *Pryor v. Webber* (1970), 23 Ohio St.2d 104, 52 O.O.2d 395, 263 N.E.2d 235, paragraph two of the syllabus, the court held:

"The collateral source rule is an exception to the general rule of compensatory damages in a tort action, and evidence of compensation from collateral sources is not admissible to diminish the damages for which a tort-feasor must pay for his negligent act."

**{¶ 63}** The court in *Pryor* explained:

"The collateral source rule has been defined as 'the judicial refusal to credit to the benefit of the wrongdoer money or services received in reparation of the injury caused which emanates from sources other than the wrongdoer.'  Maxwell, The Collateral Source Rule in the American Law of Damages, 46 Minn.L.Rev. 669, 670.

" * * *

" ' * * * To this extent, plaintiff may get double payment on account of the same items.  The defendant wrongdoer should not, it is said, get the benefit of payments that come to the plaintiff from a "collateral source" (*i.e.*, "collateral" to the defendant).'  2 Harper and James, The Law of Torts, 1343, Section 25.22."  *Id.*, 23 Ohio St.2d at 107-108, 52 O.O.2d at 397, 263 N.E.2d at 238.

---

13. While an argument could be made that, unlike former R.C. 2307.42, R.C. 2305.011 does not require the affidavit or certificate to be filed *as part of the complaint*, this argument must also be rejected.  The essence of Civ.R. 11 is that "[t]he signature of an attorney or *pro se* party constitutes a certificate by the attorney or *pro se* party that  * * * there is good ground to support it," and nothing more is needed by way of verification or affidavit.  The question whether the Civil Rules should, or could, be amended to allow for certificate-of-merit requirements is entirely distinct from the question of whether the General Assembly can do so of its own volition.

**{¶ 64}** In an effort to abrogate the collateral source rule adopted in *Pryor*, the General Assembly originally enacted R.C. 2317.45 as part of the Tort Reform Act of 1987, Am.Sub.H.B. No. 1, 142 Ohio Laws, Part I, 1661, 1694, to require trial courts to deduct from a plaintiff's jury award collateral benefits which have or will be received by the plaintiff. In *Sorrell v. Thevenir* (1994), 69 Ohio St.3d 415, 633 N.E.2d 504, syllabus, we held that "R.C. 2317.45 violates Sections 2, 5 and 16, Article I of the Ohio Constitution, and is unconstitutional *in toto*." See, also, *May v. Tandy Corp.* (1994), 69 Ohio St.3d 415, 633 N.E.2d 504; *Depew v. Ogella* (1994), 69 Ohio St.3d 610, 635 N.E.2d 310.

**{¶ 65}** In holding R.C. 2317.45 to be violative of the Due Process Clause of Section 16, Article I of the Ohio Constitution, we explained in *Sorrell*:

"In our view, R.C. 2317.45 has not been shown to be necessary to promote a compelling state interest that requires undermining the fundamental and inviolate right to a jury trial. Moreover, we believe that R.C. 2317.45 does not withstand scrutiny even under the less stringent rational basis standard * * *.

" * * *

" * * * [W]ith respect to the goal of R.C. 2317.45 of eliminating double recoveries, the means employed in the statute to attain the goal are both irrational and arbitrary. Of primary significance is that the statute requires deductions from jury verdicts irrespective of whether a collateral benefit defined in R.C. 2317.45(A)(1) is actually included in the verdict. While the goal of preventing double recoveries is not arbitrary or unreasonable, * * * R.C. 2317.45 fails to take into account whether the collateral benefits to be deducted are within the damages actually found by the jury, especially where there are no interrogatories to quantify the categories of damages that make up the general verdict. Thus, the statute can arbitrarily reduce damages that a jury awards a plaintiff, since under the statute it is irrelevant whether any collateral benefit actually represents any portion of the jury's award." *Id.*, 69 Ohio St.3d at 423-424, 633 N.E.2d at 511.

{¶ 66} Am.Sub.H.B. No. 350 amends R.C. 2317.45 in order to "[a]brogate the common law collateral source rule as adopted  * * * in *Pryor*  * * * and reaffirmed in *Sorrell*," and "[a]ddress the aspects of section 2317.45  * * * found in [*Sorrell, May,* and *Depew*] to be unconstitutional."  Sections 5(I)(1)(a) and (b), 146 Ohio Laws, Part II, 4024.  As amended by Am.Sub.H.B. No. 350, R.C. 2317.45 provides:

"(A) As used in this section:

"(1) 'Collateral benefits' means benefits that are paid by any source, including workers' compensation benefits, to or on behalf of the plaintiff as a result of an injury or loss to person or property, regardless of whether there is an obligation to pay back the money or other benefits, in whole or in part, upon recovery in a tort action.  'Collateral benefits' does not include life insurance proceeds.

" * * *

"(3) 'Trier of fact' means the jury or, in a nonjury action, the court.

"(B) In determining the amount of the compensatory damages that are recoverable by the plaintiff in a tort action, the trier of fact shall consider, if presented in the tort action, relevant collateral benefits that have been paid, or that the source of the benefits has acknowledged are payable, from insurance other than insurance for which the plaintiff, spouse of the plaintiff, or parent of the plaintiff if the plaintiff is a minor, has paid a premium, insurance that is subject to a right of subrogation, or insurance that has any other obligation of repayment, including, but not limited to, evidence of the amount of the collateral benefit and of the costs, premiums, or charges for the collateral benefits."

{¶ 67} Respondent Montgomery contends that "[t]he statute cures the defect of [its] predecessor  * * * [because] [t]here is no mandatory deduction, nor is there a blanket deduction of all collateral benefits.  Rather, the statute provides the jury with more information in order to permit the jury to better determine the

amount of recovery."

{¶ 68} *Amici* Ohio Association of Civil Trial Attorneys and Defense Research Institute ("OACTA") contend that amended R.C. 2317.45 cures the violation of the right to a jury trial of its predecessor "by removing judicial participation in the damage finding process," and that "[b]ecause the right to a jury trial is not implicated, strict scrutiny does not apply [to a due process analysis]. The statute need only have a 'rational basis' to pass constitutional muster." Quoting from Werber, Ohio Tort Reform Versus the Ohio Constitution (1996), 69 Temp.L.Rev. 1155, 1184, OACTA argues:

" 'As there is now no deduction for collateral source payments, there is no need for ascertaining whether such payments have been included in the jury verdict. The statute authorizes the jury to consider the effect of collateral source payments, however it believes appropriate, in its determination of compensatory damages. The statute's modifications have removed the arbitrary and unreasonable aspects of the prior statute. In other words, the statute merely permits the jury to predicate its award on the full story.' "

{¶ 69} We agree with OACTA that the appropriate inquiry is whether amended R.C. 2317.45 violates due process, and that the rational basis test is the appropriate test to apply in making this determination. However, it is pure sophistry to suggest that "[a]s there is now no deduction for collateral source payments, there is no need for ascertaining whether such payments have been included in the jury verdict." While the statute no longer mandates a postverdict deduction for collateral source payments, it certainly authorizes a preverdict setoff for collateral payments. In either case, it is contemplated that the amount of the compensatory damages may be reduced by the amount of collateral payments, thus triggering the constitutional requirement that those payments match the items or categories of damages actually awarded. *Sorrell, supra.* See, also, *Buchman v. Wayne Trace Local School Dist. Bd. of Edn.* (1995), 73 Ohio St.3d 260, 269, 652 N.E.2d 952,

42

960. Therefore, regardless of when and by whom the reduction for collateral source payments is made, there is every "need for ascertaining whether such payments have been included in the jury verdict."

{¶ 70} However, amended R.C. 2317.45 does everything but remove those aspects of its preamended form that were held in *Sorrell* to be arbitrary and unreasonable. Present R.C. 2317.45 still fails to take into account whether the collateral benefits held against the general verdict are within the damages actually found by the jury. Present R.C. 2317.45 essentially gathers all evidence of collateral source payments, regardless of the category of harm for which it compensates and regardless of whether it compensates for past or future losses, tosses it in an indiscriminate heap along with all categories and items of compensatory damages, and authorizes, out of that, a general verdict replete with collateral benefit setoffs. Any prevention of double recovery that may result from this morass is fortuitous at best. Indeed, the relation between the purported goal of eliminating double recovery and the means employed in amended R.C. 2317.45 to achieve it is so attenuated that one could conclude that the primary goal of R.C. 2317.45 is simply to reduce damages generally. Amended R.C. 2317.45 simply attempts to sidestep *Sorrell*.

## D

## Damage Caps

## 1

## Punitive Damages

{¶ 71} Former R.C. 2315.21(C)(2) provided:

"In a tort action, whether the trier of fact is a jury or the court, if the trier of fact determines that any defendant is liable for punitive or exemplary damages, the amount of those damages shall be determined by the court." 142 Ohio Laws, Part I, 1691.

{¶ 72} In *Zoppo v. Homestead Ins. Co.* (1994), 71 Ohio St.3d 552, 644

N.E.2d 397, paragraph two of the syllabus, we held that "R.C. 2315.21(C)(2) violates the right to trial by jury under Section 5, Article I of the Ohio Constitution." In so holding, we explained:

"Prior to the 1987 enactment of R.C. 2315.21(C)(2), 142 Ohio Laws, Part I, 1661, 1691, juries in this state had the integral role of determining not only when punitive damages were justified *but also of assessing the amount* of such damages. Clearly, the assessment of punitive damages by the jury stems from the common law and is encompassed within the right to trial by jury. * * *

"It is well settled that the right to trial by jury ' "cannot be invaded or violated by either legislative act or judicial order or decree." ' *Sorrell v. Thevenir, supra*, 69 Ohio St.3d at 421, 633 N.E.2d at 510, quoting *Gibbs v. Girard* (1913), 88 Ohio St. 34, 102 N.E. 299, paragraph two of the syllabus. Since R.C. 2315.21(C)(2) impairs the traditional function of the jury in *determining the appropriate amount* of damages, we hold that R.C. 2315.21(C)(2) violates the right to trial by jury under Section 5, Article I of the Ohio Constitution." (Emphasis added.) *Id.*, 71 Ohio St.3d at 557, 644 N.E.2d at 401.

{¶ 73} Am.Sub.H.B. No. 350 amends former R.C. 2315.21(C), and renumbers it R.C. 2315.21(D)(1), to provide that the trier of fact shall determine both "the liability of a defendant for punitive or exemplary damages and the amount of those damages to be awarded." (R.C. 2315.18 has also been amended to reflect this change.) However, R.C. 2315.21(D)(1) provides further:

"(a) Except as otherwise provided in division (D)(3)(b) of this section, the court shall not enter judgment for punitive or exemplary damages in excess of the lesser of three times the amount of the compensatory damages awarded to the plaintiff from that defendant or one hundred thousand dollars, as determined pursuant to division (B)(2) or (3) of this section.

"(b) If the defendant is a large employer, except as otherwise provided in division (D)(3)(b) of this section, the court shall not enter judgment for punitive or

exemplary damages in excess of the greater of three times the amount of the compensatory damages awarded to the plaintiff from that defendant or two hundred fifty thousand dollars, as determined pursuant to division (B)(2) or (3) of this section."

{¶ 74} Pursuant to amended R.C. 2307.801(E) and 2315.21(A)(4), R.C. 2315.21(D)(1) also applies to product liability claims.

{¶ 75} Section 5(B)(2) explains:

"In amending sections 2307.80 (2307.801), 2315.18, and 2315.21 of the Revised Code in this act to permit the trier of fact to determine the amount of recoverable punitive or exemplary damages to be awarded in connection with a product liability claim or in a tort action, as defined in section 2315.21 of the Revised Code, it is the intent of the General Assembly to reflect that portion of the holding of the Supreme Court in *Zoppo v. Homestead Ins. Co.* [*supra*] that statutory provisions requiring a trial court to determine the amount of awardable punitive or exemplary damages are unconstitutional as being violative of the right to a trial by jury established by Section 5 of Article I of the Ohio Constitution." 146 Ohio Laws, Part II, 4020.

{¶ 76} However, in prohibiting courts from entering judgment on a jury verdict greater than the amounts specified in R.C. 2315.21(D)(1)(a) and (b), the General Assembly "finds" that "[p]unitive or exemplary damages awarded in a tort action are similar in nature to fines and additional costs imposed in criminal actions," and that the lack of a statutory ceiling has resulted "in excessive punishment of tortfeasors for their wrongful actions or omissions, in violations of the prohibitions against cruel and unusual punishment of Section 9 of Article I of the Ohio Constitution and the Eighth Amendment to the Constitution of the United States, and in a denial of due process of law as guaranteed by Section 16 of Article I of the Ohio Constitution and Section 1 of the Fourteenth Amendment to the Constitution of the United States." Sections 5(B)(1)(a) and (b), Am.Sub.H.B. No.

350, *id.* at 4019-4020.

{¶ 77} These amendments create the illusion of compliance by permitting the jury to assess the amount of punitive damages to be awarded, but requiring the court to nullify the jury's determination and substitute the will of the General Assembly in any case where a jury awards punitive damages in excess of the amounts specified in R.C. 2315.21(D)(1)(a) and (b). This is a Constitution we are dealing with. "The right to a trial by jury is a fundamental constitutional right which derives from the Magna Carta." *Zoppo*, 71 Ohio St.3d at 556, 644 N.E.2d at 401. The right belongs to the litigant, not the jury, and a statute that allows the jury to determine the amount of punitive damages to be awarded but denies the litigant the benefit of that determination stands on no better constitutional footing than one that precludes the jury from making the determination in the first instance.

{¶ 78} Indeed, R.C. 2315.21(D)(1)'s violation of the right to trial by jury becomes particularly egregious when considered in conjunction with the added provisions of R.C. 2315.21(D)(3). Under R.C. 2315.21(D)(3)(a), all tort victims are denied the right to have a jury determine punitive damages against a particular tortfeasor if, at some previous time, in any state or federal court, some tort victim or victims collected against that tortfeasor a punitive damage award the aggregate sum of which exceeds the amounts specified in R.C. 2315.21(D)(1). The constitutional right to have a jury determine both the liability and amount of punitive damages to be awarded thereby becomes a lottery prize, going to that victim or victims fortunate enough to be the first to win and collect it. All others simply lose their constitutional right to a jury trial as to punitive damages.

{¶ 79} Moreover, the General Assembly has in effect found that any punitive damage award in excess of the greater of three times the amount of compensatory damages or $250,000 is unconstitutional. This finding contravenes our decision in *Williams v. Aetna Fin. Co.* (1998), 83 Ohio St.3d 464, 479-480, 700 N.E.2d 859, 870-871, where we upheld the constitutionality of an award for

46

$15,000 in compensatory damages and $1.5 million in punitive damages.

**2**

**General Damages**

{¶ 80} Former R.C. 2307.43 provided:

"In no event shall an amount recovered for general damages in any medical claim, as defined in division (D) of section 2305.11 of the Revised Code, not involving death exceed the sum of two hundred thousand dollars." 136 Ohio Laws, Part II, 3840, 3843.

{¶ 81} In *Morris v. Savoy* (1991), 61 Ohio St.3d 684, 576 N.E.2d 765, the court held R.C. 2307.43 to be violative of the due course of law provision of Section 16, Article I of the Ohio Constitution. In reaching its conclusion, the court applied the less stringent "rational relation" test, under which a legislative enactment not involving a fundamental right or suspect class will be deemed valid on due process grounds " '[1] if it bears a real and substantial relation to the public health, safety, morals or general welfare of the public and [2] if it is not unreasonable or arbitrary.' "[14] *Id.*, 61 Ohio St.3d at 688-689, 576 N.E.2d at 769, quoting *Mominee v. Scherbarth* (1986), 28 Ohio St.3d 270, 274, 28 OBR 346, 349-350, 503 N.E.2d 717, 720-721.

{¶ 82} The court explained:

---

14. The majority in *Morris* found that R.C. 2307.43 "did not involve a fundamental right or suspect class." *Id.*, 61 Ohio St.3d at 689, 576 N.E.2d at 769-770. This finding seems to suggest that the right to a jury trial guaranteed by Section 5, Article I of the Ohio Constitution was not implicated, although the majority did not conduct any specific analysis into this issue. This is significant for two reasons. First, the denial of a right to trial by jury would invalidate the statute irrespective of whether due process was accorded. Second, a finding that the right to trial by jury was implicated would have invoked a higher level of judicial scrutiny for purposes of the due process analysis. "Under this 'strict scrutiny' standard for reviewing legislation which restricts the exercise of fundamental rights, a statute will be considered unconstitutional unless it is shown to be necessary to promote a compelling governmental interest." *Id.*, 61 Ohio St.3d at 704, 576 N.E.2d at 780 (A. William Sweeney, J., concurring in part and dissenting in part). While *Morris* may have generated some confusion over whether R.C. 2307.43 implicates the right to trial by jury, our decisions subsequent to *Morris* clearly hold that the right to a jury trial includes the right to have the jury determine the amount of damages to be awarded. See *Zoppo; Galayda*; *Sorrell, supra*.

"We are unable to find, either in the *amici* briefs or elsewhere, any evidence to buttress the proposition that there is a rational connection between awards over $200,000 and malpractice insurance rates. There is evidence of the converse, however. The Supreme Court of Texas found no relationship between insurance rates and the cap, citing an independent study that showed that less than .6 percent of all claims brought were for more than $100,000. *Lucas v. United States* (Tex.1988), 757 S.W.2d 687, 691. According to three *amici* arguing against the statute's constitutionality, a 1987 study by the Insurance Service Organization, the rate-setting arm of the insurance industry, found that the savings from various tort reforms, including a $250,000 cap on noneconomic damages, were 'marginal to nonexistent.' * * *

"On the second prong of the analysis set forth in *Mominee, supra*, whether the statute is unreasonable or arbitrary, we note with approval the following excerpt from an opinion of the Court of Appeals for Stark County regarding R.C. 2307.43:

" ' * * * [I]t is irrational and arbitrary to impose the cost of the intended benefit to the general public solely upon a class consisting of those most severely injured by medical malpractice. * * * ' *Nervo v. Pritchard* (June 10, 1985), Stark App. No. CA-6560, unreported, at 8.

"We hold, therefore, that R.C. 2307.43 is unconstitutional because it does not bear a real and substantial relation to public health or welfare and further because it is unreasonable and arbitrary." *Id.*, 61 Ohio St.3d at 690-691, 576 N.E.2d at 770-771.

{¶ 83} Am.Sub.H.B. No. 350 repeals former R.C. 2307.43. Section 5(I)(2) provides that "[i]t is the intent of the General Assembly in repealing former section 2307.43 of the Revised Code in this act to reflect the holding of the Supreme Court in *Morris v. Savoy* [*supra*]." 146 Ohio Laws, Part II, 4025. However, Am.Sub.H.B. No. 350 enacts R.C. 2323.54, which caps the amount of noneconomic damages recoverable in any tort action at the greater of $250,000 or three times the economic

loss, to a maximum of $500,000; or, in the case of certain specified types of permanent injuries, at the greater of $1 million or $35,000 times the number of years remaining in the plaintiff's expected life.[15] R.C. 2305.01 has also been

15. R.C. 2323.54 provides:

"(A) As used in this section:

"(1) 'Economic loss' means any of the following types of pecuniary harm:

"(a) All wages, salaries, or other compensation lost as a result of an injury, death, or loss to person or property that is a subject of a tort action, including wages, salaries, or other compensation lost as of the date of a judgment and future expected lost earnings;

"(b) All expenditures for medical care or treatment, rehabilitation services, or other care, treatment, services, products, or accommodations incurred as a result of an injury, death, or loss to person that is a subject of a tort action, including expenditures for those purposes that were incurred as of the date of a judgment and expenditures for those purposes that, in the determination of the trier of fact, will be incurred in the future because of the injury, whether paid by the injured person or by another person on behalf of the injured person;

"(c) All expenditures of a person whose property was injured or destroyed or of another person on behalf of the person whose property was injured or destroyed in order to repair or replace the property;

"(d) Any other expenditures incurred as a result of an injury, death, or loss to person or property that is a subject of a tort action, except expenditures of the injured person, the person whose property was injured or destroyed, or another person on behalf of the injured person or the person whose property was injured or destroyed in relation to the actual preparation or presentation of the claim involved.

"(2) 'Noneconomic loss' means nonpecuniary harm that results from an injury, death, or loss to person that is a subject of a tort action, including, but not limited to, pain and suffering, loss of society, consortium, companionship, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, or education, mental anguish, and any other intangible loss.

"(3) 'Tort action' means a civil action for damages for injury, death, or loss to person or property. 'Tort action' includes a product liability claim but does not include a civil action for damages for a breach of contract or another agreement between persons.

"(4) 'Trier of fact' means the jury or, in a nonjury action, the court.

"(B)(1) Except as otherwise provided in division (B)(2) of this section, the amount of compensatory damages that represents damages for noneconomic loss that is recoverable in a tort action shall not exceed the greater of two hundred fifty thousand dollars or an amount that is equal to three times the plaintiff's economic loss, as determined by the trier of fact, to a maximum of five hundred thousand dollars.

"(2) The amount recoverable for noneconomic losses may exceed the amount described in division (B)(1) of this section but shall not exceed the greater of one million dollars or thirty-five thousand dollars times the number of years remaining in the plaintiff's expected life if the noneconomic losses of the plaintiff are for either of the following:

"(a) Permanent and substantial physical deformity, loss of use of a limb, or loss of a bodily organ system;

"(b) Permanent physical functional injury that permanently prevents the injured person from being able to independently care for herself or himself and perform life sustaining activities.

"(C) If a trial is conducted in a tort action and a plaintiff prevails with respect to any claim for relief, the court in a nonjury trial shall make findings of fact, and the jury in a jury trial shall

amended to provide that "[t]he court of common pleas shall not have jurisdiction to award compensatory damages for noneconomic loss that exceed the amounts set forth in section 2323.54 of the Revised Code."

**{¶ 84}** Section 5(P), Am.Sub.H.B. No. 350, provides as follows:

"(P) In enacting the amendments to section 2305.01 and new section 2323.54 of the Revised Code, the General Assembly finds that the direct and indirect costs of disproportionate compensatory damages awards for noneconomic loss in tort actions increase the costs of health care delivery, manufacturing, and the delivery of services and that those increased costs have a significant negative impact upon the economic well-being of the citizens of the state. The General Assembly further finds all of the following:

"(1) The limitation on the recovery of compensatory damages for noneconomic loss in tort actions is intended to stabilize the costs for health care

---

return a general verdict accompanied by answers to interrogatories, that shall specify all of the following:

"(1) The total compensatory damages recoverable by the plaintiff, subject to possible adjustment under division (D) of this section;

"(2) The portion of the total compensatory damages that represents damages for economic loss;

"(3) The portion of the total compensatory damages that represents damages for noneconomic loss and that is subject to possible adjustment under division (D) of this section.

"(D) After the trier of fact in a tort action complies with division (C) of this section, the court shall enter a judgment in favor of the plaintiff for compensatory damages for economic loss in the amount determined pursuant to division (C)(2) of this section and a judgment in favor of the plaintiff for compensatory damages for noneconomic loss in whichever of the following amounts applies:

"(1) The amount determined pursuant to division (C)(3) of this section if that amount is equal to or less than the applicable maximum amount recoverable for noneconomic loss as provided in division (B) of this section;

"(2) The maximum amount recoverable for noneconomic loss as provided in division (B) of this section if the amount determined pursuant to division (C)(3) of this section is greater than the applicable maximum amount recoverable for noneconomic loss as provided in division (B) of this section.

" * * *

"(H) If the trier of fact is a jury, the court shall not instruct the jury with respect to the limit on compensatory damages for noneconomic loss described in divisions (B) and (D) of this section, and neither counsel for any party nor a witness shall inform the jury or potential jurors of that limit."

delivery, manufacturing, and the delivery of services.

"(2) The citizens of this state will benefit from stabilized costs for health care delivery, manufacturing, and the delivery of services.

"(3) This state has a rational and legitimate state interest in stabilizing the costs of health care deliver, manufacturing, and the delivery of services.

"(4) Limiting the amount of compensatory damages for noneconomic loss in tort actions furthers this rational and legitimate state interest.

"(5) The distinctions among claimants with a permanent physical functional loss strikes a  rational balance between potential plaintiffs and defendants in consideration of the intent of an award for noneconomic losses, while treating similar plaintiffs equally, acknowledging that such distinctions do not limit the award of actual economic damages.

"(6) The Ohio Constitution, Article I, Section 19(A) provides that 'The amount of damages recoverable by civil action in the courts for death caused by the wrongful act, neglect, or default of another, shall not be limited by law.'; that provision refers only to economic or pecuniary losses and not to noneconomic or nonpecuniary losses, which by implication distinguishes among potential damages and supports the authority of the General Assembly to limit damages otherwise.

"(7) Noneconomic damage caps have been determined by the Congressional Budget Office of the United States Congress, the United States Accounting Office, and the American Academy of Actuaries to effectively reduce loss payments, liability insurance premiums, and defensive medicine costs, upon which findings the General Assembly partially relies.

"(8) The courts of common pleas were established by the Ohio Constitution as courts of general jurisdiction in Ohio, but the Constitution itself limits their jurisdiction to that which is expressly conferred by the General Assembly, including jurisdiction to limit consideration of noneconomic damages.  The Ohio Constitution, Article IV, Section 4(B) provides:  'The courts of common pleas and

divisions thereof shall have such original jurisdiction over all justiciable matters and such powers of review of proceedings of administrative officers and agencies as may be provided by law.' In addition, Section 18 of Article IV provides: 'The several judges of the supreme court, of the common pleas, and of such other courts as may be created, shall, respectively, have and exercise such power and jurisdiction, at chambers, or otherwise, as may be directed by law.' The Supreme Court of Ohio has uniformly held that the provisions of Article IV are not self-executing. Rather, the jurisdiction of the common pleas courts is limited to whatever the legislature may choose to bestow. *Central Ohio Transit Auth. v. Transport Workers Union of America* (1988), 37 Ohio St.3d 56 [524 N.E.2d 151]; *Seventh Urban, Inc. v. University Circle* (1981), 67 Ohio St.2d 19 [21 O.O.3d 12, 423 N.E.2d 1070]; *State ex rel. Miller v. Keefe* (1958), 168 Ohio St. 234 [6 O.O.2d 18, 152 N.E.2d 113]." 146 Ohio Laws, Part II, 4027-4028.

**{¶ 85}** These findings, like others in Section 5, Am.Sub.H.B. No. 350, are judicial, not legislative in nature, and are being used to justify the reenactment of legislation already determined to be unconstitutional. The thrust of Section 5(P) is to declare R.C. 2323.54 constitutional on the basis that it caps only noneconomic damages, rather than economic damages. However, this is precisely what former R.C. 2307.43 did. In his concurring and dissenting opinion in *Morris*, Justice Holmes described former R.C. 2307.43 as follows:

"It must be emphasized that this limiting section involves *only* general, noneconomic damages, and *not* special, economic damages. The damages that *are* limited to $200,000 are those of a nonpecuniary harm alleged to have resulted from injury, such as pain and suffering, loss of society, companionship, mental anguish, etc. The damages that are *not* limited are those of a pecuniary harm such as all wages, salaries, or other compensation lost as a result of the injury; all expenditures for medical care or treatment, rehabilitation services, or other care, treatment, products or accommodations needed by virtue of the injury; or any other

expenditures incurred as a result of the injury." (Emphasis *sic*.) *Morris, supra*, 61 Ohio St.3d at 696, 576 N.E.2d at 774 (Holmes, J., concurring and dissenting in part).

{¶ 86} In addition, R.C. 2323.54 continues to impose the cost of the intended benefit to the general public solely upon a class consisting of those most severely injured by tortious conduct. Thus, like former R.C. 2307.43, R.C. 2323.54 is invalid on due process grounds because it is unreasonable and arbitrary, irrespective of whether it bears a real and substantial relation to public health or welfare. *Morris*, 61 Ohio St.3d at 691, 576 N.E.2d at 771. There is simply no constitutional difference between R.C. 2323.54 and former R.C. 2307.43. By replacing former R.C. 2307.43 with R.C. 2323.54, the General Assembly has merely expanded the scope of a statute declared unconstitutional by this court in the context of medical claims to include all tort claims, medical and otherwise.

{¶ 87} Moreover, the General Assembly has attempted in Section 5(P)(8) to bind this court to its interpretation of the Constitution. We have held, as the General Assembly asserts, that "the jurisdiction of the common pleas courts is limited to whatever the legislature may choose to bestow." However, we have never allowed this rubric to be employed in an effort to shield legislation from judicial review or deprive the courts of the jurisdiction to enforce a constitutional right. The General Assembly may not gain the authority to take away a constitutional right by the simple expedient of limiting the jurisdiction of the courts to the parameters of its own unconstitutional Act. "What the constitution grants, no statute may take away." *State ex rel. Hoel v. Brown* (1922), 105 Ohio St. 479, 138 N.E. 230, paragraph three of the syllabus.

### E

**Appropriate Summary Judgment Standard for Proving Causation in**
**Hazardous or Toxic Exposure Cases**

{¶ 88} In *Horton v. Harwick Chem. Corp.* (1995), 73 Ohio St.3d 679, 653

N.E.2d 1196, paragraphs two and three of the syllabus, we held:

"2. A plaintiff need not prove that he was exposed to a specific product on a regular basis over some extended period of time in close proximity to where the plaintiff actually worked in order to prove that the product was a substantial factor in causing his injury. (*Lohrmann v. Pittsburgh Corning Corp.* [C.A.4, 1986], 782 F.2d 1156, disapproved.)

"3. Summary judgment is proper in an asbestos case in the same circumstances as in any other case, *i.e.*, when, looking at the evidence as a whole, (1) no genuine issue of material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence, construed most strongly in favor of the nonmoving party, that reasonable minds could only conclude in favor of the moving party."

{¶ 89} Section 5(O) provides:

"The intent of the General Assembly in enacting section 2307.792 of the Revised Code is to establish the *judicial standard* for the granting of summary judgment in hazardous or toxic exposure cases, consistent with the decision of *Lohrmann v. Pittsburgh Corning Corp.* * * * and contrary to Syllabus 2, *Horton v. Harwick Chemical Corp.* * * * The General Assembly recognizes that the courts of Ohio prior to the *Horton* decision generally followed the rationale of the *Lohrmann* decision in determining when summary judgment was appropriate in hazardous or toxic exposure cases, a similar standard of which has been adopted by the majority of states. The *Lohrmann* standard provides litigants and the courts of Ohio with an objective, easily applied standard for determining when summary judgment is appropriate." (Emphasis added.) 146 Ohio Laws, Part II, 4027.

{¶ 90} This is a clear violation of the principle of separation of powers for the General Assembly to actually attempt to establish a judicial standard for the granting of summary judgment, contrary to our own, and based on a decision by another court, which this court has expressly rejected pursuant to our authority

under Section 5(B), Article IV of the Ohio Constitution.

## F

### Admissibility of Evidence of a Common Insurer

{¶ 91} Like the Ohio Rules of Civil Procedure, the Ohio Rules of Evidence, which were promulgated by the Supreme Court pursuant to Section 5(B), Article IV of the Ohio Constitution, must control over subsequently enacted inconsistent statutes purporting to govern evidentiary matters. *In re Coy* (1993), 67 Ohio St.3d 215, 616 N.E.2d 1105.

{¶ 92} In *Ede v. Atrium S. OB-GYN, Inc.* (1994), 71 Ohio St.3d 124, 642 N.E.2d 365, at the syllabus, we held:

"In a medical malpractice action, evidence of a commonality of insurance interests between a defendant and an expert witness is sufficiently probative of the expert's bias as to clearly outweigh any potential prejudice evidence of insurance might cause. (Evid.R. 411, applied.)"

{¶ 93} Am.Sub.H.B. No. 350 enacts R.C. 2317.46, which provides:

"(C) If a defendant presents testimony or other evidence in a tort action by means of an expert witness, evidence of a common insurer of liability of the defendant and the expert witness or evidence of a potential financial impact of the action on the amount of liability insurance premiums paid by the expert witness is inadmissible to prove bias, interest, or prejudice of the expert witness unless the party offering the evidence proves that the probative value of the evidence outweighs the evidence's potential prejudicial effect."

{¶ 94} Section 5(N), Am.Sub.H.B. No. 350, provides:

"In enacting division (C) of section 2317.46 of the Revised Code in this act, the General Assembly declares that it is the public policy of the state of Ohio that evidence of a common insurer of liability of the defendant and an expert witness in an action upon a medical, dental, optometric, or chiropractic claim or evidence of a potential financial impact of the action on the amount of liability insurance

premiums paid by the expert witness is not admissible to prove bias, interest, or prejudice of the expert witness unless the party offering the evidence proves that probative value of the evidence outweighs the evidence's potential prejudicial effect."

**{¶ 95}** As our holding in *Ede* involves the application of a Rule of Evidence promulgated pursuant to Section 5(B), Article IV of the Ohio Constitution, any attempt to statutorily supersede that holding constitutes a violation of the doctrine of separation of powers.

### G

### Summary — Separation of Powers

**{¶ 96}** Am.Sub.H.B. No. 350 is no ordinary piece of legislation that happens to inadvertently cross the boundaries of legislative authority. The General Assembly has circumvented our mandates, while attempting to establish itself as the final arbiter of the validity of its own legislation. It has boldly seized the power of constitutional adjudication, appropriated the authority to establish rules of court and overrule judicial declarations of unconstitutionality, and, under the thinly veiled guise of declaring "public policy," establishing "jurisdiction," and enacting "substantive" law, forbade the courts the province of judicial review.

**{¶ 97}** Such a threat to judicial independence is reminiscent of a bygone era of legislative omnipotence existing prior to the adoption of the Constitution of 1851. In this regard, we find the following remarks of Hamilton in The Federalist No. 78 to be particularly illuminating:

"The complete independence of the courts of justice is particularly essential in a limited Constitution. * * * Without this, all the reservations of particular rights or privileges would amount to nothing.

" * * *

"If it be said that the legislative body are themselves the constitutional judges of their own powers, and that the construction they put upon them is

conclusive upon the other departments, it may be answered, that this cannot be the natural presumption, where it is not to be collected from any particular provisions in the Constitution.  It is not otherwise to be supposed, that the Constitution could intend to enable the representatives of the people to substitute their will to that of their constituents.  It is far more rational to suppose, that the courts were designed to be an intermediate body between the people and the legislature, in order, among other things, to keep the latter within the limits assigned to their authority.  The interpretation of the laws is the proper and peculiar province of the courts.  A constitution is, in fact, and must be regarded by the judges, as a fundamental law.  It therefore belongs to them to ascertain its meaning, as well as the meaning of any particular act proceeding from the legislative body.  If there should happen to be an irreconcilable variance between the two, that which has the superior obligation and validity ought, of course, to be preferred; or, in other words, the Constitution ought to be preferred to the statute, the intention of the people to the intention of their agents.

"Nor does this conclusion by any means suppose a superiority of the judicial to the legislative power.  It only supposes that the power of the people is superior to both; and that where the will of the legislature, declared in its statutes, stands in opposition to that of the people, declared in the Constitution, the judges ought to be governed by the latter rather than the former.  They ought to regulate their decisions by the fundamental laws, rather than by those which are not fundamental."

{¶ 98} As another writer has observed, "we create an independent judiciary in order to remove from the legislature the temptation to draft [unconstitutional] statutes and to then use the judiciary under its control as an instrument to shore up such statutes.  * * * In particular, it is difficult to imagine how an independent judiciary could possibly play the role of keeping the legislature in check without also having the final say in what the constitution means.  * * * Therefore, to give the legislature and not the judiciary the final say on the meaning of the constitution,

would undermine  * * * the separation of powers scheme by giving the legislature the means to overrule or circumvent the judiciary's decision to strike down a statute as unconstitutional."  Anhang, Separation of Powers and The Rule of Law:  On The Role of Judicial Restraint in 'Secur[ing] the Blessings of Liberty' (1990), 24 Akron L.Rev. 211, 226.  And as Chief Justice Huntington so shrewdly observed in *Rutherford v. M'Faddon, Pollack, supra*, at 75:  "The people can never be secure under any form of government, where there is no check among the several departments."

{¶ 99} We hold that Am.Sub.H.B. No. 350 usurps judicial power in violation of the Ohio constitutional doctrine of separation of powers and, therefore, is unconstitutional.

**V**

**Am.Sub.H.B. No. 350 Violates the One-Subject Rule**

{¶ 100} In their first ancillary claim, relators maintain that Am.Sub.H.B. No. 350 was passed in violation of Section 15(D), Article II of the Ohio Constitution, which provides that "[n]o bill shall contain more than one subject, which shall be clearly expressed in its title." Relators argue that Am.Sub.H.B. No. 350 "addresses at least 19 diverse topics * * * [that] cannot logically be viewed as a single subject." Respondent Montgomery maintains that "each and every provision contained in H.B. 350 deals with the law of torts."

{¶ 101} The bill purports to encompass "changes in the laws pertaining to tort and other civil actions." Title, 146 Ohio Laws, Part II, 3868. Section 8, Am.Sub.H.B. No. 350 provides:

"The General Assembly hereby finds that the sections presented in this act constitute one subject as required by Section 15(D), Article II of the Ohio Constitution, in particular finding that each change and each topic relates directly to or in conjunction with other sections to the subject of tort and other civil action reform as clearly enumerated in the title. The General Assembly further recognizes the holdings in *State ex rel. Ohio AFL-CIO v. Voinovich* (1994), 69 Ohio St.3d 225 [631 N.E.2d 582], and *State ex rel. Dix v. Celeste* (1984), 11 Ohio St.3d 141 [11 OBR 436, 464 N.E.2d 153], and finds that a common purpose or relationship exists among the sections, representing a potential plurality but not disunity of topics, notwithstanding that reasonable minds might differ in identifying more than one topic contained in the bill."

{¶ 102} This determination, however, is neither conclusive nor binding upon this court. As we held in *Dix, supra*, at the syllabus:

"The one-subject rule contained in Section 15(D), Article II of the Ohio Constitution is merely directory in nature; while it is within the discretion of the courts to rely upon the judgment of the General Assembly as to a bill's compliance

with the Constitution, a manifestly gross and fraudulent violation of this rule will cause an enactment to be invalidated. (*Pim v. Nicholson*, 6 Ohio St. 176, approved and followed, and extended; *State ex rel. Attorney General v. Covington*, 29 Ohio St. 102, paragraph seven of the syllabus, modified.)"

{¶ 103} The one-subject rule was added to our Constitution in 1851. It was one of the proposals resulting from the efforts of the Second Constitutional Convention, of 1850-1851. See Kulewicz, The History of the One-Subject Rule of the Ohio Constitution (1997), 45 Cleve.St.L.Rev. 591, 591-593. The genesis of support for this rule had its roots in the same concerns over the General Assembly's dominance of state government that formed the most significant theme of the Constitution of 1851. These concerns, illustrated earlier in this opinion, resulted in the placement of concrete limits on the power of the General Assembly to proceed however it saw fit in the enactment of legislation. The one-subject rule is one product of the drafters' desire to place checks on the legislative branch's ability to exploit its position as the overwhelmingly pre-eminent branch of state government prior to 1851.

{¶ 104} Accordingly, one delegate to the Constitutional Convention of 1851 remarked:

"It is well known that special charters are always 'got through' our Legislature at will, and it must be evident that it always will be so, in the absence of a constitutional prohibition. When was there ever an instance within the recollection of the oldest legislator on this floor, where a single special act of incorporation was defeated — I mean an act applying to any subject matter embraced in this report. * * * It is but too generally known, that these 'special acts' are 'got through' by a log-rolling system as it is called, the friends of one 'bill' voting for the bills of others, in consideration of their aid, when the final vote is taken upon his own. These acts will always pass a legislative body — the 'dignity' and 'purity' of your General Assembly to the contrary, notwithstanding. Any

association of capitalists, who ask for a right of way, through any part of the country, will always get it, and ten thousand remonstrances might be sent up in vain. A single member could carry it through the Legislature, if each other member had had a bill of his own for similar acts of [incorporation]." I Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of Ohio (1851) 351.

{¶ 105} One commentator, writing approximately sixty years later, identified the above quote as "an illuminating exposition of the devious ways of legislatures sixty years ago." Galbreath, Constitutional Conventions of Ohio (1911) 27.

{¶ 106} Thus, as we explained in *Dix, supra*, 11 Ohio St.3d at 142-143, 11 OBR at 438, 464 N.E.2d at 155:

"Ohio is one of among forty-one states whose Constitution contains a one-subject provision. The primary and universally recognized purpose of such provisions is to prevent logrolling—' * * * the practice of several minorities combining their several proposals as different provisions of a single bill and thus consolidating their votes so that a majority is obtained for the omnibus bill where perhaps no single proposal of each minority could have obtained majority approval separately.' * * *

"The one-subject provision attacks logrolling by disallowing unnatural combinations of provisions in acts, *i.e.*, those dealing with more than one subject, on the theory that the best explanation for the unnatural combination is a tactical one—logrolling. By limiting each bill to a single subject, the bill will have unity and thus the purpose of the provision will be satisfied."

{¶ 107} In attempting to define our role in the enforcement of the one-subject provision of Section 15(D), Article II of the Ohio Constitution, this court has been emphatic about its reluctance to interfere or become entangled with the legislative process. We have endeavored to "accor[d] appropriate respect to the

General Assembly, a coordinate branch of the state government." *Dix, supra*, 11 Ohio St.3d at 144, 11 OBR at 439, 464 N.E.2d at 157. In so doing, we have recognized "the necessity of giving the General Assembly great latitude in enacting comprehensive legislation by not construing the one-subject provision so as to unnecessarily restrict the scope and operation of laws, or to multiply their number excessively, or to prevent legislation from embracing in one act all matters properly connected with one general subject." *Id.* at 145, 11 OBR at 440, 464 N.E.2d at 157. We have emphasized that "every presumption in favor of the enactment's validity should be indulged." *Hoover v. Franklin Cty. Bd. of Commrs.* (1985), 19 Ohio St.3d 1, 6, 19 OBR 1, 5, 482 N.E.2d 575, 580, and noted that "while this provision has been invoked in hundreds of cases in various jurisdictions, ' * * * in only a handful of cases have the courts held an act to embrace more than one subject.' " *Dix*, 11 Ohio St.3d at 144, 11 OBR at 439, 464 N.E.2d at 157, quoting Ruud, "No Law Shall Embrace More Than One Subject" (1958), 42 Minn.L.Rev. 389, 447.

{¶ 108} On the other hand, we have been equally emphatic about not extending this reluctance to impede the legislative process so far as to negate the one-subject provision of Section 15(D), Article II of the Ohio Constitution. "While this court has consistently expressed its reluctance to interfere with the legislative process, it will not, however, abdicate in its duty to enforce the Ohio Constitution." *Dix,* 11 Ohio St.3d at 144, 11 OBR at 439, 464 N.E.2d at 157. See, also, *Ohio AFL-CIO v. Voinovich, supra*, 69 Ohio St.3d at 229, 631 N.E.2d at 586.

{¶ 109} With these principles in mind, we have adopted the position that "the one-subject provision is not directed at plurality but at disunity in subject matter." *Dix*, 11 Ohio St.3d at 146, 11 OBR at 440-441, 464 N.E.2d at 158. See, also, *State ex rel. Hinkle v. Franklin Cty. Bd. of Elections* (1991), 62 Ohio St.3d 145, 148, 580 N.E.2d 767, 770. Thus, "[t]he mere fact that a bill embraces more than one topic is not fatal, as long as a common purpose or relationship exists between the topics." *Hoover, supra*, 19 Ohio St.3d at 6, 19 OBR at 5, 482 N.E.2d

at 580; *Ohio AFL-CIO, supra*, 69 Ohio St.3d at 229, 631 N.E.2d at 586. However, "when there is an absence of common purpose or relationship between specific topics in an act and when there are no discernible practical, rational or legitimate reasons for combining the provisions in one act, there is a strong suggestion that the provisions were combined for tactical reasons, *i.e.*, logrolling. Inasmuch as this was the very evil the one-subject rule was designed to prevent, an act which contains such unrelated provisions must necessarily be held to be invalid in order to effectuate the purpose of the rule." *Dix,* 11 Ohio St.3d at 145, 11 OBR at 440, 464 N.E.2d at 157. See, also, *Beagle v. Walden* (1997), 78 Ohio St.3d 59, 62, 676 N.E.2d 506, 507; *Hinkle, supra*, 62 Ohio St.3d at 148-149, 580 N.E.2d at 770; *Hoover, supra*, 19 Ohio St.3d at 6, 19 OBR at 5, 482 N.E.2d at 580.

{¶ 110} Undoubtedly, Am.Sub.H.B. No. 350 embraces a multitude of topics. See fn. 6. The bill affects some eighteen different titles, thirty-eight different chapters, and over one hundred different sections of the Revised Code, as well as procedural and evidentiary rules and hitherto uncodified common law. The pivotal question is whether these various topics share a common purpose or relationship, *i.e.*, whether they unite to form a single subject for purposes of Section 15(D), Article II of the Ohio Constitution.

{¶ 111} While an examination of any two provisions contained in Am.Sub.H.B. No. 350, carefully selected and compared in isolation, could support a finding that "a common purpose or relationship exists among the sections, representing a potential plurality but not disunity of topics," an examination of the bill in its entirety belies such a conclusion. For example, R.C. 2323.54 (establishing noneconomic damage caps) could be grouped with amended R.C. 2305.01 (depriving the court of common pleas of jurisdiction to award compensatory damages in excess of the amounts set forth in R.C. 2323.54) to be comprised within the subject "noneconomic damage caps." Similarly, R.C. 2315.21(D)(1) (establishing punitive damage caps), and R.C. 2305.01 (which also deprives the

common pleas court of jurisdiction to award punitive damages that exceed the amounts set forth in R.C. 2315.21), could be juxtaposed under the subject "punitive damage caps." If noneconomic and punitive damage caps were to be considered topics rather than subjects, and if the term "subject" were interpreted broadly enough, R.C. 2305.01, 2315.21(D)(1), and 2323.54 could all be classified as "damage cap provisions." It could then be argued that R.C. 2315.21(B)(1), which governs the procedural matter of bifurcating tort actions into compensatory and punitive damage stages, correlates with these provisions under the expanded heading "tort damage matters."

{¶ 112} However, a thorough and in-depth review of Am.Sub.H.B. No. 350 reveals numerous other, more diverse, provisions contained therein; and as we examine the substance and content of these provisions, it becomes apparent that the commonality of purpose or relationship between them becomes increasingly attenuated, and the statement of subject necessary to encompass them grows broader and more expansive, until finally any suggestion of unity of subject matter is illusory. For example, Am.Sub.H.B. No. 350 attempts to combine the wearing of seat belts with employment discrimination claims, class actions arising from the sale of securities with limitations on agency liability in actions against a hospital, recall notification with qualified immunity for athletic coaches, actions by a roller skater with supporting affidavits in a medical claim, and so on. See fn. 6.

{¶ 113} With all due respect and deference to the General Assembly, it is simply impossible to uphold the constitutionality of Am.Sub.H.B. No. 350 under the one-subject provision of Section 15(D), Article II of the Ohio Constitution. The various provisions in this bill are so blatantly unrelated that, if allowed to stand as a single subject, this court would be forever left with no basis upon which to invalidate any bill, no matter how flawed. Indeed, even one of Am.Sub.H.B. No. 350's most ardent defenders was compelled to write that "[d]ue to its scope, House Bill 350 may be subjected to an attack based on Article II, § 15(C) [*sic* (D)] of the

Ohio Constitution—the one subject rule." Werber, *supra*, 69 Temple L.Rev. at 1156, fn. 3. Our precedents require us to invalidate a bill when a "manifestly gross and fraudulent violation" of the one-subject rule has occurred. Despite the General Assembly's own stated conclusion to the contrary, we find that just such a violation has occurred in the enactment of Am.Sub.H.B. No. 350. To find otherwise would be no less than an "abdicat[ion] [of our] duty to enforce the Ohio Constitution." *Dix, supra*, 11 Ohio St.3d at 144, 11 OBR at 439, 464 N.E.2d at 157.

{¶ 114} In pronouncing its compliance with the one-subject rule, the General Assembly has managed to concoct a subject broad enough to encompass the multifarious provisions of Am.Sub.H.B. No. 350—"laws pertaining to tort and other civil actions." We fully accept the proposition that, in order to accord appropriate deference to the General Assembly in its law-making function, a subject for purposes of the one-subject rule is to be liberally construed as a classification of significant scope and generality. As Black's Law Dictionary (6 Ed.1990) 1425, states, the "term 'subject' within such constitutional provisions is to be given a broad and extensive meaning so as to allow legislature full scope to include in one act all matters having a logical or natural connection." However, this principle does not extend to give the General Assembly such latitude as to include in one act blatantly unrelated matters, and we are not obliged to accept that any ingenious comprehensive form of expression constitutes a legitimate subject for purposes of the one-subject rule.

{¶ 115} This is not the first time that this court has faced this issue. In *Hinkle, supra*, 62 Ohio St.3d at 148, 580 N.E.2d at 770, we were "not persuaded by the board of elections' argument that Am.Sub.H.B. No. 200 manifests two topics on the same subject—'election matters'—because it provides for elective judicial offices and pertains to local option elections. To say that laws relating to the state judiciary and local option have elections in common is akin to saying that securities laws and drug trafficking penalties have sales in common—the connection is

merely coincidental."

{¶ 116} Similarly, in *Ohio AFL-CIO v. Voinovich, supra*, 69 Ohio St.3d at 230, 631 N.E.2d at 587, we held that certain provisions in 1993 Am.Sub.H.B. No. 107 creating an exemption for the employment of minors were unrelated to other provisions pertaining to workers' compensation, despite the fact that "[i]n a broad sense this exemption addresses the area of employment, an area also addressed by the workers' compensation laws."

{¶ 117} These cases can be perceived as points along a spectrum. At one end, closely related topics unite under a narrowly denominated subject. As the topics embraced in a single act become more diverse, and as their connection to each other becomes more attenuated, so the statement of subject necessary to comprehend them broadens and expands. There comes a point past which a denominated subject becomes so strained in its effort to cohere diverse matter as to lose its legitimacy as such. It becomes a ruse by which to connect blatantly unrelated topics. At the farthest end of this spectrum lies the single enactment which endeavors to legislate on all matters under the heading of "law."

{¶ 118} Am.Sub.H.B. No. 350 falls near the far end of this spectrum. As already stated, it advances the notion that "tort and other civil actions" is a legitimate subject under which to combine the wearing of seat belts with employment discrimination claims, class actions arising from the sale of securities with limitations on agency liability in actions against a hospital, recall notifications with qualified immunity for athletic coaches, actions by a roller skater with supporting affidavits in a medical claim and so on. These are but a few examples. If we accept this notion, the General Assembly could conceivably revamp all Ohio law in two strokes of the legislative pen — writing once on civil law and again on criminal law. The thought of it is staggering.

{¶ 119} We hold, therefore, that Am.Sub.H.B. No. 350 is unconstitutional in that it violates the one-subject provision of Section 15(D), Article II of the Ohio

Constitution.

{¶ 120} Respondent Montgomery and *amici* Owens Corning and American Legislative Exchange Council propose that any provision of Am.Sub.H.B. No. 350 found to be unconstitutional is severable from the remainder of the bill. They point to numerous cases in which this court has held that unconstitutional statutory provisions can and should be severed from the remainder of the statute of which they are a part, providing that severability will not fundamentally disrupt the statutory scheme. See *Hochhausler, supra*, 76 Ohio St.3d at 464-465, 668 N.E.2d at 466-467; *Hausman v. Dayton* (1995), 73 Ohio St.3d 671, 679, 653 N.E.2d 1190, 1196; *State ex rel. Huntington Ins. Agency, Inc. v. Duryee* (1995), 73 Ohio St.3d 530, 536, 653 N.E.2d 349, 355; *State ex rel. Maurer v. Sheward* (1994), 71 Ohio St.3d 513, 523-524, 644 N.E.2d 369, 377; *State ex rel. Doersam v. Indus. Comm.* (1989), 45 Ohio St.3d 115, 121, 543 N.E.2d 1169, 1175; *Jemison, supra*, 28 Ohio St.3d at 164, 28 OBR at 256, 503 N.E.2d at 142; *State ex rel. King v. Rhodes* (1967), 11 Ohio St.2d 95, 101, 40 O.O.2d 109, 112, 228 N.E.2d 653, 657; *Geiger v. Geiger* (1927), 117 Ohio St. 451, 466, 160 N.E. 28, 33. See, also, R.C. 1.50.

{¶ 121} In *Hinkle, supra*, 62 Ohio St.3d at 149, 580 N.E.2d at 770, this court provided the authority to sever portions of an act that violate the one-subject rule in order "to cure the defect and save the portions * * * which do relate to a single subject." In *Ohio AFL-CIO v. Voinovich*, the court again severed unrelated portions of a bill, but the various concurring and dissenting opinions in that case raised serious questions about the propriety of applying the doctrine of severability to cases involving the one-subject rule. As Justice A. William Sweeney observed, "a clear reading of all the concurring and dissenting opinions in the cause *sub judice* indicates there is adequate support for" overruling *Hinkle* on the issue of severability. *Id.*, 69 Ohio St.3d at 249, 631 N.E.2d at 600 (A. William Sweeney, J., concurring in part and dissenting in part). However, it is unnecessary to revisit *Hinkle* at this time because, even if we follow *Hinkle*, severability is not an option

here.

{¶ 122} Under *Hinkle*, whenever a bill contains more than one subject, this court is permitted to ascertain which subject is primary and which subject is an unrelated add-on. The former is then saved by severing the latter. Thus, the court in *Hinkle* determined that 1991 Am.Sub.H.B. No. 200 was mainly about matters pertaining to the state judicial system, and this aspect of the bill was saved by severing Section 7, a liquor-control law that declared what elections were affected by a recent definition of "resident district" for the purpose of exercising the local option privilege. Similarly, in *Ohio AFL-CIO v. Voinovich*, the court determined that 1993 Am.Sub.H.B. No. 107 was principally about workers' compensation, and this aspect of the bill was saved by severing other provisions relating to intentional torts and child labor.

{¶ 123} In the present case, however, it is not possible to make this kind of determination. Am.Sub.H.B. No. 350 is designed to comprehensively reform the civil justice system, and any attempt on our part to carve out a primary subject by identifying and assembling what we believe to be key or core provisions of the bill would constitute a legislative exercise wholly beyond the province of this court. Moreover, it appears, based on comments from Representative Pat Tiberi, the bill's architect, and several key supporters, that the passage of the entire bill was so dependent upon its unconstitutional component parts, particularly damage caps, statutes of repose, and collateral source offsets, that any possible identifiable core would not be worthy of salvation. See "Small Businesses Urge Tort Reform In Ohio," Financial News (Jan. 18, 1996); "Ohio Senate Approves Tort Reform Measures," Financial News (May 30, 1996); Kathy Showalter, "Time Limits, Payout Caps [Are] Major Tort Reform Issues," Business Dateline (May 3, 1996); "Tort Reform Effort May Be On Death Bed," Regional News (May 29, 1996); Tom McKee, "Wrangling Makes Action Iffy on Tort Bill," Business Dateline (Aug. 16, 1996).

**{¶ 124}** Accordingly, severability is not an option in this case, and Am.Sub.H.B. No. 350 must be held unconstitutional *in toto*.

## VI

## Conclusion

**{¶ 125}** A basic contention of the proponents of Am.Sub.H.B. No. 350 is that this court is without original jurisdiction to consider the constitutionality of this Act. However, this case involves a public right that of necessity requires this court to exercise its original jurisdiction and address the extensive and broad issues presented without waiting for piecemeal appeals winding their way through the lower courts. With the enactment of Am.Sub.H.B. No. 350, many litigants have been required to try their cases under procedural and substantive laws that have previously been declared invalid and unconstitutional by this court; and countless other individuals have been required to settle their claims under Am.Sub.H.B. No. 350, who will never have the opportunity to bring their cases to court. Thus this enactment is being enforced against the citizens of Ohio on a vast scale.

**{¶ 126}** The judicial branch is the final arbiter in interpreting the Constitution. Fairness and judicial economy, as well as the preservation of judicial independence, require this court to address this cause which is of the greatest concern to all of the citizens of Ohio. By doing otherwise, this court would become a willing participant in divesting the courts of judicial power and a coconspirator in the abdication of fundamental individual rights and liberties contained in our Constitution.

**{¶ 127}** We have addressed only some aspects of relators' primary claim and only one of their seven ancillary claims. This limited review, however, is not to be construed as either a rejection or acceptance of those claims not herein considered. Cf. *Best v. Taylor Machine Works* (1997), 179 Ill.2d 367, 228 Ill.Dec. 636, 689 N.E.2d 1057. We have simply gone as far as we need to. Based on all of the foregoing, it has become distressingly obvious that Am.Sub.H.B. No. 350 was

passed with disregard for the constraints imposed by the Ohio Constitution to curb legislative excesses.

{¶ 128} We recognize that Am.Sub.H.B. No. 350 arguably derives from the popular will, and that the people may alter or abolish the Constitution which they created; "yet it is not to be inferred from this principle, that the representatives of the people, whenever a momentary inclination happens to lay hold of a majority of their constituents, incompatible with the provisions of the existing Constitution, would, on that account, be justified in a violation of those provisions." Hamilton, The Federalist No. 78. It is our sworn duty to uphold the Constitution, even "where legislative invasions of it had been instigated by the major voice of the community." *Id.* Majoritarian preferences are transitory; the Constitution is enduring and fundamental.

## VII

### Anatomy of the Dissents

{¶ 129} Generally, a response to dissenting opinions is unwarranted in a majority opinion. However, this is no ordinary piece of legislation, nor are the dissenting opinions ordinary. Rather, the dissenting justices mischaracterize our findings, misconstrue prior decisions of this court, selectively extrapolate portions of Am.Sub.H.B. No. 350 while ignoring its overall tenor and content, dissociate themselves from a decision in which one of them concurred, suggest that we have created a new theory of standing, minimize the magnitude and scope of Am.Sub.H.B. No. 350 and the importance of separation of powers, accuse us of language unbecoming a judicial opinion, and question our faith in our courts of record, all in an obvious effort to distort our opinion into a form susceptible to conflagrant criticism and protect this legislation from any timely, meaningful, and inclusive judicial review.

{¶ 130} In order to dispel any confusion that these dissenting opinions may create regarding the nature and parameters of our holdings, we find it necessary to

issue the following response.

## A

## Relators Have Standing to Bring This Action

### 1

### The Application of the Public-Right Doctrine to the Facts of This Case Does Not Create Any New Judicial Doctrine or Theory of Standing

{¶ 131} In his dissent, the Chief Justice claims that "[t]he majority has, however, in applying paragraph one of the syllabus to the facts of this case, created a new judicial doctrine pursuant to which any citizen is deemed to have standing to assert violation of the public right to preservation of judicial power and implementation of the doctrine of separation of powers." According to the Chief Justice, it is "the majority's proposition that the actual-injury component of standing should be replaced by a public-right component in cases where it is asserted that a coequal branch of government has exceeded its constitutional authority." He argues that although the public-right doctrine "dates from the last century as an exception to the personal-injury requirement of standing * * *, the extension of that doctrine so as to equate public duty with enforcement of the doctrine of separation of powers, or with preservation of judicial power within the judiciary, is not a long-standing legal principle. The majority has indeed created a new theory of standing * * *."

{¶ 132} The public-right doctrine is, indeed, an exception to the personal-injury requirement of standing. But more than that, "the public action is conceived as an action to vindicate the general public interest. Not all alleged illegalities or irregularities are thought to be of that high order of concern." Jaffe, Standing to Secure Judicial Review: Public Actions (1961), 74 Harv.L.Rev. 1265, 1314. Thus, this court will entertain a public action " 'under circumstances when the public injury by its refusal will be serious.' " *State ex rel. Trauger, supra*, 66 Ohio St. at 616, 64 N.E. at 559, quoting *Ayres*, *supra*, 42 Mich. at 429, 4 N.W. at 279.

Similarly, in *State ex rel. Sego v. Kirkpatrick* (1974), 86 N.M. 359, 363, 524 P.2d 975, 979, the Supreme Court of New Mexico held that "even though a private party may not have standing to invoke the power of this Court to resolve constitutional questions and enforce constitutional compliance, this Court, in its discretion, may grant standing to private parties to vindicate the public interest in cases presenting issues of great public importance." In *Jenkins v. State* (Utah 1978), 585 P.2d 442, 443, the Supreme Court of Utah held that while it is true that under "the usual rule * * * one must be personally adversely affected before he has standing to prosecute an action * * *, it is also true this Court may grant standing where matters of great public interest and societal impact are concerned."

{¶ 133} The application of these principles to protect or enforce the people's right to maintain the constitutional system of justice they created is nothing new. See, *e.g.*, *In re Assignment of Judges to Hold Dist. Courts, supra; State v. Brown, supra*. It may be true that this court has not hitherto applied the public-right doctrine to review a statute like Am.Sub.H.B. No. 350, but we have never been confronted with a statute quite like Am.Sub.H.B. No. 350; and it is certainly no disparagement to the principles that underlie the doctrine to apply it so as to protect the people's interest in keeping the judicial power of the state in those in whom they vested it.

{¶ 134} We have not proposed, as the dissent suggests, that our citizens have standing as such to challenge the constitutionality of every legislative enactment that allegedly violates the doctrine of separation of powers or exceeds legislative authority. We have expressed quite clearly in our preamble to the issue of relators' standing that this court will entertain a public action only "*in the rare and extraordinary case*" where the challenged statute operates, "*directly and broadly, to divest the courts of judicial power*." (Emphasis added.) We will not entertain a public action to review the constitutionality of a legislative enactment unless it is of a magnitude and scope comparable to that of Am.Sub.H.B. No. 350.

{¶ 135} It is incongruous, therefore, for the dissent to suggest that we have created a new doctrine or theory of standing, and it is unfortunate that the dissent has chosen to distort our holding in order to criticize it.

## 2

## The Principle of Separation of Powers Is Embedded in the Constitutional Framework of Our State Government

{¶ 136} The dissent argues that Am.Sub.H.B. No. 350 does not usurp judicial power in violation of the doctrine of separation of powers and, therefore, that the public-right theory, even if accepted, would not apply in this case to confer standing on relators. The Chief Justice begins this portion of his analysis by stating that the doctrine of separation of powers "is not one that is easily defined."

{¶ 137} This is a rather curious statement considering that the Chief Justice has himself found the doctrine sufficiently definable to render the "no-stay" provision of R.C. 4511.191(H)(1) unconstitutional. *Hochhausler*, *supra*, 76 Ohio St.3d at 463-464, 668 N.E.2d at 465-466. As the Chief Justice explained in *Hochhausler*:

"The principle of separation of powers is embedded in the constitutional framework of our state government. The Ohio Constitution applies the principle in defining the nature and scope of powers designated to the three branches of government. It is inherent in our theory of government ' "that each of the three grand divisions of the government, must be protected from the encroachments of the others, so far that its integrity and independence may be preserved." ' " (Citations omitted.) *Id.*, 76 Ohio St.3d at 463, 668 N.E.2d at 465-466, quoting *Fairview v. Giffee, supra*, 73 Ohio St. at 187, 76 N.E. at 866.

{¶ 138} Thus, "[t]he legislative branch has no right to limit the inherent powers of the judicial branch of the government." *Id.*, 76 Ohio St.3d at 464, 668 N.E.2d at 466.

{¶ 139} It is true, as the Chief Justice points out by quoting from *Fairview*,

*supra*, 73 Ohio St. at 186-187, 76 N.E. at 866, that it is "practically impossible to distinctly define the line of demarkation between the different departments of government," and that "no exact rule can be laid down, *a priori*, for determining, in all cases, what powers may or may not be assigned by law to each branch." But the reader should not be led to believe that definitional difficulty is tantamount to obscurity, or that a fundamental constitutional doctrine becomes any less significant or enforceable simply because it defies a single definitional statement.

{¶ 140} For example, in *State v. Van Gundy* (1992), 64 Ohio St.3d 230, 235, 594 N.E.2d 604, 608, this court observed that "[t]here is inherent difficulty in any attempt to define the abstract concept of reasonable doubt." Yet it could hardly be suggested that the requirement that the state prove guilt beyond a reasonable doubt is thereby vitiated. In fact, if definitional difficulty diminished the viability of a fundamental legal doctrine, we would not be having this discussion at all, for the concept of standing itself has been appropriately described as being among "the most amorphous in the entire domain of public law." Hearings on S. 2097, before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary, 89th Cong., 20 Session (1966) 498 (statement of Professor Paul A. Freund).

{¶ 141} Thus, while we cannot, and do not claim to, define the doctrine of separation of powers in all its particulars and for all cases, intents, and purposes, we can say without hesitation or equivocation that the General Assembly has no right to refuse to be bound by this court's interpretation of the Ohio Constitution.

**3**

**A Legislative Enactment that Denies the Binding Effect of This Court's Interpretation of the Ohio Constitution Is Violative Of the Doctrine of Separation of Powers**

{¶ 142} The dissent's remaining arguments advance the proposition that Am.Sub.H.B. No. 350 does not infringe upon judicial power. The primary thrust

of these arguments is that the General Assembly has the unrestricted right to reenact legislation that this court previously determined unconstitutional, and that the uncodified sections of the Act constitute no more than expressions of disagreement with our rulings comparable to the opinion of an individual legislator in a newspaper editorial. Interspersed throughout these arguments are various expressions of the theme that the enactment of unconstitutional statutes does not *per se* violate the doctrine of separation of powers.

{¶ 143} We agree that "the General Assembly has the right to enact legislation even if the constitutionality of that legislation is questionable." In fact, any holding which suggests otherwise would itself violate the doctrine of separation of powers as a derogation of the veto power and an intrusion into the legislative domain.

{¶ 144} However, it does not follow that the General Assembly has the right or the power to enact legislation that purports to release itself from the binding effect of this court's interpretation of the Ohio Constitution. While the General Assembly "is free to act upon its own judgment of its constitutional powers," *Pfeifer*, *supra*, 88 Ohio St. at 487, 104 N.E. at 533, it "cannot annul, reverse or modify a judgment of a court already rendered, nor require the courts to treat as valid laws those which are unconstitutional. If this could be permitted the whole power of the government would at once become absorbed and taken into itself by the legislature." *Bartlett*, *supra*, 73 Ohio St. at 58, 75 N.E. at 941. What the dissent fails to appreciate is that there is a marked difference between the initial enactment of a statute where its constitutionality is questionable and an attempt to nullify this court's opinions which have interpreted the constitutionality of a statute.

{¶ 145} With all due respect, the dissent's view of Am.Sub.H.B. No. 350 appears plausible only so long as the provisions of Am.Sub.H.B. No. 350 are shielded from scrutiny. Thus, the dissent characterizes the uncodified provisions of Am.Sub.H.B. No. 350 as mere "expression[s] of opinion as to constitutionality"

and suggests that "[t]he majority's indignation with the General Assembly's expressions of disagreement with prior decisions of this court appears founded on mere pique," but never actually examines the substance and content of Am.Sub.H.B. No. 350. Our previous examination reveals quite clearly that the General Assembly, in enacting Am.Sub.H.B. No. 350, has resolved to deny the power of this court to render a conclusive interpretation of the Ohio Constitution binding upon the other branches, and the arguments of the dissent serve not to dispute our analysis, but to block it.

**B**

**This Court's Decision in *Zupancic* Is Dispositive of Respondents' Arguments Going to the True Nature of the Relief Sought and the Availability of Alternative Remedies and Forms of Action**

{¶ 146} In his dissent, Chief Justice Moyer argues, as did respondents, that relators actually seek "a declaratory judgment that Am.Sub.H.B. No. 350 is unconstitutional, accompanied by an injunctive order," and that extraordinary relief is inappropriate because "an adequate remedy exists to determine the constitutionality of Am.Sub.H.B. No. 350 by way of review by the trial courts of this state, followed by appellate review in the courts of appeals, and ultimately by the Supreme Court of Ohio." The Chief Justice feels that we have "not satisfactorily addressed these fundamental arguments," but instead have disposed of these matters relying primarily on our decision in *Zupancic*, *supra*, 58 Ohio St.3d at 131-134, 568 N.E.2d at 1207-1209. The Chief Justice does not agree that "our decision in *Zupancic* justifies our exercising original jurisdiction in mandamus," and attempts to distinguish *Zupancic* on the basis that we considered the constitutional issue therein only because that issue "was determinative of the issue whether the respondent was under a clear legal duty to perform acts prescribed *by the challenged statute.*" (Emphasis *sic*.)

{¶ 147} Not only does *Zupancic* justify jurisdiction in this case, but perhaps

the most forceful argument in favor of our reliance on *Zupancic* is that the dissent is compelled to literally quote around the relevant discussion in that case to make our reliance thereon appear misplaced. The dissent quotes virtually all of the language in *Zupancic* at 132, 568 N.E.2d at 1208, from the paragraph that sets out the general requirements for bringing a mandamus action through the first of two paragraphs quoted from the syllabus of *State ex rel. Pressley v. Indus. Comm.* (1967), 11 Ohio St.2d 141, 40 O.O.2d 141, 228 N.E.2d 631. The dissent abruptly stops quoting at this point and resumes quoting midway through fn. 2, at 134, 568 N.E.2d at 1210. Everything in between, and the surrounding language in fn. 2, is omitted by the dissent, and it is this missing analysis that justifies jurisdiction in the present case.

{¶ 148} Thus, the court in *Zupancic* reasoned as follows:

" 'Where a petition stating a proper cause of action in mandamus is filed originally in the Supreme Court, and it is determined that there is no plain and adequate remedy in the ordinary course of the law by way of an appeal, the Supreme Court has no authority to exercise jurisdictional discretion and the refusal to exercise jurisdiction on the ground that either of the extraordinary remedies of statutory mandatory injunction (Section 2727.01 *et seq*., Revised Code) or statutory mandamus (Section 2731.01 *et seq*., Revised Code) is available in the Common Pleas Court, is constitutionally impermissible under the last sentence of Section 2 of Article IV of the Ohio Constitution. * * * ' (Citations omitted.) [Quoting *Pressley*, paragraph five of the syllabus.]

"In the case at bar, relators do not seek a prohibitory injunction. Although the relators' request is for this court to have the respondent refrain from exercising her statutory responsibility, the essence of their request is for respondent to abide by a former statute. In exercising our original jurisdiction we will necessarily have to address the constitutionality of R.C. 5727.15(C) and decide whether to prevent respondent from carrying out the task required under the present apportionment

77

statute; however, these decisions are only ancillary to our consideration of the writ itself on the merits.

"This court has previously held that a mandamus action may test the constitutionality of a statute. *State ex rel. Michaels v. Morse* (1956), 165 Ohio St. 599, 608, 60 O.O. 531, 536, 138 N.E.2d 660, 666 ('[t]he right of relator to question, by mandamus, the constitutionality of the statute is recognized in Ohio"); *State ex rel. Brown v. Summit Cty. Bd. of Elections* (1989), 46 Ohio St.3d 166, 167, 545 N.E.2d 1256, 1258. Moreover, where this court has found a statute unconstitutional it may direct the public bodies or officials to follow a constitutional course in completing their duties. See *State ex rel. Park Invest. Co. v. Bd. of Tax Appeals* (1971), 26 Ohio St.2d 161, 55 O.O.2d 338, 270 N.E.2d 342 (where this court in a mandamus proceeding directed the Board of Tax Appeals to comply with this court's earlier decision in the same case after finding two tax statutes unconstitutional).

"Furthermore, this court has recognized that the availability of a declaratory judgment or mandatory injunction action will not usually defeat a request for a writ of mandamus under certain conditions. Specifically, in *State ex rel. Fenske v. McGovern* (1984), 11 Ohio St.3d 129, 11 OBR 426, 464 N.E.2d 525, paragraphs one and two of the syllabus provide:

" 'The extraordinary remedy of mandatory injunction in the court of common pleas is not a plain and adequate remedy in the ordinary course of law precluding exercise of the original jurisdiction in mandamus conferred upon a court of appeals by Section 3, Article IV of the Ohio Constitution. (Paragraph six of the syllabus of *State ex rel. Pressley v. Indus. Comm.,* 11 Ohio St.2d 141 [40 O.O.2d 141, 228 N.E.2d 631], approved and followed.)

" 'The availability of an action for declaratory judgment does not bar the issuance of a writ of mandamus if the relator demonstrates a clear legal right thereto, although the availability of declaratory judgment may be considered by the

court as an element in exercising its discretion whether a writ should issue. However, where declaratory judgment would not be a complete remedy unless coupled with ancillary relief in the nature of mandatory injunction, the availability of declaratory injunction is not an appropriate basis to deny a writ to which the relator is otherwise entitled.'

"See, also, *State ex rel. Merydith Constr. Co. v. Dean* (1916), 95 Ohio St. 108, 123, 116 N.E. 37, 41 (for a remedy at law to be adequate, the remedy should be complete in its nature, beneficial and speedy); *State ex rel. Butler v. Demis* (1981), 66 Ohio St.2d 123, 124, 20 O.O.3d 121, 122, 420 N.E.2d 116, 117 (the question for this court to decide is whether an alternative remedy is adequate under the circumstances).

"In the present case relators would have a clear legal right to have respondent proceed under the former apportionment formula if we found R.C. 5727.15(C), in its present form, unconstitutional. Although relators could seek a declaratory judgment coupled with a mandatory injunction in order to achieve nearly the same result we find that the alternative remedy would not be as complete as a writ of mandamus. Ultimately, if any court would declare R.C. 5727.15(C) unconstitutional, the relators could still be forced to request a writ of mandamus in order to have respondent follow the apportionment formula requested in their complaint and/or a prohibitory injunction to enjoin respondent from exercising her statutory duties under the challenged statute. Accordingly, we hold that relators have properly brought this mandamus action before the court since all alternative remedies at law are wholly inadequate."

{¶ 149} Footnote 2 at this point in *Zupancic* states:

"We note that there are instances where exigent circumstances may call for this court to exercise its jurisdiction to order a writ of mandamus in cases where an appeal is an available remedy. However, the mere assertion by a relator that the appellate process is lengthy and the accelerated nature of mandamus is preferred

does *not* entitle the relator to such an extraordinary writ. In the present case, relators have failed to show why an action filed initially with the common pleas court and appealed therefrom would substantially impair their rights. However, due to the nature of the relief requested here (determination of the constitutionality of R.C. 5727.15[C], an order enjoining respondent from exercising her statutory duty, and an order compelling respondent to proceed with apportionment under former R.C. 5727.15[D]), we will address the request for the writ on its merits." (Emphasis *sic*.) *Id*., 58 Ohio St.3d at 132-134, 568 N.E.2d at 1208-1210.

**{¶ 150}** In the present case, as in *Zupancic*, relators do not seek a prohibitory injunction. Although the relators' request is for this court to have respondents refrain from exercising their statutory responsibility, the essence of their request is for respondents to abide by former law. In exercising our original jurisdiction we will necessarily have to address the constitutionality of Am.Sub.H.B. No. 350 and decide whether to prevent respondents from performing acts prescribed therein; however, these decisions are only ancillary to our consideration of the writ itself on the merits.

**{¶ 151}** Relators of course challenge the constitutionality of Am.Sub.H.B. No. 350 and seek to have it declared unconstitutional. However, in Ohio mandamus is a proper proceeding in which to question the constitutionality of legislative enactments.

**{¶ 152}** It is necessary to consider whether Am.Sub.H.B. No. 350 is unconstitutional in order to determine whether respondents have a clear legal duty to follow prior law. Concomitantly, relators would have a clear legal right to have respondents proceed under preexisting law if we found Am.Sub.H.B. No. 350 unconstitutional. The fact that relators might be able to seek a declaratory judgment accompanied by an injunctive order would not defeat jurisdiction in this case. The availability of such an action is not an appropriate basis to deny a writ to which relators are otherwise entitled.

{¶ 153} Relators themselves have no personal or private right to secure judicial review by way of the ordinary trial and appeals process. While the constitutionality of Am.Sub.H.B. No. 350 could be tested piecemeal by others who become personally affected by its provisions, we have already set forth the reasons that compel us to exercise jurisdiction at this time. Moreover, even in the absence of such compelling circumstances, we would still address the request for the writ on its merits, as we did in *Zupancic*, due to the nature of the relief requested (determination of the constitutionality of Am.Sub.H.B. No. 350, an order enjoining respondents from exercising their duties under Am.Sub.H.B. No. 350, and an order compelling respondents to proceed under former law).

{¶ 154} Thus, our decision in *Zupancic* is dispositive of respondents' arguments going to the true nature of the relief sought and the availability of alternate remedies and forms of actions, and our reliance thereon is entirely justified.

{¶ 155} Although the Chief Justice fully concurred in *Zupancic*, he now seeks to distance himself from this portion of its analysis. According to the Chief Justice, this portion of *Zupancic* "was an aberration" and nonbinding because it embodies a drastic change in the law not set forth in a syllabus. However, as the above quotation reveals, this portion of *Zupancic's* analysis relied primarily upon syllabus law that this court had already adopted in prior cases.

{¶ 156} The Chief Justice also reasserts the argument that in exercising our jurisdiction we are interfering with the jurisdiction conferred upon our inferior courts. In so doing, he actually questions our faith in our courts: "Does the majority have so little confidence in the courts of this state to make correct decisions that it must pluck important issues from them in order to ensure correctness?" Aside from the derisive nature of this question, the argument misses the point; our exercise of original jurisdiction in this case has nothing to do with ensuring decisional correctness.

{¶ 157} In *State ex rel. Huntington Ins. Agency, Inc. v. Duryee* (1995), 73 Ohio St.3d 530, 653 N.E.2d 349, an action in mandamus was brought originally in this court to compel the Superintendent of Insurance to act on a pending application for licensure as an insurance agent. The merits of the request for a writ were dependent upon the applicability of our prior decision in *Indep. Ins. Agents of Ohio, Inc. v. Fabe* (1992), 63 Ohio St.3d 310, 587 N.E.2d 814. However, at the time an action for declaratory and injunctive relief was pending in the Franklin County Court of Common Pleas challenging the constitutionality of *Fabe* and requesting that the superintendent be enjoined from taking any action on relator's application. The superintendent contended that the pending declaratory judgment action provided an adequate alternative remedy at law. We noted that relator could intervene in the declaratory judgment action and seek a mandatory injunction compelling the superintendent to act on its application. *Id*., 73 Ohio St.3d at 537, 653 N.E.2d at 356. Nevertheless, we granted the writ, finding that the pending declaratory judgment did not constitute an adequate remedy at law. In so doing, we explained that the "declaratory judgment action directly attacks the decision of this court in *Fabe* as requiring the superintendent to perform an unconstitutional determination * * *. *This court, rather than the common pleas court, seems to be better equipped to rule on the constitutionality of the application of its own opinion.*" (Emphasis added.) *Id*., 73 Ohio St.3d at 537-538, 653 N.E.2d at 356.

{¶ 158} Now consider the following. Two years prior to the enactment of Am.Sub.H.B. No. 350, this court held that "R.C. 2305.131, a statute of repose, violates the right to a remedy guaranteed by Section 16, Article I of the Ohio Constitution, and is, thus, unconstitutional." *Brennaman*, *supra*, 70 Ohio St.3d 460, 639 N.E.2d 425, at paragraph two of the syllabus. Nevertheless, the General Assembly enacted five statutes of repose in Am.Sub.H.B. No. 350, including R.C. 2305.131. In so doing, the General Assembly stated its intent to be bound by opinions contrary to *Brennaman*, and found not only that "the concept of a statute

of repose does not violate the remedy by due course of law and open courts provisions of Section 16 of Article I of the Ohio Constitution," Section 5(G)(1), but also that a failure to recognize the validity of a statute of repose would itself "violate the rights of certain defendants to due course of law under Section 16 of Article I of the Ohio Constitution," Section 5(G)(4). 146 Ohio Laws, Part II, 4021.

{¶ 159} Since the Chief Justice concurred in *State ex rel. Huntington Ins. Agency,* we fail to understand how he can perceive our actions in exercising jurisdiction in this case as interfering with the jurisdiction of our inferior courts or lacking confidence in them.

{¶ 160} A denial of standing or jurisdiction in this case would force a piecemeal determination over time of the various provisions of Am.Sub.H.B. No. 350, which is the dissent's admitted goal. However, the only discernible interest to be served by such action would be to protect this legislation from any timely, meaningful, and inclusive review. The full magnitude and scope of Am.Sub.H.B. No. 350 can be appreciated only upon a full review of all its provisions in a single action.

## C

### Am.Sub.H.B. No. 350 Must Be Held Invalid in Order to Effectuate the Purpose of the One-Subject Rule

{¶ 161} Justice Lundberg Stratton "would find that while Am.Sub.H.B. No. 350 addresses a plurality of topics, there is no disunity of the subject matter in Am.Sub.H.B. No. 350 because all these topics address the single subject of tort reform." She begins her analysis by relying on *Pim*, *supra*, 6 Ohio St. at 179-180, and the Proceedings and Debates of the Third Constitutional Convention of Ohio (1874), to show that the one-subject rule is directory in nature. She cites several of our previous decisions for the general propositions that the General Assembly should be given wide latitude in enacting comprehensive legislation, that the one-subject rule should be applied with extreme caution, and that legislation challenged

under the one-subject rule enjoys a strong presumption of constitutionality. Accordingly, she informs that "[i]t is against this daunting presumption of constitutionality that the majority finds that Am.Sub.H.B. No. 350 violates the one-subject rule."

{¶ 162} Aside from certain statements that attempt to impugn our analysis, we agree wholeheartedly with this portion of Justice Lundberg Stratton's dissent. Not only have we set forth these principles in our analysis, but, as Justice Lundberg Stratton observes, we have gone so far as to give a broad and extensive meaning to the term "subject" for purposes of applying Section 15(D), Article II of the Ohio Constitution.

{¶ 163} However, this is only half of the story. While the proposal to make the one-subject rule mandatory was rejected at the Third Constitutional Convention, nothing was done at that time to weaken the rule or remove the provision from the Ohio Constitution. The dissent correctly observes that "*Pim* emerged unscathed," but so did the rule itself; and history reveals that the one-subject rule was originally added to our Constitution in 1851 in order to place concrete limits on the power of the General Assembly to combine in one bill unrelated provisions that otherwise would have failed to gain majority approval. See 1 Debates of 1851, *supra*, at 351. See, also, *Dix*, *supra*, 11 Ohio St.3d at 142-143, 11 OBR at 438, 464 N.E.2d at 155. Unless we are willing to "abdicate [our] duty to enforce the Ohio Constitution," *id*. at 144, 11 OBR at 439, 464 N.E.2d at 157, the one-subject rule cannot be construed as wholly without teeth. "Inasmuch as this was the very evil the one-subject rule was designed to prevent, an act which contains such unrelated provisions must necessarily be held invalid in order to effectuate the purpose of the rule." *Id*. at 145, 11 OBR at 440, 464 N.E.2d at 157.

{¶ 164} The dissent's remaining arguments attempt to minimize the scope of Am.Sub.H.B. No. 350. Faced with the fact that Am.Sub.H.B. No. 350 indicates in its title, 146 Ohio Laws, Part II, 3868, that the bill encompasses "changes in the

laws pertaining to tort *and other civil actions*" (emphasis added), the dissent attempts to argue that "[i]n other words, Am.Sub.H.B. No. 350 is aimed at 'tort reform.' *Id.* at Section 8, at 4031." However, Section 8 does not purport to narrow the subject of the bill from "tort and other civil actions" to "tort reform." To the contrary, Section 8 confirms that the sections presented in the act relate "to the subject of tort *and other civil action reform as clearly enumerated in the title*." (Emphasis added.) The dissent's attempt to narrow the subject necessary to encompass all the provisions of Am.Sub.H.B. No. 350 is unavailing.

{¶ 165} The dissent also identifies "a core of * * * provisions" in Am.Sub.H.B. No. 350 that comprise five general topics, and reasons that Am.Sub.H.B. No. 350 must have the single subject of tort reform because these topics are typically discussed in law review articles under the subject of tort reform. However, this "core" consists of twenty-eight out of approximately one hundred provisions contained in Am.Sub.H.B. No. 350, and the dissent's admission that "this is not an exhaustive list of every topic in Am.Sub.H.B. No. 350" is an understatement. See fn. 6.

{¶ 166} The dissent then sets forth two other Acts that contain a wide range of topics and that have never been challenged under the one-subject rule. The dissent reasons that because these Acts have never been challenged under the one-subject rule, they must be constitutional, and concludes by way of analogy that Am.Sub.H.B. No. 350 must also be constitutional under the one-subject rule. It is a tenuous argument indeed that proceeds from the premise that a statute not under consideration must be constitutional because it has never been challenged, and concludes therefrom that another and different statute, which is under consideration, must also be constitutional.

{¶ 167} We have explained that Am.Sub.H.B. No. 350 affects some eighteen different titles, thirty-eight different chapters, and over one hundred different sections of the Revised Code, as well as procedural and evidentiary rules

and hitherto uncodified common law. We have set forth a multitude of topics corresponding to various sections contained in the bill. The LSC has analyzed the substance and content of the bill and categorized its sections as well. We have explained the vast scope and diversity of Am.Sub.H.B. No. 350, and pointed to a number of unnatural combinations contained therein as representative examples of the attenuated relationship among its provisions. Justice Lundberg Stratton remains unpersuaded by our analysis and that of the LSC, and argues that antidiscrimination law and seat belts are related topics.

{¶ 168} We respect the fact that Justice Lundberg Stratton and the other dissenting justices hold a view contrary to ours. However, our differences are fundamental. The dissent believes that "there is no limitation in this [the one-subject] rule pertaining to the breadth of the subject that the General Assembly may address. Torts are civil actions. A civil action by its nature encompasses any action that is noncriminal in nature, including tort actions. Clearly all the provisions that Am.Sub.H.B. No. 350 addresses are civil in nature."

{¶ 169} In our view, there is such a disunity of subject matter in Am.Sub.H.B. No. 350 that the subject "tort and other civil actions" is a ruse by which to connect blatantly unrelated topics. This denominated subject, in attempting to encompass the multifarious provisions in the bill, has become so strained in its effort to cohere diverse matter as to lose its legitimacy as a single subject. While the breadth of the subject that the General Assembly may address is certainly significant in scope and generality, this principle does not give the General Assembly such latitude as to include in one act blatantly unrelated matters, and we are not obliged to accept that any ingenious comprehensive form of expression serves to nullify disunity. If there were no limit on the breadth of the subject that the General Assembly may address in a single bill, the one-subject rule would have no meaning. As we have explained, if we accept the notion the dissent advances, "the General Assembly could conceivably revamp all Ohio law in two

86

strokes of the legislative pen — writing once on civil law and again on criminal law. The thought of it is staggering."

{¶ 170} Regardless of whether all of the provisions contained in Am.Sub.H.B. No. 350 are "noncriminal" or "civil in nature," they are so blatantly unrelated that the Act must of necessity be held invalid in order to effectuate the purpose of the one-subject rule.

{¶ 171} In light of all of the foregoing, we hold that Am.Sub.H.B. No. 350 is unconstitutional *in toto*, and the writs of prohibition and mandamus as prayed for by relators are hereby granted.

*Writs granted.*

DOUGLAS, F.E. SWEENEY and PFEIFER, JJ., concur.

PFEIFER, J., concurs separately.

MOYER, C.J., COOK and LUNDBERG STRATTON, JJ., dissent.

_____

**PFEIFER, J., concurring**.

{¶ 172} I fully agree with all that Justice Resnick has written in her powerful and compelling lead opinion. I write only because I am compelled to challenge the jurisdictional thesis advanced by Chief Justice Moyer in his dissent. Ours is an honest and civil, yet deep, disagreement as to this court's role in administering an efficient and orderly system of justice in this state.

{¶ 173} Twenty-seven thousand tort cases were filed in Ohio in 1998. That does not include those instances where causes of action occurred but were settled without legal action. We should not expect those numbers to decrease in succeeding years. Am.Sub.H.B. No. 350 is a global cloud over most of the cases and would-be cases arising after the bill's effective date of January 27, 1997. The numerous constitutional issues the bill raises will not be resolved until this court has addressed them.

{¶ 174} Why now and not later? Because we compound the damage to

injured parties and to the judicial system by delaying our decision. The General Assembly's most obvious flouting of the Constitution is its imposition of caps on damages in H.B. 350. It will not be a malingering plaintiff with a "soft tissue" injury who is most harmed by a delay in resolving that issue. Instead, profoundly injured Ohioans, those in the greatest need of a prompt resolution of their claims, are affected most.

{¶ 175} A majority of this court have determined to address the constitutional issues promptly and thereby prevent gridlock of our justice system. The granting of writs of mandamus and prohibition will remain extraordinary. Certainly, no one could argue that H.B. 350 is ordinary. It is sweeping, and it affects the administration of justice as a whole. If, as the Chief Justice predicts, persons unhappy with certain legislation will rush to this court to have it overturned by mandamus or prohibition, so be it. Such cases, if lacking compelling necessity for prompt attention will last only as long as it takes this court to say "no." Justice Resnick's opinion is absolutely clear that successful original actions in the Supreme Court will remain limited to exceptional circumstances that demand early resolution.

{¶ 176} Our resolution of this case has not been a rush to judgment. The petitions were filed in November 1997, and this court will announce its decision over eighteen months later. Certainly, on specific and limited issues, a delay caused by the thoughtful consideration of trial and appellate courts, allowing facts to play themselves out in unimagined ways, has great merit. However, today's decision regarding the constitutionality of H.B. 350 is not fact-driven. No specific variation of automobile accident or unique medical mistake would nullify the legislative constitutional assault that is today overturned. While delay does sometimes have value, the delay the Chief Justice advocates would be wholly unproductive. Petitioners have asked this court to discharge promptly our constitutional duty. Not to act would be to ignore the important role that this court plays in the lives of

Ohioans.

{¶ 177} We know from experience with bills similar to this one that the vagaries and vicissitudes of the justice system can lead to the needless extension of obvious injustice. Fifteen years passed between the enactment of former R.C. 2307.43, which provided a $200,000 limit in general damages on medical malpractice cases, and the eventual determination of unconstitutionality by this court in *Morris v. Savoy* (1991), 61 Ohio St.3d 684, 576 N.E.2d 765. Justice Wright in his majority opinion was somewhat incredulous that it had taken so long for the constitutional challenge to reach this court. But such is the ordinary, unpredictable course of justice. It sometimes needs shepherding, and this court must provide that guidance.

{¶ 178} I am reminded of the fires in Yellowstone National Park eleven years ago. Park officials, despite strong opposition, decided to let the naturally occurring wildfires run their course through the park. The fires raged beyond the officials' expectation. By the time they decided to fight the fires, it was too late. Mile upon otherworldly mile of scorched, limbless tree trunks stand as monuments to the park officials' well-meaning inaction. Restraint is not always admirable. Here it simply would be unjust.

———————————

**MOYER, C.J., dissenting.**

I

Introduction

{¶ 179} From the inception of this case the respondent common pleas court judges have argued that this original action fails to meet the long-established requirements for the granting of a writ of mandamus or writ of prohibition. Respondents urge that the relief sought by the relators is, in effect, a declaratory judgment and injunctive relief, which this court has no jurisdiction to grant. Respondents presented these arguments in two motions to dismiss, which remain

pending. Today the majority impliedly denies these motions by granting writs ordering the extraordinary relief sought by the relators.

{¶ 180} I would grant the motions to dismiss. The substantive issues concerning the constitutionality of Am.Sub.H.B. No. 350 simply are not appropriate for determination, by this or any Ohio court, in a proceeding seeking the extraordinary writs of mandamus and prohibition. Relator's complaint purports to seek a writ of mandamus or a writ of prohibition. Actually relators have successfully sought a declaratory judgment that Am.Sub.H.B. No. 350 is unconstitutional, accompanied by an injunctive order. The Ohio Constitution does not vest this court with original jurisdiction to issue either a declaratory judgment or injunctive relief. Section 2, Article IV, Constitution; *State ex rel. Pressley v. Indus. Comm.* (1967), 11 Ohio St.2d 141, 40 O.O.2d 141, 228 N.E.2d 631.

{¶ 181} The majority has not satisfactorily addressed these fundamental arguments challenging the propriety of proceeding to a substantive judgment of the constitutionality of Am.Sub.H.B. No. 350 in a mandamus or prohibition action. The majority provided no legal opinion to support its issuance of an alternative writ in February 1998. *State ex rel. Ohio Academy of Trial Lawyers v. Sheward* (1998), 81 Ohio St.3d 1226, 689 N.E.2d 971. Today the majority disposes of respondents' arguments going to the true nature of the relief sought, that is, declaratory judgment and injunctive relief, and the availability of alternative remedies and forms of actions, which precludes issuance of writs of mandamus and prohibition, by relying primarily on a single case, *State ex rel. Zupancic v. Limbach* (1991), 58 Ohio St.3d 130, 131-134, 568 N.E.2d 1206, 1207-1209, describing it as "dispositive." *Zupancic* does not, however, justify a determination of the constitutionality of Am.Sub.H.B. No. 350 in the case at bar.

{¶ 182} Significantly, the syllabus of *Zupancic* does not set forth any principles of law relevant to exercise of this court's original jurisdiction in mandamus or prohibition. See S.Ct.R.Rep.Op. 1(B) ("The syllabus of a Supreme Court opinion

states the controlling point or points of law decided in and necessarily arising from the facts of the specific case before the Court for adjudication"). See, also, *MTD Products, Inc. v. Robatin* (1991), 61 Ohio St.3d 66, 70, 572 N.E.2d 661, 665, Resnick, J., dissenting ("Such a drastic change in the law of workers' compensation should be made, if at all, in the syllabus. See Rule 1[B] of the Supreme Court Rules for the Reporting of Opinions  * * *.  In Ohio, the syllabus of a Supreme Court case states the law").

{¶ 183} Accordingly, *Zupancic* does not justify abandonment of principles of law that have been incorporated into syllabus law, stand contrary to the action of the court in *Zupancic*, and have governed the proper exercise of our original jurisdiction since Ohio became a state.  Application of those principles precludes our exercising original jurisdiction over the case at bar.

{¶ 184} The majority, in granting the writs sought by relators, has in effect said that long-established standards for determining whether a court should grant an extraordinary writ of mandamus or prohibition no longer apply.  Undoubtedly, those dissatisfied with enactments of the General Assembly (or of local legislative bodies) will no longer consider a writ of mandamus or prohibition to be an extraordinary remedy: instead they will consider them the remedy of choice, available upon simple assertion that the legislation contradicts previous judicial pronouncements, thereby violating the doctrine of separation of powers.  That is precisely what relators argued here.  We should expect, after the announcement of the majority opinion, that opponents of legislation will frequently choose to file such actions in this court, the court of last resort in interpreting the Ohio Constitution.  If the highest court of a state is to make a radical change in the rules governing the jurisdiction of its courts, the change should be the product of deliberative study and debate, perhaps even constitutional amendment, not the result of a single highly factious case, such as the one before us, in which very little rationale is offered for the change.

{¶ 185} The determinative issue herein is not the constitutionality of

Am.Sub.H.B. No. 350.  The issue is whether it is appropriate for this court to examine constitutional challenges to Am.Sub.H.B. No. 350 in the context of an extraordinary action rather than in the ordinary course of law.  Established legal principles exist to guide the courts in making such a determination, and require the conclusion that it is not appropriate.  I cannot condone the majority's willingness to sweep aside these established common-law principles, which date from the time of Elizabethan England,[16] in order to accelerate review of relators' claim that Am.Sub.H.B. No. 350 and its various provisions are unconstitutional.

**{¶ 186}** Moreover, I fear that today's decision will unnecessarily create tension between this court and the General Assembly.  The majority acknowledges in fn. 4 that the perception already exists of an " 'ongoing war between the tort policies and power of the judicial branch and those of the legislative and executive branches of state government,' " quoting Werber, Ohio Tort Reform Versus the Ohio Constitution (1996), 69 Temple L.Rev. 1155, 1156.  It disparages the General Assembly with faint praise, declaring that both the General Assembly and this court have "endeavored to comport with the principle of separation of powers and respect the integrity and independence of the other, that is, *until now*." (Emphasis added.)  It then less subtly accuses the General Assembly of challenging the existence of "the judiciary as a coordinate branch of government," of "openly challeng[ing] this court's authority to prescribe rules" of procedure, of "intrud[ing] upon judicial power," of "brushing aside" a prior decision of this court as though it were "of no consequence," thereby "tear[ing] at the fabric of our Constitution."

**{¶ 187}** In conclusion, the majority describes the adoption of Am.Sub.H.B. No. 350 as being in "disregard for the constraints imposed by the Ohio Constitution to curb legislative excesses," and as constituting a threat to judicial independence "reminiscent of a bygone era of legislative omnipotence existing prior to the adoption

---

16. See 1 Antieau, The Practice of Extraordinary Remedies (1987) 291, Section 2.00.

of the Constitution of 1851." It accuses the General Assembly of "boldly seiz[ing] the power of constitutional adjudication" and of forbidding "the courts the province of judicial review." Such statements are unwarranted and have no place in an opinion of this court.

{¶ 188} In arriving at these conclusions the majority has chosen, unnecessarily, to construe the actions and language of the General Assembly in the most negative light. In so doing, and in referring to the General Assembly with inflammatory and accusatory language, the majority appears to be throwing down the gauntlet to that coequal legislative branch of government. It is difficult to see how the majority's rhetoric will result in anything but detriment to the citizens of Ohio.

{¶ 189} It is time to end this war of words. Rather than responding in outrage to the adoption of Am.Sub.H.B. No. 350, thereby escalating the battle, this court should scrupulously adhere to its own constitutional role in accordance with established legal principles. Judicial restraint of this nature would be the best way to avoid a true challenge to the doctrine of separation of powers. Instead, in its zeal to invalidate all aspects of the comprehensive tort reform legislation incorporated in Am.Sub.H.B. No. 350, the majority has itself arguably affronted our constitutional system of government in a manner no less egregious than it attributes to the General Assembly.

II

The Complaint Does Not State a Claim Justifying Issuance of Relief in the Form of an Extraordinary Writ of Mandamus or Prohibition Because an Adequate Remedy Exists to Determine the Constitutionality of Am.Sub.H.B. No. 350 by Way of Review by the Trial Courts of this State, Followed by Appellate Review in the Courts of Appeals, and Ultimately by the Supreme Court of Ohio.

{¶ 190} In proceeding to judge the constitutionality of Am.Sub.H.B. No. 350, the majority has disregarded established legal principles governing the exercise of this court's jurisdiction in mandamus and prohibition.

**{¶ 191}** In order to be entitled to a writ of mandamus, the relator must establish (1) that the relator has a clear legal right to the relief prayed for, (2) that the respondent has a clear legal duty to perform the requested act, and (3) that the relator has no plain and adequate remedy at law. *State ex rel. Seikbert v. Wilkinson* (1994), 69 Ohio St.3d 489, 490, 633 N.E.2d 1128, 1129. See, also, R.C. Chapter 2731.

**{¶ 192}** As early as 1877 this court recognized that "[m]andamus is an extraordinary or supplementary remedy, which can not be resorted to if the party has any other adequate, specific remedy." *Chinn v. Fayette Twp. Trustees* (1877), 32 Ohio St. 236, 237. Although mandamus may be used to order a court to make a ruling if it has failed to do so in a timely manner, it should never be used to direct a court to rule in any particular way. *State ex rel. Ney v. Niehaus* (1987), 33 Ohio St.3d 118, 515 N.E.2d 914. This, of course, is what the writ issued today will do, in accordance with relators' demand that the respondents be ordered to disregard duly enacted Am.Sub.H.B. No. 350 and enjoined from ruling that Am.Sub.H.B. No. 350 is constitutional.

**{¶ 193}** The majority believes that our decision in *Zupancic* justifies our exercising original jurisdiction in mandamus in this case, despite the fact that the syllabus in *Zupancic* does not set forth principles of law governing the exercise of our original jurisdiction. I believe that *Zupancic* was an aberration to the extent that it implies that this court may determine, on a case-by-case basis, whether a constitutional challenge to any particular statute raises exigent circumstances sufficient to allow the court to proceed to examine that constitutional challenge, despite the existence of an available remedy by way of appeal. I therefore disagree that it is dispositive.

**{¶ 194}** In *Zupancic* the relators, Lake County Auditor Edward Zupancic and others, invoked the jurisdiction of this court seeking a writ of mandamus ordering the Tax Commissioner of Ohio to apportion funds according to a formula established by R.C. 5727.15(D) as it read prior to November 28, 1988, the effective date of a statutory amendment. They argued that the amendment rendered the apportionment statute

unconstitutional and unenforceable and that the Tax Commissioner therefore had no legal duty to apportion funds in compliance with the statute as amended.

{¶ 195} Although the *Zupancic* court did consider the constitutionality of amended R.C. 5727.15(D), it did so only because the constitutionality of the statute was determinative of the issue whether the respondent was under a clear legal duty to perform acts prescribed *by the challenged statute*.

{¶ 196} The *Zupancic* court did not repudiate the vast body of precedent emphasizing the limited nature of our original jurisdiction. Instead, it reinforced it. The court recognized that "in order for this court to grant a writ of mandamus we must find ' * * * that the relator has a clear legal right to the relief prayed for, that the respondent is under a clear legal duty to perform the requested act, and that relator has no plain and adequate remedy at law.' " *Zupancic*, 58 Ohio St.3d at 132, 568 N.E.2d at 1208, quoting *State ex rel. Westchester Estates, Inc. v. Bacon* (1980), 61 Ohio St.2d 42, 15 O.O.3d 53, 399 N.E.2d 81, paragraph one of the syllabus. The *Zupancic* court acknowledged its lack of jurisdiction to entertain injunction actions, quoting the following syllabus law:

" 'Original jurisdiction is conferred upon the Supreme Court by the state Constitution only in *quo warranto*, mandamus, *habeas corpus*, prohibition and *procedendo*. The court is without authority to entertain an action in injunction instituted therein.

" 'A writ of mandamus compels action or commands the performance of a duty, while a decree of injunction ordinarily restrains or forbids the performance of a specified act.

" 'A proceeding wherein an order is sought directing the Industrial Commission of Ohio to "cease disbursing" certain funds is essentially one in injunction and not mandamus, and is not within the original jurisdiction of the Supreme Court,' " *Zupancic*, 58 Ohio St.3d at 132, 568 N.E.2d at 1208, quoting *State ex rel. Smith v. Indus. Comm.* (1942), 139 Ohio St. 303, 22 O.O. 349, 39 N.E.2d 838,

syllabus.

**{¶ 197}** Further, the *Zupancic* court recognized that "this court will scrutinize pleadings in order to assure that actions filed by parties requesting mandamus relief are consistent with our prior decisions as to the form and substance of the relief sought." *Id.* The court quoted with approval holdings in which we acknowledged our responsibility to go beyond the pleadings to determine whether the desired relief was actually mandamus:

" 'Where a petition filed in the Supreme Court or in the Court of Appeals is in the form of a proceeding in mandamus but the substance of the allegations makes it manifest that the real object of the relator is for an injunction, such a petition does not state a cause of action in mandamus and since neither the Supreme Court nor the Court of Appeals has original jurisdiction in injunction the action must be dismissed for want of jurisdiction.' " *Id.*, quoting *State ex rel. Pressley v. Indus. Comm.* (1967), 11 Ohio St.2d 141, 40 O.O.2d 141, 228 N.E.2d 631, paragraph four of the syllabus.

**{¶ 198}** Mandamus is not a substitute for appeal. *State ex rel. Keenan v. Calabrese* (1994), 69 Ohio St.3d 176, 631 N.E.2d 119. It is clear that the *Zupancic* court accepted this principle. In *Zupancic*, the court observed that "the mere assertion by a relator that the appellate process is lengthy and the accelerated nature of mandamus is preferred does *not* entitle the relator to such an extraordinary writ." (Emphasis *sic*.) *Zupancic*, 58 Ohio St.3d at 134, 568 N.E.2d at 1210, fn. 2. See, also, *State ex rel. Willis v. Sheboy* (1983), 6 Ohio St.3d 167, 6 OBR 225, 451 N.E.2d 1200, paragraph one of the syllabus: "Where a constitutional process of appeal has been legislatively provided, the sole fact that pursuing such process would encompass more delay and inconvenience than seeking a writ of mandamus is insufficient to prevent the process from constituting a plain and adequate remedy in the ordinary course of law."

**{¶ 199}** The *Zupancic* opinion did draw a distinction between petitions in mandamus that, in effect, seek prohibitory injunctions against enforcement of duties

imposed by statutes (which the court recognized not to be cognizable in mandamus) and petitions that seek affirmative relief in the form of an order whose "essence is for respondents to abide by former law" (which the *Zupancic* court and the majority today deem appropriately addressed in a mandamus action). Such a distinction is merely semantical, as the only reason a respondent in mandamus would be under an affirmative duty to abide by former statutory or common law, rather than current statutory law, would be that the current statute is unconstitutional, hence void. Thus an order prohibiting an official from carrying out a duty imposed by a current statute, because it is unconstitutional, is of no substantive difference from an order mandating that the official carry out duties established by preexisting law, because the current statute is unconstitutional.

{¶ 200} The majority states that "[i]t is necessary to consider whether Am.Sub.H.B. No. 350 is unconstitutional in order to determine whether [respondent judges] have a clear legal duty to follow prior law." If this reasoning justifies exercise of original jurisdiction in mandamus in this case, then a mandamus action naming trial court judges respondents is available to entertain a constitutional challenge to any statute, because trial court judges are always under a duty to enforce only valid, constitutional laws. The majority appears ready to accept this premise, as it baldly states that "in Ohio mandamus is a proper proceeding in which to question the constitutionality of legislative enactments." But in its willingness to do so, the majority is sounding a death knell for the doctrine that mandamus may not be used where a declaratory judgment action offers an adequate remedy to challenge the constitutionality of a statute, initially in the trial courts, followed by appellate review.

{¶ 201} To the extent that the majority implies that mandamus may be necessary in order to ensure that the trial court apply the correct law, preexisting the adoption of Am.Sub.H.B. No. 350, to determine the case before it, as opposed to being necessary to ensure that the trial court performs its duty of proceeding to final judgment, the majority demonstrates that the true motive underlying relators'

petition is not to ensure that the respondent judges make rulings, but to ensure that the respondent judges make particular rulings, *i.e.*, that the law existing before Am.Sub.H.B. No. 350 remains in effect despite the adoption of that bill. Until today, mandamus has never been available to further such a goal.

**{¶ 202}** The clear legal duty of the respondent judges in the case at bar is to *make* rulings on cases filed in their courts — not to make *specific* rulings. The relators have made no showing that the respondent judges have refused to perform their duties. To the contrary, it is this suit itself that has precluded the respondents from exercising their duty of deciding tort cases pending in their courts. Relators are, in effect, improperly pursuing interlocutory appeals of rulings that the trial courts have not yet made, but that the relators suspect they may make.

**{¶ 203}** While it is true that the trial courts of this state have a clear legal duty to recognize and enforce only those statutes that are constitutional, that duty is not imposed by the challenged statutes created by Am.Sub.H.B. No. 350. This distinguishes the case at bar from *Zupancic*, and from the traditional "public duty/taxpayer" case in Ohio. The majority notes that the public-right doctrine (defined by the majority as permitting an individual to obtain a writ of mandamus to enforce a public right without the showing of a personal interest in the subject matter) dates from the last century as an exception to the personal-injury requirement of standing. However, the extension of that doctrine so as to equate public duty with enforcement of the doctrine of separation of powers, or with preservation of judicial power within the judiciary, is not a long-standing legal principle. The majority has indeed created a new theory of standing, and one not justified by *Zupancic*. Moreover, it is significant that, ultimately, the *Zupancic* court refused to issue an extraordinary writ.

**{¶ 204}** *Zupancic* thus does not provide a logical basis for this court to determine with *carte blanche* the constitutionality of any statute in an action seeking mandamus and prohibition. To the extent that *Zupancic* has any precedential value, it stands only for the proposition that the constitutionality of a statute can be determined

in mandamus where the specific duty at issue is imposed by the challenged statute.

{¶ 205} Even assuming, purely for purposes of argument, that *Zupancic* supports our jurisdiction to issue a writ of mandamus, it does not support our jurisdiction in prohibition. We recognized as early as 1915, in accordance with English common law, that a writ of prohibition is a " 'prerogative writ to be used with great caution and forbearance for the furtherance of justice, and for securing order and regularity in all the tribunals where there is no other regular and ordinary remedy.' " *State ex rel. Nolan v. ClenDening* (1915), 93 Ohio St. 264, 270, 112 N.E. 1029, 1031, quoting 32 Cyc. 598. Accordingly, the court recognized three conditions for the writ of prohibition:

" '1. That the court, officer or person against whom it is sought is about to exercise judicial or quasi-judicial power.

" '2. That the exercise of such power is unauthorized by law;

" '3. That it will result in injury for which no other adequate remedy exists.' " *Id.* at 271, 112 N.E. at 1031, quoting High, Extraordinary Legal Remedies, Section 764a.

{¶ 206} In *State ex rel. Garrison v. Brough* (1916), 94 Ohio St. 115, 113 N.E. 683, the court held as syllabus law that "[t]he writ of prohibition is an extraordinary legal remedy whose object is to prevent a court or tribunal of peculiar, limited or inferior power from assuming jurisdiction of a matter beyond its cognizance." The court further observed that prohibition "does not lie to prevent a subordinate court from deciding erroneously or from enforcing an erroneous judgment in a case in which it has a right to adjudicate. In all such cases the aggrieved party must pursue the ordinary remedies for the correction of errors." *Id.* at 123-124, 113 N.E. at 685.

{¶ 207} Moreover, the court aptly noted, in reference to the then recently adopted amendment to the Ohio Constitution vesting this court with jurisdiction in prohibition, that "[i]t was not contemplated by the people, when they adopted the amendment referred to, that this court would interfere with the proper exercise by

inferior courts of the functions and the jurisdiction conferred upon them under the provisions of the constitution." *Id.* at 129, 113 N.E. at 687. The court noted, "Established order and the respect due to properly constituted inferior courts require that it should never issue unless it clearly appears that the inferior court is about to exceed its jurisdiction. The writ cannot be made to serve the purpose of a writ of error, to correct mistakes of the lower court in deciding questions of law or evidence within its jurisdiction." *Id.* at 123, 113 N.E. at 685. These principles not only are of long standing, but have been accepted by this court and all courts of Ohio to the modern day. See, *e.g.*, *State ex rel. Tubbs Jones v. Suster* (1998), 84 Ohio St.3d 70, 701 N.E.2d 1002.

{¶ 208} The majority states that "this case has little to do with the jurisdiction of common pleas courts to initially determine constitutional questions or with preventing anticipated erroneous judgments." With all due respect to the majority, this case has everything to do with it. One need only identify the respondents (individual judges sitting in common pleas courts of Franklin, Cuyahoga, and Montgomery Counties) and the nature of the relief sought (enjoinder of those judges against following the statutory law enacted in Am.Sub.H.B. No. 350) to see the error of the majority's position.

{¶ 209} By proceeding itself to determine the constitutionality of Am.Sub.H.B. No. 350 in an action for extraordinary relief, the majority has usurped any opportunity of the trial courts to do so. In truth, the majority's substantive review today circumvents the constitutional authority of the courts of general jurisdiction in Ohio: the common pleas courts. Section 4, Article IV, Ohio Constitution.

{¶ 210} The majority correctly observes that inferior tribunals have no "power to reject the mandates of this court on constitutional questions or rules of court in favor of conflicting judicial mandates issued by the General Assembly." The trial courts of this state recognize their duty to follow binding precedents of this court on a daily basis. The relators have failed to demonstrate that the respondents would not adhere

to their duty were this court to deny the extraordinary writs they seek. That being so, the relators' contention that they are not improperly seeking the extraordinary remedy of prohibition to prevent incorrect rulings rings false.

{¶ 211} Certainly an accelerated process is not necessary to protect the legal rights of Ohio litigants. If the provisions of Am.Sub.H.B. No. 350 are indeed as blatantly unconstitutional as the majority deems them to be, they would undoubtedly be struck down by the trial and appellate courts of this state. The legal rights of our citizens are adequately protected in the ordinary course of law: determination of issues of fact and law by the trial courts, appellate review by the courts of appeals, and ultimately review by this court. Does the majority have so little confidence in the courts of this state to make correct decisions that it must pluck important issues from them in order to ensure correctness?

{¶ 212} The action before us does not state a claim in mandamus or prohibition, and should be dismissed for that reason.

III

Relators Lack Standing to Challenge the Constitutionality of Am.Sub.H.B. No. 350. Am.Sub.H.B. No. 350 Does Not Usurp Judicial Power in Violation of the Doctrine of Separation of Powers

{¶ 213} The concept of legal standing is based on the principle that courts decide only cases or controversies between litigants whose interests are adverse to each other, and do not issue advisory opinions. The long- and well-established rule is that "[t]he general and abstract question, whether an act of the legislature be unconstitutional, can not with propriety be presented to a court. The question must be, whether the act furnishes the rule to govern the particular case. What, then, is the effect and operation of the act upon the particular case? and does such effect and operation conflict with any provision of the constitution?" *Foster v. Wood Cty. Commrs.* (1859), 9 Ohio St. 540, 543. We have recognized that "it is the duty of every judicial tribunal to decide actual controversies between parties legitimately affected

by specific facts and to render judgments which can be carried into effect." *Fortner v. Thomas* (1970), 22 Ohio St.2d 13, 14, 51 O.O.2d 35, 257 N.E.2d 371, 372. It is thus the "settled judicial responsibility for courts to refrain from giving opinions on abstract propositions and to avoid the imposition by judgment of premature declarations or advice upon potential controversies." *Id.* Even as to proceedings seeking declaratory judgments, there must be a genuine controversy " 'between parties having adverse legal interests, of *sufficient immediacy and reality*.' " *Burger Brewing Co. v. Liquor Control Comm.* (1973), 34 Ohio St.2d 93, 97, 63 O.O.2d 149, 151, 296 N.E.2d 261, 264, quoting, with emphasis added, *Maryland Cas. Co. v. Pacific Coal & Oil Co.* (1941), 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826, 829. For a cause to be justiciable, there must exist a real controversy presenting issues that are ripe for judicial resolution and that will have a direct and immediate effect on the parties. *Id.* at 97-98, 63 O.O.2d at 151-152, 296 N.E.2d at 264-265.

{¶ 214} These relators do not have a true dispute, or controversy, with the individual common pleas court judges they have named as respondents. Nor have the relators alleged that the courts have failed to comply with any of the duties required of them. Indeed, the respondent judges have no interest in the ultimate determination whether Am.Sub.H.B. No. 350's provisions dealing with tort actions are constitutional and have not even briefed the issue.

{¶ 215} In addition, even assuming that the relators have standing, they nevertheless are not entitled to an extraordinary writ of mandamus or prohibition, because, as discussed above, they have not met the tests justifying the issuance of such writs. That the majority has deemed the relators to have standing does not excuse its failure to explain how the relators meet the established tests governing issuance of extraordinary writs, including the requirement that no other adequate legal remedy exists.

{¶ 216} The majority has rejected respondents' challenge to the standing of the relators to present and argue the issue of the constitutionality of the provisions of

Am.Sub.H.B. No. 350. The majority concedes that these relators have failed to demonstrate that they have suffered a "direct and concrete injury in a manner or degree different from that suffered by the public in general," the test generally used to determine standing. See, also, *Ohio Contractors Assn. v. Bicking* (1994), 71 Ohio St.3d 318, 643 N.E.2d 1088 (not-for-profit association of contractors lacked standing to assert prevailing-wage claims where no association members had been shown to have suffered actual and concrete injury).

{¶ 217} The majority has, however, in applying paragraph one of the syllabus to the facts of this case, created a new judicial doctrine pursuant to which any citizen is deemed to have standing to assert violation of the public right to preservation of judicial power and implementation of the doctrine of separation of powers.

{¶ 218} In paragraph one of the syllabus the majority holds that "[w]here the object of an action in mandamus and/or prohibition is to procure the enforcement or protection of a public right, the relator need not show any legal or special individual interest in the result," but will be deemed to have the required standing if the relator is an Ohio citizen. The majority then deems the preservation of judicial power in the judiciary to be the "public right" implicated in this case, and states that the General Assembly has jeopardized that public right in adopting Am.Sub.H.B. No. 350. However, the relator does not seek a writ of mandamus addressed to the General Assembly, but rather a writ addressed to judges of the common pleas courts, which are constituent parts of the judicial branch itself. The majority thus concludes that the issuance of a writ restraining the exercise of authority by the judicial branch thereby preserves judicial authority.

{¶ 219} Even accepting, *arguendo*, the majority's proposition that the actual-injury component of standing should be replaced by a public-right component in cases where it is asserted that a coequal branch of government has exceeded its constitutional authority, no such showing has been made in this case.

{¶ 220} I bow to no one in my respect for the doctrine of separation of powers.

Nevertheless, that doctrine is not one that is easily defined. In 1905, this court cogently observed that it "seems to be assumed that the separation of executive, legislative and judicial powers is complete and distinct under the constitution. Theoretically it is so; but in practice it is not so and never was so; and by the best modern writers on political science it is recognized to be practically impossible to distinctly define the line of demarkation between the different departments of government. This was well expressed in *Taylor v. Place*, 4 R.I. [324] 332: 'To some extent, and in some sense, each of the powers must be exercised by every other department of the government in order to the proper performance of its duty.' So likewise it was said by White, J., in *State ex rel. v. Harmon*, 31 Ohio St. 250, that 'The distribution of powers among the legislative, executive and judicial branches of the government, is, in a general sense, easily understood; but no exact rule can be laid down, *a priori,* for determining, in all cases, what powers may or may not be assigned by law to each branch.' * * * It is nevertheless true, in the American theory of government, that each of the three grand divisions of the government, must be protected from encroachments by the others, so far that its integrity and independence may be preserved." *Fairview v. Giffee* (1905), 73 Ohio St. 183, 187, 76 N.E. 865, 866.

{¶ 221} Relators contend that the General Assembly, in adopting Am.Sub.H.B. No. 350, violated the separation-of-powers doctrine by "overruling constitutional decisions of this Court, by overriding rules of procedure and evidence, and by interfering with access to the courts and the fair administration of justice." The majority may be correct that one or more specific provisions of Am.Sub.H.B. No. 350 are unconstitutional, but that is a determination that should be made upon a record developed in a trial court proceeding.

{¶ 222} The majority accepts relators' argument, and states further that "[i]n enacting and/or amending these sections [of Am.Sub.H.B. No. 350], the General Assembly chose to usurp this court's constitutional authority by refusing to recognize

our holdings" in prior cases. The majority says, for example, that "[t]here is simply no constitutional difference between R.C. 2323.54 and former R.C. 2307.43" (which limited recovery of general damages in medical claims to $200,000, and was held unconstitutional in *Morris v. Savoy* [1991], 61 Ohio St.3d 684, 576 N.E.2d 765). However, *Morris* does not state that any statute limiting general damages that might thereafter be enacted would, of necessity, also be deemed unconstitutional, nor could this court properly express an advisory opinion of this nature. Indeed, Justice Wright, who authored the lead opinion in *Morris*, determined at 690, 576 N.E.2d at 770, that the record before the court lacked evidence of a causal relationship between damage caps and medical malpractice insurance rate-setting. Justice Wright, however, implicitly acknowledged the possibility that the General Assembly may, subsequent to the announcement of the court's decision, attempt to draft a constitutional damage-cap statute: "Conceivably, such evidence may exist, but that would require a second trip to the General Assembly." *Id*. at 690, 576 N.E.2d at 771. I concurred in Justice Wright's opinion only because it rested upon this absence of evidence of the necessity of imposing damages caps.

{¶ 223} The majority states that the General Assembly has "direct[ed] our trial courts to apply a legislative rule that this court has already declared to be in conflict with the Civil Rules." But the General Assembly simply has not, and cannot, usurp judicial power by the act of adopting unconstitutional statutes. Passage of such legislation is instead no more than the undertaking of a vain act: where a court finds an Act to be violative of the Constitution, it is a nullity, and has been from the time of its enactment. *Cincinnati, Wilmington & Zanesville RR. Co. v. Clinton Cty. Commrs.* (1852), 1 Ohio St. 77. Accordingly, enactment of a law that may be, or even is likely to be, later deemed void by this court does not constitute a violation of the doctrine of separation of powers.

{¶ 224} The majority describes Am.Sub.H.B. No. 350 as including multiple provisions that are substantively indistinguishable from statutes previously struck

down by this court. Should the executive or legislative branches of government fail to enforce a direct order of this court, that failure would constitute a violation of the doctrine of separation of powers. But the General Assembly has not done this in enacting Am.Sub.H.B. No. 350. Adoption of a statute similar to one already struck down does not contradict a prior judgment of this court invalidating the first statute. The fact remains that two separate statutes are involved, passed in different sessions of the General Assembly, by different legislators, and having different effective dates. The majority in effect acknowledges that the various provisions of Am.Sub.H.B. No. 350 are not the same provisions as those previously struck down by this court, but are instead separate statutes. For example, the majority differentiates between "amended" R.C. 2317.45 and "preamended" R.C. 2317.45 and refers to Am.Sub.H.B. No. 350 as having amended former R.C. 2315.21(C) and renumbered it R.C. 2315.21(D)(1).

{¶ 225} Although it is desirable that a legislature make a good-faith effort to enact law that is constitutional, the General Assembly has the right to enact legislation even if the constitutionality of that legislation is questionable. Although I agree with the majority that it is beyond question that this court has authority to declare existing statutes unconstitutional, this court has no authority to control future legislative initiatives of the General Assembly. *Pfeifer v. Graves* (1913), 88 Ohio St. 473, 104 N.E. 529. It necessarily follows that this court does not have authority to order the General Assembly to refrain from enacting a similar statute. Our precedent recognizes this conclusion. The legislative branch of government "is free to act upon its own judgment of its constitutional powers. We have not even advisory jurisdiction to render opinions upon mooted questions about constitutional limitations of the legislative function * * *. The legislature, having delegated authority, prescribed and limited by the constitution, may exceed its authority by promulgating a law in conflict with the constitution." *Id*. at 487, 104 N.E. at 533.

{¶ 226} Of course, should the General Assembly adopt a law in conflict with the Constitution, it is the constitutional responsibility of the judicial branch of

106

government to protect the rights of persons who might be injured by that law. The judiciary accomplishes this by declaring the law unconstitutional and void. Such declarations are properly made only in actual cases or controversies between adverse parties. We do not have such a case or controversy before us today.

{¶ 227} The crux of the majority's position is that language of intent in Am.Sub.H.B. No. 350—and not the substantive provisions of the bill themselves—constitutes an attempt to " 'require the courts to treat [these laws] as valid,' " quoting *Bartlett*, 73 Ohio St. at 58, 75 N.E. at 941, and that the General Assembly "intends for the courts to treat these laws [*i.e.*, the various provisions of Am.Sub.H.B. No. 350] as valid notwithstanding our previous pronouncements." Relators characterize the sections of Am.Sub.H.B. No. 350 expressing legislative intent, outlined in fn. 7 of the majority opinion, as containing a "selective and disapproving review of this court's precedents," and describe the Act as a "frontal assault" on prior decisions of this court.

{¶ 228} Despite the majority's protests and indignation, the General Assembly's expression of disagreement with the constitutional analysis of a majority of this court in any given past case does not constitute a violation of the doctrine of separation of powers.

{¶ 229} While the statements of intent in Am.Sub.H.B. No. 350 obviously have raised the ire of the majority, those statements in no way affect the duty of the common pleas courts to follow the precedent established by this court or the substantive power of this court to follow, or reject, its precedents. The enactment of a statute similar, or even identical, to one previously found to be unconstitutional in no way affects the power of the judiciary to strike down the new statute as well. Judicial power is no more infringed by the General Assembly's statements of intent than by the expression of disagreement with our rulings by a legislator in debate over proposed legislation, or in a newspaper editorial. The majority's indignation with the General Assembly's expressions of disagreement with prior decisions of this court appears founded on mere pique.

**{¶ 230}** Moreover, the General Assembly's inclusion of language of intent, which the majority finds so egregious, is consistent with the General Assembly's duty to consider the constitutionality of proposed legislation before enacting it. The majority confuses determination of constitutionality with expression of opinion as to constitutionality. The General Assembly has not deemed its constitutional interpretation to be superior to that of the courts, and its statements of intent in Am.Sub.H.B. No. 350 simply are not binding on the judiciary.

**{¶ 231}** The majority has failed to recognize that a difference exists between legislative findings and judicial findings. The General Assembly chose to include commentary within Am.Sub.H.B. No. 350, stating, for example, that it "finds" that "[l]imiting the amount of compensatory damages for noneconomic loss in tort actions furthers [a] rational and legitimate state interest." Section 5(P)(4), 146 Ohio Laws, Part II, 4028. I strongly disagree with the majority's conclusion that adopting such findings constitutes a usurpation of judicial power. Rather, I find them to be in the nature of a statement of public policy with which one may agree or disagree. More important, I can find no provision in Am.Sub.H.B. No. 350 where the General Assembly enacted statutory law purporting to bind the judiciary to its findings, or provided that the trial courts of the state should enforce the legal opinions of the General Assembly itself over those of this court. Even if it had, such a statutory mandate would be legally ineffective.

**{¶ 232}** The intentions of the General Assembly are not controlling upon any Ohio court passing upon the constitutionality of legislation adopted by the General Assembly. Nowhere in Am.Sub.H.B. No. 350 has the General Assembly "purport[ed] to give any inferior tribunal the power to reject the mandates of this court on constitutional questions or rules of court in favor of conflicting judicial mandates issued by the General Assembly," as stated by the majority. Nor does the fact that these sections may ultimately be deemed unconstitutional mean that the General Assembly has unconstitutionally exercised its legislative power in adopting them.

{¶ 233} The majority's justification of relators' standing is based upon the following circular reasoning: Am.Sub.H.B. No. 350 is unconstitutional because it encroaches upon judicial authority; therefore relators have standing in mandamus and prohibition to assert that Am.Sub.H.B. No. 350 is unconstitutional because it encroaches upon judicial authority. Stated another way, the majority concludes that, since Am.Sub.H.B. No. 350 is unconstitutional, the trial courts of the state should be precluded from determining whether Am.Sub.H.B. No. 350 is unconstitutional. I cannot subscribe to such reasoning.

{¶ 234} The General Assembly simply has not violated the doctrine of separation of powers by enacting Am.Sub.H.B. No. 350. The General Assembly has the right to disagree with this court's prior rulings on constitutional issues, and, pursuant to its legislative authority granted by Section 1, Article II of the Ohio Constitution, to enact legislation that accords with its own constitutional views. This power exists even though ultimately, and in the context of judicial review in the ordinary course of law, those views must yield to the determinations of the courts.

{¶ 235} The relators do not have standing to litigate the substantive issues presented by this case under either a private-right or newly created public-right theory of standing. The case should be dismissed for that reason.

IV

Conclusion

{¶ 236} Respondent common pleas judges McMonagle and Fuerst correctly describe this action as one in which the "Relators would have this Honorable Court expand its own constitutional parameters and, on Relators' bald allegations of unconstitutional impact, with no benefit of a developed record below and without the benefit of a case or controversy directly involving Relators, issue an order declaring the duly enacted laws of this state to be unconstitutional and enjoining the application of the laws of this state." This court should decline such a misdirected invitation to

change Ohio jurisprudence in order to give relators the result they seek.

{¶ 237} Relators' requests for writs of mandamus and prohibition accompanied by an order of injunctive relief should be denied, and this action dismissed.

COOK and LUNDBERG STRATTON, JJ., concur in the foregoing dissenting opinion.

―――――――――――

**LUNDBERG STRATTON, J., dissenting**.

{¶ 238} I join in Chief Justice Moyer's well-reasoned dissent and would grant the two motions to dismiss pending in this case. This case should have never been accepted for review on the merits. The majority's acceptance of this case means that we have created a whole new arena of jurisdiction—"advisory opinions on the constitutionality of a statute challenged by a special interest group."

{¶ 239} In addition to the reasons set out in the Chief Justice's dissent, I also object to the majority's holding that Am.Sub.H.B. No. 350 violates the one-subject rule. I would find that Am.Sub.H.B. No. 350 encompasses only related topics pertaining to tort litigation.

Purpose of Am.Sub.H.B. No. 350

{¶ 240} The history of the one-subject rule reveals the weakness in the majority's position. The one-subject rule, set forth in Section 15, Article II of the Ohio Constitution, was first construed in 1856 in *Pim v. Nicholson* (1856), 6 Ohio St. 176. In *Pim*, the court considered whether an Act entitled "An Act in addition to the several acts in relation to the courts of justice and their powers and duties" violated the one-subject rule. The Act gave common pleas courts jurisdiction to enjoin collection of taxes, allowed appeals to the Supreme Court of decrees on title to real estate, and allowed appointment of assistant prosecuting attorneys. The appellee alleged that the Act violated the one-subject rule.

{¶ 241} The court in *Pim* determined that the purpose of the one-subject

rule was "to prevent combinations, by which various and distinct matters of legislation should gain a support which they could not if presented separately." *Id.* at 179. But the court in *Pim* held that the one-subject rule was intended only to operate as a rule for the General Assembly to apply to bills. *Id.* The court also determined that to expose every Act to judicial application of a mandatory one-subject rule would result in inconsistent decisions because of differing judicial philosophies, which would make legislating a formidable task at best. *Id.* at 180. Thus, the court held that the one-subject rule is directory. *Id.* Accordingly, *Pim* envisioned that the *only judicial safeguard* against a violation of the one-subject rule would be upon a finding of a *gross* and *fraudulent* violation of the rule. *Id.* Based upon this analysis, the court in *Pim* held that the Act did not violate the one-subject rule.

{¶ 242} Some delegates at the 1873-1874 Ohio Constitutional Convention proposed to amend the one-subject rule to make it mandatory rather than directory. 2 Proceedings and Debates of the Third Constitutional Convention of Ohio (1874) 285. However, concern grew among the other delegates over the wisdom of making the one-subject rule mandatory, as evidenced by the remarks of delegate S.O. Griswold:

"I am opposed to the adoption of this amendment, on the ground that it will lead to confusion and constant litigation of the question whether one subject is embraced in it or not. A subject of legislation may require various provisions, and men will be in doubt whether these different provisions come within the language of this clause. Under this general rule, the bill shall be made to express, by the title, all the provisions of the bill, and subjects of legislation have frequently such a wide range, and are so connected with other matters, that it is necessary, sometimes, to have your bill so enlarged that doubts will constantly be raised * * *." *Id*. at 284-285.

{¶ 243} Also opposing one such amendment was delegate William W.

West, who stated:

"[W]hat is a single subject, one subject? Take for example, the code of civil procedure. There is your title: a bill or an act to provide for a code of civil procedure. * * * Now, under that general title we may express that the general subject matter within that act is the civil practice; but there are an infinite number of subjects contained within that general subject, which might very properly be considered and regarded as distinct and different subjects matter [*sic*]. You have a statute of limitation. True, that has a general relation to the subject of practice, but it is a very distinct thing from the organization of a jury, and a very distinct thing from the law of evidence; and yet, they are all embraced within the same act. Now if we put into the Constitution the provision that no law shall contain more than one subject matter, may we not get into trouble and confusion about the matter? The subject of juries has a general relation to the matter of civil practice, a general relation to the subject matter of criminal practice; but it is a different subject entirely from the law of evidence. *Hence you will see that difficulties at once arise; so that under a statute of that kind it may be difficult to incorporate a great many subordinate subjects that have relation to the general subject.* * * * I fear very much that our generalization of subjects will exclude a hundred and one subordinate subjects that ought to be embraced in the same bill, or might very properly be embraced in the same bill.

" * * * *There are general subjects of legislation, and there are subordinate subjects, cognate to the general subject, that are properly embraced in the same bill; and yet if you put this in, I fear very much, that they cannot be included.*" (Emphasis added.) *Id.* at 291.

{¶ 244} The convention *voted against* the proposed amendments to the one-subject rule. *Id*. at 292, 1543-1544. *Pim* emerged unscathed. Until today, the one-subject rule remained directory and *only* a *gross* and *fraudulent* violation of the rule would render a statute or provisions thereof unconstitutional. See *Beagle v. Walden*

(1997), 78 Ohio St.3d 59, 676 N.E.2d 506; *State ex rel. Hinkle v. Franklin Cty. Bd. of Elections* (1991), 62 Ohio St.3d 145, 580 N.E.2d 767; *State ex rel. Dix v. Celeste* (1984), 11 Ohio St.3d 141, 11 OBR 436, 464 N.E.2d 153.

{¶ 245} The purpose of the one-subject rule is to prevent logrolling. *Id.* at 142, 11 OBR at 438, 464 N.E.2d at 155. Logrolling is the practice of several minorities combining their proposals as a single bill, thereby consolidating their votes to obtain a majority even though no single proposal would have passed separately. Rudd, "No Law Shall Embrace More Than One Subject" (1958), 42 Minn.L.Rev. 389, 391. A variant is the practice of attaching a rider to a popular bill, whereby the rider is passed on the coattails of the popular bill. *Id.*

{¶ 246} Yet "[a]ll bills are subject to debate, discussion, and amendment prior to being put to a vote." *Chambers v. St. Mary's School* (1998), 82 Ohio St.3d 563, 566, 697 N.E.2d 198, 201, citing Section 15, Article II of the Ohio Constitution. I believe that there is an important distinction between logrolling and the typical and necessary debate, compromise, and amendment of bills during the legislative process. Protecting this negotiation and revision from being negated by an overzealous application of the one-subject rule is further reason to apply the one-subject rule with extreme caution. The one-subject rule "was imposed to facilitate orderly legislative procedure, *not* to hamper or impede it." (Emphasis *sic.*) *Dix,* 11 Ohio St.3d at 143, 11 OBR at 438, 464 N.E.2d at 156.

{¶ 247} Another purpose of the one-subject rule is to "facilitate orderly legislative procedure" by excluding issues that are extraneous to the bill. Rudd, *supra,* 42 Minn.L.Rev. at 391. But this purpose "does not aim to eradicate devices designed to pervert the rule of majority vote but rather to eliminate *rambling, discursive deliberations*." (Emphasis added.) *Id.* The one-subject rule is "not directed at plurality but at disunity in subject matter." *Dix* at 146, 11 OBR at 441, 464 N.E.2d at 158. Multiple topics will not render a bill constitutionally infirm as long as the topics have a common purpose or relationship. *Hoover v. Franklin Cty.*

*Bd. of Commrs.* (1985), 19 Ohio St.3d 1, 6, 19 OBR 1, 5, 482 N.E.2d 575, 580. There must be a "common thread" that "ties each of these topics together." *Beagle,* 78 Ohio St.3d at 62, 676 N.E.2d at 507. Only "when there is an absence of *common purpose* or *relationship* between specific topics in an act and when there are *no discernable practical, rationale* or *legitimate* reasons for combining the provisions in one act, there is a strong suggestion that the provisions were combined for tactical reasons, *i.e.*, logrolling." (Emphasis added.) *Dix*, 11 Ohio St.3d at 145, 11 OBR at 440, 464 N.E.2d at 157. The majority even goes so far as to recognize that the " 'term "subject" within such constitutional provisions [one-subject rule] is to be given a broad and extensive meaning so as to allow legislature full scope to include in one act *all matters having a logical or natural connection.*' " (Emphasis added.) Quoting Black's Law Dictionary (6 Ed.1990) 1425.

{¶ 248} Finally, it must also be remembered that statutes maintain a strong presumption of constitutionality and that the challenger has the burden of overcoming this strong presumption of constitutionality. *State ex rel. Jackman v. Cuyahoga Cty. Court of Common Pleas* (1967), 9 Ohio St.2d 159, 161, 38 O.O.2d 404, 405, 224 N.E.2d 906, 908-909. *Only if it appears beyond a reasonable doubt* that the constitutional provision and the statute are *clearly* incompatible will the legislation be found unconstitutional. *State ex rel. Dickman v. Defenbacher* (1955), 164 Ohio St. 142, 147, 57 O.O. 134, 137, 128 N.E.2d 59, 63.

{¶ 249} It is against this daunting presumption of constitutionality that the majority finds that Am.Sub.H.B. No. 350 violates the one-subject rule. The majority states that "[w]hile an examination of any two provisions contained in Am.Sub.H.B. No. 350, carefully selected and compared in isolation, could support a finding that 'a common purpose or relationship exists among the sections, representing a potential plurality but not disunity of topics,' an examination of the bill in its entirety belies such a conclusion." I disagree.

{¶ 250} Am.Sub.H.B. No. 350 indicates that it encompasses "changes in the

laws pertaining to tort and other civil actions." Title, 146 Ohio Laws, Part II, 3868. In other words, Am.Sub.H.B. No. 350 is aimed at "tort reform." *Id.*, Section 8, at 4031; see, also, Werber, Ohio Tort Reform 1998: The War Continues (1997), 45 Cleve.St.L.Rev. 539. An examination of the substantive language of Am.Sub.H.B. No. 350 reveals that its provisions generally address the following topics: (1) immunity/liability,[17] (2) statutes of limitation/repose,[18] (3) damages,[19] (4) contributory tortious conduct,[20] and (5) joint and several liability.[21]

{¶ 251} While this is not an exhaustive list of every topic in Am.Sub.H.B. No. 350, it does address a core of its provisions and demonstrates the various topics represented in Am.Sub.H.B. No. 350. These provisions address issues that pertain to private, noncontract, civil actions by which the injured party may seek redress for his or her injuries. Such actions are commonly referred to as torts. See, *e.g.,* R.C. 2315.21(4); see, also, *Haag v. Cuyahoga Cty.* (N.D.Ohio 1985), 619 F.Supp. 262, 276-277. The subject of tort reform typically addresses such diverse topics as damages, products liability law, medical malpractice law, joint and several liability, wrongful death, etc. See, *e.g.,* Payne, Linking Tort Reform to Fairness and Moral Values (1995), Det.C.L.Mich.St.U.L.Rev. 1207, 1215-1236 (reviewing tort reform efforts including damage caps, medical malpractice, and products liability law); Michael, Joint Liability: Should it be Reformed or Abolished?—The Illinois Experience (1996), 27 Loy.U.Chi.L.J. 867 (discussion on tort reform and joint and several liability); Peck, Constitutional Challenges to the Partial Rejection and

---

17. See R.C. 723.01, 901.52, 2125.01, 2305.25, 2305.381, 2305.382, 2744.03, 2307.60, 2307.61, 2307.75, 2307.73, 2307.791.

18. See R.C. 2125.02, 2125.04, 2305.10, 2305.11, 2305.113, 2305.131, 2744.04.

19. See R.C. 2323.54, 2307.801, 2317.45, 1707.438, 2315.21.

20. See R.C. 2315.19, 2315.20.

21. See R.C. 2307.31, 4507.07(B).

Modification of the Common Law Rule of Joint and Several Liability by the 1986 Washington Tort Reform Act (1987), 62 Wash.L.Rev. 681, fn. 60 (discussing changes in joint and several liability as part of tort reform); Bovbjerg & Schumm, Judicial Policy and Quantitative Research: Indiana's Statute of Limitations for Medical Practitioners (1998), 31 Ind.L.Rev. 1051 (revision of statute of limitations was part of tort reform). Similarly, the provisions of Am.Sub.H.B. No. 350, while diverse, have the *common purpose* of reforming tort law. *Hoover,* 19 Ohio St.3d at 6, 19 OBR at 5, 482 N.E.2d at 580. And Am.Sub.H.B. No. 350 has the *practical* advantage of addressing all tort reform issues in a single bill rather than addressing them in a piecemeal fashion. As we have acknowledged, " '[t]he number of statutes required to effect a given purpose is not to be needlessly multiplied, nor is the scope of the required single subject to be unduly restricted.' " *Dix*, 11 Ohio St.3d at 143, 11 OBR at 438, 464 N.E.2d at 156, quoting 1A Sutherland, Statutes and Statutory Construction (4 Ed.1972) 2, Section 17.01. The issues addressed in Am.Sub.H.B. No. 350 are interrelated and reflect the give and take of lawmaking.

{¶ 252} Historically, the General Assembly has passed numerous bills that contain a wide range of topics and that have never been challenged under the one-subject rule. For example, in 1995 the General Assembly passed Am.Sub.S.B. No. 2, 146 Ohio Laws, Part IV, 7136. The purpose of Am.Sub.S.B. No. 2 as stated in its title was to "implement recommendations of the Criminal Sentencing Commission and to make other changes in the criminal law." *Id*. at 7138. Consistent with this purpose, Am.Sub.S.B. No. 2 changed the term of imprisonment for many criminal offenses. *State v. Rush* (1998), 83 Ohio St.3d 53, 55-56, 697 N.E.2d 634, 636. Am.Sub.S.B. No. 2 also made numerous substantive changes in various criminal statutes other than sentencing. For instance, Am.Sub.S.B. No. 2 (1) created the criminal act of possession of an unauthorized device for gaining

116

access to cable television,[22] (2) gave additional duties to the Ohio Criminal Sentencing Commission,[23] and (3) modified definitions in the Victims' Rights Law.[24]

{¶ 253} Am.Sub.S.B. No. 2 addresses numerous diverse topics including sentencing, defining new crimes, and amending current criminal statutes. Yet all these provisions clearly fit within the broad but single subject of changes in the criminal law. This is evidenced by the fact that Am.Sub.S.B. No. 2 has not been challenged under the one-subject rule.

{¶ 254} Even more relevant to the case at bar is Am.Sub.H.B. No. 1 enacted in 1987. 142 Ohio Laws, Part I, 1661. Its stated purpose was to "make changes in civil justice and insurance law, thereby reducing the causes of the current insurance crisis." *Id.* Its provisions (1) addressed damages in wrongful death actions,[25] (2) made changes in joint and several liability,[26] (3) codified products liability as a cause of action,[27] (4) made changes in contributory negligence and implied assumption of the risk,[28] (5) made changes in the doctor-patient privilege,[29] (6) defined how collateral benefits reduce compensatory damages,[30] (7) created the Ohio Commercial Insurance Joint Underwriting Association,[31] (8) amended the law

---

22. See R.C. 2913.041.

23. See R.C. 181.25.

24. See R.C. 2930.01.

25. R.C. 2125.02, 142 Ohio Laws, Part I, 1669, 1670.

26. R.C. 2307.33, *id*. at 1673.

27. R.C. 2307.71 to 2307.80, *id*. at 1674-1684.

28. R.C. 2315.19 and 2315.20, *id*. at 1686-1690.
29. R.C. 2317.02, *id*. at 1692-1694.

30. R.C. 2317.45, *id*. at 1694-1697.

31. R.C. 3930.03, *id*. at 1725.

governing frivolous conduct in litigation,[32] (9) provided for periodic payment of damages,[33] and (10) addressed numerous issues on administration and enforcement of insurance law.[34]

{¶ 255} Clearly, Am.Sub.H.B. No. 1 also addresses a diverse range of topics from creating a commercial underwriting association to making changes in the physician-patient privilege. Many of these topics addressed in Am.Sub.H.B. No. 1 regarding the *reform of the civil justice system* are similar to the topics addressed in Am.Sub.H.B. No. 350 at issue in this case. Yet Am.Sub.H.B. No. 1 was never challenged under the one-subject rule. I submit that the reason Am.Sub.H.B. No. 1 was not challenged is that its topics all pertained to the diverse, but single, subject of *reform of the civil justice system*. Likewise, Am.Sub.H.B. No. 350 addresses the diverse, but single, subject of *tort reform* and thus comports with the single-subject rule.

{¶ 256} The majority's own analysis is primarily composed of (1) a listing of sections of the Ohio Revised Code affected by Am.Sub.H.B. No. 350, (2) a comparison of eight sections of the Ohio Revised Code affected by Am.Sub.H.B. No. 350, and (3) a Legislative Service Commission ("LSC") analysis of Am.Sub.H.B. No. 350.

{¶ 257} This analysis remains unpersuasive. First, a mere listing of the provisions affected merely reveals that Am.Sub.H.B. No. 350 addresses a plurality of topics. The one-subject rule addresses disunity, not plurality.

{¶ 258} Second, the LSC analysis is unpersuasive. Similar to the majority's determination that the General Assembly's stamp of constitutionality on its own

---

32. R.C. 2323.51, *id*. at 1698-1700.

33. R.C. 2323.56, *id*. at 1700-1706.

34. *Id*. at 1706-1751.

legislation has no binding authority on this court, neither does the LSC analysis carry any weight as authority.

{¶ 259} Third, the majority's comparison of the sections of the Revised Code does not  reveal a disunity of subject matter.  Even an examination of the majority's own comparison of the changes made by Am.Sub.H.B. No. 350 in the seat belt law (R.C. 4513.263) and in the antidiscrimination law (R.C. Chapter 4112) does not reveal disunity.  The primary substantive amendment to the seat belt law (R.C. 4513.263) by Am.Sub.H.B. No. 350 allows evidence of nonuse of a seat belt to *diminish recovery* in a *tort action*.  146 Ohio Laws, Part II, 4012-4014.  The primary substantive amendment to the antidiscrimination law (R.C. Chapter 4112) is in R.C. 4112.99, which places a two-year *limitation of actions* on discrimination *tort cases*.  146 Ohio Laws, Part II, 4007.  Thus, these changes address *contributory tortious conduct* and *limitation of actions* in tort cases.  These are two of the five categories that pertain to tort law that I identified above.  Thus, taken in their proper context, the changes made in these sections of the Revised Code, pursuant to Am.Sub.H.B. No. 350, do not display a disunity of subject matter as the majority claims.

{¶ 260} Finally, the majority makes an interesting point.  Am.Sub.H.B. No. 350 addresses torts and *other civil actions*.  As has been recognized many times throughout this dissent, as well as in the majority opinion, the one-subject rule addresses disunity, not plurality.  In other words, there is no limitation in this rule pertaining to the breadth of the subject that the General Assembly may address. Torts are civil actions.  A civil action by its nature encompasses any action that is noncriminal in nature, including tort actions.  Clearly all the provisions that Am.Sub.H.B. No. 350 addresses are civil in nature.  Thus, even under this analysis, there is no violation of the one-subject rule.

{¶ 261} Accordingly, I would find that while Am.Sub.H.B. No. 350 addresses a plurality of topics, there is no disunity of the subject matter in

Am.Sub.H.B. No. 350 because all these topics address the single subject of tort reform.

Severability

{¶ 262} Although I disagree with the majority's determination that Am.Sub.H.B. No. 350 violates the one-subject rule, that determination still requires the court to attempt to sever the offending provisions. The majority unjustifiably gives short shrift to the argument that the unconstitutional provisions of Am.Sub.H.B. 350, if any, should be severed. Ironically, the majority declines even to attempt to sever any provisions because it believes that any attempt at "identifying and assembling what we believe to be key or core provisions of the bill would constitute a legislative exercise wholly beyond the province of this court." This conclusion does not comport with this court's historical approach to addressing unconstitutional provisions within a statute.

{¶ 263} Where a statute is found to be unconstitutional, the offending provisions do not nullify the entire statute, if the offending provisions are severable. See, *e.g., State ex rel. Maurer v. Sheward* (1994), 71 Ohio St.3d 513, 644 N.E.2d 369. In the rare instance where this court has found a violation of the one-subject rule, the court has severed the offending provisions. See, *e.g., Hinkle*, 62 Ohio St.3d at 149, 580 N.E.2d at 770; *State ex rel. Ohio AFL-CIO v. Voinovich* (1994), 69 Ohio St.3d 225, 230, 631 N.E.2d 582, 587; and *Simmons-Harris v. Goff* (1999), 86 Ohio St.3d 1, 711 N.E.2d 203.

{¶ 264} In *Hinkle*, the court determined that Section 7 of 1991 Am.Sub.H.B. No. 200, which changed the effective date of a previous amendment to liquor control law, violated the one-subject rule. 62 Ohio St.3d at 148, 580 N.E.2d at 770. The court severed Section 7. The remainder of Am.Sub.H.B. No. 200 contained provisions that (1) created an environmental division of the Franklin County Municipal Court, (2) added a common pleas judge in Lucas County, (3) revised municipal and county court law, and (4) changed the disposition of court

fines. *Id.* Obviously these provisions addressed a wide range of topics. Yet, in deference to the General Assembly, the court in *Hinkle* held that these provisions did "relate to a single subject" of the "state judicial system," and could therefore be saved by severance. *Id.* at 148-149, 580 N.E.2d at 770.

{¶ 265} In *State ex rel. Ohio AFL-CIO v. Voinovich,* 69 Ohio St.3d at 230, 631 N.E.2d at 587, the court held that 1993 Am.Sub.H.B. No. 107 was enacted specifically to "amend workers' compensation laws." Am.Sub.H.B. No. 107 (1) appropriated funds for the Bureau of Workers' Compensation, (2) appropriated funds for the Industrial Commission, (3) made structural changes to the Bureau of Workers' Compensation, (4) made changes to substantive provisions of the workers' compensation law, (5) made structural changes to the Industrial Commission, (6) restricted actions for employment intentional torts, and (7) created a child-labor exemption in the entertainment industry. The court held that the restrictions on the employment intentional tort and the creation of the child-labor exemption violated the one-subject rule. Despite the fact that the remaining provisions addressed such diverse issues as redefining the types of investments that the Administrator of Workers' Compensation is authorized to make[35] and changing the appeal process,[36] the court held that these remaining provisions came under the single subject of workers' compensation.

{¶ 266} Finally, in our recently issued opinion in *Simmons-Harris v. Goff* (1999), *supra,* this court exercised its power to sever an offending provision from a bill. The court found that the School Voucher Program was so dissimilar to the other provisions of the bill that logrolling had occurred, and therefore it violated the one-subject rule. The lead opinion stated that "[t]he School Voucher Program, which is leading-edge legislation, was in essence little more than a rider attached

---

35. R.C. 4123.44 and 4123.441, 145 Ohio Laws, Part II, 3138-3147.

36. R.C. 4123.511, *id.* at 3148-3153.

to an appropriations bill." *Id.*, 86 Ohio St.3d at 16, 711 N.E.2d at 215. Stating that *Dix* was modified only to the extent that appropriations cannot be a catchall subject upon which to defeat the one-subject rule, the lead opinion clearly stated that "[o]ur holding does not overrule *Dix.*" *Id.* at 17, 711 N.E.2d at 216. But the court severed only the offending program, not the entire appropriation bill.

{¶ 267} I believe that the provisions in Am.Sub.H.B. No. 350 relate to the single subject and common purpose of "tort reform." But if the majority truly found that any provisions in Am.Sub.H.B. No. 350 met the test of a fraudulent violation of the one-subject rule, it should have severed those offending provisions that have no common purpose with the subject matter of tort reform and left the remaining provisions as this court did in *Hinkle*, *Voinovich,* and *Goff*.

## Conclusion

{¶ 268} To hold that the topics addressed in Am.Sub.H.B. No. 350 grossly and fraudulently violate the one-subject rule because they have no common purpose, not only ignores the true nature of Am.Sub.H.B. No. 350 as a unified tort reform measure and its presumption of constitutionality, but also interjects a judge's personal philosophy in determining whether a bill addresses a single subject—an exercise that the *Pim* decision warned against. Because I believe that the topics addressed in Am.Sub.H.B. No. 350 have a common purpose of addressing the single subject of tort reform, I respectfully dissent.

MOYER, C.J., and COOK, J., concur in the foregoing dissenting opinion.

––––––––––––––––––